# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### ROANOKE DIVISION

|  |  |  |
|---|---|---|
| MOUNTAIN VALLEY PIPELINE, L.L.C., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 7:17-cv-492-EKD |
| | ) | |
| EASEMENTS TO CONSTRUCT, OPERATE | ) | |
| AND MAINTAIN A NATURAL GAS PIPELINE | ) | |
| OVER TRACTS OF LAND IN GILES COUNTY, | ) | |
| CRAIG COUNTY, MONTGOMERY COUNTY, | ) | |
| ROANOKE COUNTY, FRANKLIN COUNTY, | ) | |
| AND PITTSYLVANIA COUNTY, VIRGINIA, | ) | |
| et al., | ) | |
| | ) | |
| Defendants. | ) | |

**POST-HEARING BRIEF OF DEFENDANTS REPRESENTED BY APPALACHIAN MOUNTAIN ADVOCATES, THE LAW OFFICE OF ISAK HOWELL, JOHNS MARRS ELLIS & HODGE, BLANKINGSHIP & KEITH, LOLLAR LAW, AND WALDO & LYLE**

DEREK O. TEANEY (*pro hac vice*)
JOSEPH M. LOVETT (Va. Bar # 89735)
APPALACHIAN MOUNTAIN ADVOCATES, INC.
P.O. Box 507
Lewisburg, WV 24901
Telephone: (304) 793-9007
Facsimile: (304) 645-9008
dteaney@appalmad.org
*Counsel for Appalachian Mountain Advocates Defendants*[1]

ISAK J. HOWELL (Va. Bar. # 75011)
LAW OFFICE OF ISAK HOWELL
119 Norfolk Ave. SW # 330
Roanoke, VA 24011
Telephone: (540) 998-7744
Facsimile: (304) 645-9008
isak@howell-lawoffice.com
*Counsel for Law Office of Isak Howell Defendants*[2]

[1] Stephen W. Bernard, Anne W. Bernard, and New River Conservancy, Inc.

[2] John L. Barbazon and Laura S. Barbazon, Glenn C. Frith and Linda K. Frith, Trustees of The Frith Living Trust, Orren Richard Anderson and Geneva Bell Anderson, Jennifer L. Fraley, Andrew P. Buckman and Sharon H. Buckman, Frank H. Biscardi and Jacqueline S. Biscardi, Raymond Thomas Worrell and Linda D. Worrell, Heatherwood Properties, Inc., George Lee Jones, Nancy Lorraine Britton and Kenith Dwain Britton, Sr., Trustees of the Nancy Lorraine Britton and Kenith Dwain Britton, Sr. Living Trust, Michael S. Hurt and Mary Frances K. Hurt, Gordon Wayne Jones and Donna W. Jones, Roanoke Valley 4-Wheelers Association, Stephen W. Bernard and Anne W. Bernard, Lydia Laverne Brown, Keith M. Wilson and Mary K. Wilson,

CHRISTOPHER S. JOHNS (*pro hac vice*)
JOHNS MARRS ELLIS & HODGE LLP
805 West 10th Street, Suite 400
Austin, TX 78701
Telephone: (512) 215-4078
Facsimile: (512) 215-4078
cjohns@jmehlaw.com

*Counsel for JMEH Law Defendants*[3]

KEVIN DETURRIS (Va. Bar # 65400)
PAUL TERPAK (Va. Bar. # 20209)
BLANKINGSHIP & KEITH, P.C.
4020 University Dr., Suite 300
Fairfax, VA 22030
Telephone: (703) 691-1235
Facsimile: (703) 691-3913
kdeturris@bklawwva.com

*Counself for B&K Defendants*[4]

---

George Lee Jones, Steven C. Hodges and Judy R. Hodges, Vernon V. Beacham, Sr. and Vernon V. Beacham, II, Delwyn A. Dyer, Trustee of the Dyer Family Trust, and Delwyn A. Dyer, Trustee of the Dyer Living Trust, Clarence B. Givens and Karolyn W. Givens, Elizabeth Rogers Harrison, Wendell Wray Flora and Mary McNeil Flora, New River Conservancy, Inc., and Donna Rogers Altizer.

[3] John L. Barbazon, Laura S. Barbazon, Vernon V. Beacham, Sr., Vernon V. Beacham, II, Stephen W. Bernard, Anne W. Bernard, Andrew P. Buckman, Sharon H. Buckman, Roanoke Valley 4-Wheelers Association, Delwyn A. Dyer, Trustee of the Dyre Family Trust, Jennifer L. Fraley, Glenn C. Frith, Trustee, and Linda K. Frith, Trustee, of the Frith Living Trus, Heatherwood Properties, Inc., Wendell W. Flora, Mary M. Flora, Steven C. Hodges, Judy R. Hodges, George Lee Jones, Donna Rogers Altizer, Elizabeth Rogers Harrison, Karolyn W. Givens, Nancy Lorraine Britton, Trustee, and Kenith Dwain Britton, Sr. Trustee of the Nancy Lorraine Britton and Kenith Dwain Britton, Sr. Living Trust, Lydia Laverne Brown, Gordon W. Jones, Donna W. Jones, Keith M. Wilson, Mary K. Wilson, Raymond Thomas Worrell, Linda Worrell, Michael S. Hurt, Frances K. Hurt, Frank H. Biscardi, Jacquelin S. Biscardi, Orren R. Anderson, Geneva Bell Anders, and New River Conservancy.

[4] Benny L. Huffman; Jeremy Joseph Rice and Michelle Renee Rice; Roy A. Stevens; Daniel G. Myers and Deborah L. Myers; Bruce M. Wood and Jennifer M. Wood; Ronald B. Edwards, Sr., Gloria Martin, Terrance Edwards, Linda White, Ruby Penn, Janis E. Waller, Crystal Diane Edwards, and Penny Edwards Blue; George A. Craighead and Helen P. Craighead; Dale E. Angle and Mary A. Angle, Trustees of Dale E. Angle and Mary A. Angle Revocable Trust; Russell W. Lawless; Timothy and Megan Lawless; Frederick C. McGhee and Angela L. McGhee; Donald W. Long and Evelyn W. Long; Robert Alan Pegram; James Glynwood Haynes, Jr.; Travis Scott Lancaster and Tracy Lynn Taylor; Shelby A. Law; William David Board; Susan Board Myers, Kenneth Craig Board, and Nancy B. Flora; Oyler Land and Leasing, LLC; Trustees of Evangel Foursquare Church; Joseph Patrick Tomelty; Donald B. Barnhart; Helena Delaney Teekell; George Teekell and Helena Delaney Teekell, Trustees of Helena Delaney Teekell Trust; Robert W. Crawford and Patricia D. Crawford, Trustees Under the Crawford Living Trust, and Anita Hughes; Mark Cronk and Allison Cronk; Russell E. Callaway and Heide K. Callaway; Robert Wayne Morgan and Patricia Ann Morgan; Lucy A. Price; Mark A. Divers and Marie P. Divers; and Charles Flora and Stephanie Flora.

CHARLES M. LOLLAR (Va. Bar # 17009)
CHARLES M. LOLLAR JR. (Va. Bar # 88635)
LOLLAR LAW, PLLC
109 E. Main St., Suite 501
Norfolk, VA 23510
Telephone: (757) 644-4657
Facsimile: (757) 644-4659
chuck@lollarlaw.com
*Counsel for Lollar Law Defendants*[5]

STEPHEN J. CLARKE (Va. Bar # 72835)
WALDO & LYLE, P.C.
301 W. Freemason St.
Norfolk, VA 23510
Telephone: (757) 622-5812
Facsimile: (757) 622-5815
sjc@waldoandlyle.com
*Counsel for Waldo & Lyle Defendants*[6]

---

[5] Lonnie L. Lester and Judith P. Lester; George Robert Ferguson and Dana Michelle Ferguson; Michelle R. Lester; Teddy D. Crowe and Susan F. Crowe; Michael L. Lester and Teresa A. Lester; Carolyn A. Cunningham; Heirs of June Smith, Estate of Raymond Foster Smith, deceased, Patricia Devecka, Stephen R. Smith, Barry Scott Smith, Douglas F. Smith, David L. Smith, Frederick I. Apgar, Ruth Apgar Glock, Gregory M. Apgar and Angela H. Apgar; JoAnne A. Lofaro & Lisa J. Tincher, heirs and successors in interest to Anthony B. Novitzki, deceased; Russell R. Barksdale; Robert Matthew Hamm and Aimee Chase Hamm; Cletus Woodrow Bohon and Beverly Ann Bohon; Carolyn A. Cunningham; Jacquiline J. Lucki; Gail Dudley Smithers and Ginger K. Smithers; Rebecca Jane Dameron; Grace Minor Terry; Elizabeth Terry Reynolds; Robin B. Austin and Allen R. Austin; Kermit C. Crowe and Alva T. Crowe; Betty E. McCoy and Edward Conner; James Cabel Law and Carolyn Diana Eanes Law; Bruce M. Coffey and Mary E. Coffey; Emilie M. Owen and Richard Clark Owen; Richard Wayne Jones, Trustee of Bobby I. Jones and Richard Wayne Jones Revocable Trust; Martin G. Morrison and Patricia A. Boyd; Robert M. Jones and Donna Thomas Jones; Evelena Grubbs Rouse and Enzy Grubbs Anderson; Alvin E. Wray, Linda L. Wray, L. Benton Wray, Jr., and Diane S. Wray; H.W. Cox, Jr. and Janet DeGroff; May Ellen Rives, Sandra H. Lancaster; Guy W. Buford and Margaret S. Buford; John Coles Terry, III; Howard Thompson and Christine W. Thompson; Donald D. Apgar and Mildred M. Apgar; Hilah Parks Terry; Phyllis M. Hutton; Brian David Glock and Susan Elizabeth Glock Buch; Mark A. Pettipiece and Teresa J. Pettipiece; Sandra Townes Powell; Lois King Waldron and Lois Mabel Waldron Martin; Thomas W. Triplett and Bonnie B. Triplett; David J. Werner, Betty B. Werner, Ian Elliott Reilly, and Carolyn Elizabeth Reilly; Doris Marie Henry; Matthew D. Roller and Deanna S. Robinson; Mark E. Daniel and Angela D. Daniel; James T. Chandler and Kathy E. Chandler; Fred W. Vest; Brenda Lynn Williams; Juliana Bernholz and Irina Bernholz Siegrist; Thomas O. White, Jr., Trustee of the Beverly A. McLaughlin Testamentary Trust; Frank H. Terry, Jr.; and Elizabeth Lee Terry Reynolds.

[6] Ann Elizabeth Andrews; Dawn E. Cisek; Frances D.W. Collins; Doe Creek Farm, Inc.; Dowdy Farm, LLC; Eagle's Nest Ministries, Inc.; Estial Earl Echols, Jr. & Edith Fern Echols; Georgia Lou Haverty; Allison Hollopter and Gary Hollopter; Stephen D. Legge, David Legge, and Phyllis J. Legge; Glenn W. Loveless & June S. Loveless; Lenora W. Montuori; Lenora Montuori and Kristina Montuori Hillman, Trustees of the Antonio Montuori Family Trust; Nancye B. Motley; Occanneechi, Inc.; Samuel Hale Reynolds & Mary Sutton Reynolds; James D. Scott and Karen B. Scott; Clifford A. Shaffer and Teresa C. Hrubec; Sizemore, Incorporated of Virginia; Margaret McGraw Slayton and Michael Edward Slayton, Trustees of the Margaret McGraw Slayton Living Trust Dated December 14, 2001; Larry Thompson & Loreen Thompson; and David G. Yolton and Karen M. Yolton.

**TABLE OF CONTENTS**

INTRODUCTION........................................................................................................1

I. MVP's Request for Immediate Possession is Highly Disfavored
Because It Would Irrevocably Upend the Status Quo.............................................1

II. The Four Injunction Factors Do Not Weigh in Favor of MVP...................................3

    A. MVP Does Not Clearly Show It Will Suffer Irreparable Harm Without
    Immediate Possession...........................................................................................3

        1. Even if MVP Would Suffer Injury Without Immediate Possession,
        That Injury Will Not Be *Irreperable*...........................................................4

        2. MVP Has No Evidence It Will Suffer Irreparable Injury (Even Economic Injury)
        Without Immediate Possession......................................................................7

            a. MVP's Claim That it Will Lose Revenue Cannot Withstand Scrutiny.................7

            b. MVP's Claim That It Will Incur Contractor Penalties Cannot Support
            an Injunction....................................................................................9

            c. MVP's Claim Claim That it Will Incur Excessive Administrative Costs Cannot
            Withstand Scrutiny............................................................................14

        3. MVP Cannot Show that Denial of Early Entry Would *Cause* Its Alleged Injuries.....16

        4. MVP's Alleged Injuries Are Not "Imminent:" MVP Can Complete its
        Pipeline in Compliance With its FERC Certificate and Shipping Agreements
        Even if Access to Landowners' Properties Were Delayed Until November 2018
        or Later............................................................................................18

        5. MVP's Claimed "Intangible" Harm is Speculative........................................20

    B. Plaintiff Grossly Underestimates the Significant Burdens on Defendants......................21

        1. Early Possession Threatens Premature Destruction of Landowners' Properties
        and their Environmental and Cultural Resources.............................................21

            a. Although the Harm to the Non-Movant Need Not Be Irreparable In
            The Injunction Analysis, It Is In This Case...........................................21

            b. Evidence At The Motions Hearing Established Irreparable Harm to
            Numerous Landowners......................................................................23

i

   c. The Harm To the Landowners Is Not Simply A Question of Timing..................28

  2. Immediate Possession Threatens Landowners With Unnecessary,
   Long-Term Damage to Their Property Because of MVP's Continuing
   Route Adjustments......................................................................................30

 C. MVP Fails to Show It Is Likely to Succeed on the Merits................................34

 D. The Public Interest Weighs Against Granting MVP an Injunction....................34

  1. MVP's FERC Certificate Does Not Establish That Immediate Possession Serves
   the Public Interest......................................................................................34

  2. Constitutional Concerns Weigh Against An Injunction..............................36

  3. Environmental Concerns Weigh Against An Injunction.............................36

  4. Historical and Cultural Concerns Weight Against An Injunction...............37

  5. Due Process Concerns Weigh Against An Injunction................................39

II. MVP May Not Take Private Property Based On the Evidence in the Record Regarding the
 Appropriate Security.................................................................................................40

 A. NGA Caselaw Is Neither Persuasive Nor Binding...........................................42

 B. MVP Relies Wholly on Inadmissible Evidence................................................43

  1. Mr. Long's Testimony and Supporting Exhibits Are Inadmissible...........44

  2. Mr. Wagner's Testimony is Inadmissible..................................................47

 C. MVP Successfully Precluded Landowners from Inquiring Into its Financial Strength
  and Ability to Provide Just Compensation.......................................................49

 D. Alternatively, If the Court Were Inclined to Grant the Injunctive Relief Sought,
  It Should Require Further Discovery and Proceedings to Determine the Bond Amount..49

 CONCLUSION.............................................................................................................50

## INTRODUCTION

Landowners, identified above, by counsel, respectfully submit this Post-Hearing Brief pursuant to the Court's January 16, 2018 Order. ECF #304. As explained below, the evidence produced at the Motions Hearing on January 12 and 13, 2018, shows that Plaintiff Mountain Valley Pipeline, LLC ("MVP") has failed to establish the requirements for a preliminary mandatory injunction.

MVP seeks to permanently and summarily dispossess Landowners of their property through motions practice—before the Court has decided whether MVP has the right to take Landowners' property, before a neutral factfinder has had an opportunity to determine the proper amount of just compensation, and before MVP has established it is able to pay that amount. Importantly, no court has yet had the opportunity to review the merits of MVP's FERC Certificate or decided whether MVP has the right to take Landowners' property.

MVP is not entitled to an injunction because it has not satisfied the four injunction factors. MVP (1) fails to show it will suffer any injury, let alone any legally cognizable "irreparable injury," if denied immediate possession of Landowners' property. That failure alone requires denial of MVP's motion. Additionally, MVP (2) grossly understates the harm Landowners will suffer if their property is immediately taken; (3) overstates MVP's likelihood of success on the merits; and (4) misconstrues the public interest. Finally, there is no competent evidence before the Court on which it could determine the appropriate amount for a deposit or a bond. For those reasons, the Court should deny MVP's motion for immediate possession.

## I. MVP's Request for Immediate Possession Is Highly Disfavored Because It Would Irrevocably Upend the Status Quo.

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Natural Res. Defense Council, Inc.*, 555 U.S. 7, 24 (2008). To succeed, a plaintiff must (1)

1

make a "clear showing" that it will "likely" suffer irreparable harm absent the injunction; (2) "clearly demonstrate" that it will "likely" prevail on the merits; (3) demonstrate that the equities weigh in its favor; and (4) demonstrate that granting the injunction serves the public interest. *The Real Truth About Obama, Inc. v. F.E.C.*, 575 F.3d 342, 346-47 (4th Cir. 2009) (citing *Winter*, 555 U.S. at 20). "[A]ll four factors must be independently satisfied"; "no matter how likely the irreparable injury absent an injunction, a plaintiff can obtain a preliminary injunction only if he [also] demonstrates a clear likelihood of success on the merits, *and* the balance of equities favors him, *and* the injunction is in the public interest." *League of Women Voters of N. Carolina v. North Carolina*, 769 F.3d 224, 250 (4th Cir. 2014). The standard from *The Real Truth About Obama* is far more exacting than the one applied in *East Tennessee Natural Gas Co. v. Sage*, 361 F.3d 808, 828 (4th Cir. 2004) (which predated *Winter*), and relied on by MVP (*see* ECF # 7 at 12); that standard did not require a *clear* showing of *likely* irreparable harm, instead requiring only a *basic* showing of *possible* irreparable harm. Moreover, it allowed a strong showing of one factor to displace other factors. *Sage*, 361 F.3d at 828 (citing *Blackwelder Furniture Co. v. Seilig Mfg. Co.*, 550 F.2d 189, 193–96 (4th Cir.1977)).[1]

Additionally, preliminary injunctions that seek to alter the status quo rather than maintain it are *especially* disfavored. *See In re Microsoft Corp. Antitrust Litigation*, 333 F.3d 517, 525 (4th Cir. 2003) ("Our application of this exacting standard of review is even more searching when the preliminary injunctive relief … is mandatory rather than prohibitory …"); *Taylor v. Freeman*, 34 F.3d 266, 270 n.2 (4th Cir. 1994) ("Mandatory preliminary injunctive relief in any

---

[1] *The Real Truth About Obama* expressly overruled *Blackwelder*—and, by extension, aspects of *Sage*, which relied on *Blackwelder*—holding that its standard was too lax in light of *Winter*. *See* 575 F.3d at 346-47.

2

circumstance is disfavored and warranted only in the most extraordinary circumstances.").[2] Accordingly, MVP must show that "the facts and law clearly favor" the injunction. *Faulkner v. Jones*, 10 F.3d 226, 238 (4th Cir. 1993) (citation omitted). It fails to do so.

## II. The Four Injunction Factors Do Not Weigh in Favor of MVP.

### A. MVP Does Not Clearly Show It Will Suffer Irreparable Harm Without Immediate Possession.

A plaintiff seeking a preliminary injunction "must make a clear showing of irreparable harm . . . , and the irreparable harm must be neither remote nor speculative, but actual and imminent." *Cornwell v. Sachs*, 99 F.Supp.2d 695, 702 (E.D. Va. 2000) (punctuation and citations omitted). This means "[t]he movant must provide proof . . . that the harm is certain to occur in the near future"; "bare allegations of what is likely to occur are of no value since the court must decide whether the harm will *in fact* occur." *Bloodgood v. Garraghty*, 783 F.2d 470, 475-76 (4th Cir. 1986) (punctuation and citations omitted). *See also Direx Israel, Ltd. v. Breakthrough Med. Corp.*, 952 F.2d 802, 812 (4th Cir. 1991) (holding that irreparable harm must be "neither remote nor speculative, but actual and imminent" (internal quotation marks omitted)). Where a plaintiff seeks mandatory relief, the clear showing of irreparable injury must be "strong" because "changing the status quo is not favored." *Handsome Brook Farm, LLC v. Humane Farm Animal Care, Inc.*, 193 F.Supp.3d 556, 566 (E.D. Va. 2016). An unreported opinion of the Fourth Circuit suggests that "the appropriate standard" on the irreparable harm prong for a mandatory injunction is "clear and convincing" evidence. *Tiffany v. Forbes Custom Boats, Inc.*, 959 F.2d

---

[2] *See also Communist Party of Ind. v. Whitcomb*, 409 U.S. 1235 (1972) (Rehnquist, J., opinion in chambers) ("While a Circuit Justice of this Court apparently has authority under Supreme Court Rule 51 to grant . . . a mandatory injunction, usage and practice suggest that this extraordinary remedy be employed only in the most unusual case. In order that it be available, the applicants' right to relief must be indisputably clear."); *Transwestern Pipeline Co. v. 17.19 Acres of Prop.*, 550 F.3d 770, 776 (9th Cir. 2008) (holding in an NGA condemnation action that mandatory preliminary injunctions are "particularly disfavored in the law").

232, 1992 WL 67358 at *11 (4th Cir. Apr. 6, 1992) (unpublished). If the plaintiff fails to make a strong, clear showing of actual, imminent, irreparable harm, the preliminary-injunction analysis "never proceeds further." *Cornwell*, 99 F.Supp.2d at 702.

MVP fails to meet that standard. Its argument boils down to the claim that without early possession it may suffer financial losses and construction delays. That argument fails for multiple, independent reasons.

1. **Even if MVP Would Suffer Injury Without Immediate Possession, That Injury Would Not Be *Irreparable*.**

All of MVP's alleged irreparable injuries, even if real, would be economic in nature. But "'purely economic injury and economic loss alone, however substantial, does not constitute irreparable harm.'" *Mylan Pharm., Inc. v. U.S.F.D.A.*, 23 F.Supp.3d 631, 646 (N.D. W. Va. 2014) (quoting *Mylan Pharms., Inc. v. Thompson*, 207 F.Supp.2d 476, 485 (N.D. W. Va. 2001)); *see also Wisc. Gas Co. v. F.E.R.C.*, 758 F.2d 669, 674 (D.C. Cir. 1985) ("It is...well settled that economic loss does not in and of itself, constitute irreparable harm."). "[M]onetary loss is not irreparable unless it threatens a business's existence." *Children's Hosp. of the King's Daughters, Inc. v. Price*, 258 F.Supp.3d 672, 690 (E.D. Va. 2017); *see also Wisc. Gas Co.*, 758 F.2d at 674. MVP has not claimed or shown that the alleged monetary losses arising from later entry would threaten its existence. In fact, MVP admitted that MVP would likely survive to build its pipeline even if it has to wait until November 15, 2018 to begin construction. Day 1 Tr. at 209:21–23.

It has long been the law in the Fourth Circuit that "mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of [equitable relief], are not enough" to support equitable relief. *Di Biase v. SPX Corp.*, 872 F.3d 224, 230 (4th Cir. 2017); *Long v. Robinson*, 432 F.2d 977, 980 (4th Cir. 1970). Notwithstanding those holdings, MVP asserts that *Sage* stands for the proposition that financial harm to a pipeline developer is

4

sufficient to establish irreparable harm. Day 1 Tr. at 90:4–6. For that to be so, however, *Sage* would have had to abrogate *Long*, which it did not purport to do. As explained below, *Long* and *Sage* are not in conflict, but if there were a conflict between the two, *Long* would control as the prior opinion. "When published panel opinions are in direct conflict on a given issue, the earliest opinion controls, unless the prior opinion has been overruled by an intervening opinion from this court sitting *en banc* or the Supreme Court." *McMellon v. U.S.*, 387 F.3d 329, 332 (4th Cir. 2004) (*en banc*). Consequently, *Sage,* not an *en banc* ruling, could not overrule *Long*.

In all events, MVP misunderstands the import of *Sage*—an opinion issued under the now-rejected *Blackwelder* standard. *Sage*, 361 F.3d at 828 (citing *Blackwelder*). Under *Blackwelder*, a lesser showing of irreparable harm could support an injunction if a particularly strong showing of likelihood of success on the merits was made. 550 F.2d at 195. The Fourth Circuit abandoned that sliding scale in *The Real Truth About Obama*, recognizing that *Blackwelder*'s allowance for the mere demonstration of a possibility of irreparable injury upon a strong showing on the probability of success was "explicitly rejected [by the Supreme Court] in *Winter*[.]" 575 F.3d at 347. After *The Real Truth About Obama*, a party seeking an injunction must "make a clear showing that it is likely to be irreparably harmed absent preliminary relief." *Id.*

In *Sage*, the Fourth Circuit was not merely persuaded that the pipeline developer had a likelihood of success on the merits, it was certain that "[s]uccess on the merits for ETNG is . . . apparent." 361 F.3d at 829–30. Indeed, the landowners in *Sage* conceded as much. *Id.* Because the pipeline developer was *guaranteed* success on the merits, under the applicable *Blackwelder* standard, a *de minimis* showing of *possible* irreparable harm by the pipeline developer was sufficient. *Sage* must be read with that key point in mind. In other words, because the pipeline developer was guaranteed success on the merits, the Fourth Circuit did not have to conclude that

5

economic loss constituted irreparable harm.

That is particularly clear in light of *Sage*'s discussion of irreparable harm, in which it noted that the pipeline developer was "under an order from FERC to complete construction and have the pipeline in operation by January 1, 2005. It would not be possible to meet FERC's deadline without a preliminary injunction." *Sage*, 361 F.3d at 829. To the extent that there was irreparable harm present in *Sage*, it was the potential that the pipeline developer would miss the FERC-imposed completion deadline without early possession—not potential economic harm.[3]

After *The Real Truth About Obama* and *Winter*, pipeline developers must make a stronger showing of irreparable harm to obtain injunctive relief, no matter their likelihood of success on the merits. Because the analysis changed as a result of *Winter*, *Sage* cannot be applied to this case without modification. *McMellon v. United States*, 387 F.3d at 332. Specifically, MVP must clearly establish irreparable injury. Because, under Fourth Circuit precedent, monetary losses do not constitute irreparable injury, MVP falls short of carrying its burden.

Additionally, MVP claims that construction delays will render it "unable to meet its contractual requirements" and suggests that *Sage* found "inability to meet contractual obligations to be" a form of "irreparable harm." ECF # 6 at 14. That gloss on *Sage* is misleading. *Sage* found inability to meet contractual obligations to be irreparable harm because the plaintiff's "inability to satisfy these commitments would have negative impacts on its customers and the consumers they serve." *Sage*, 361 F.3d at 829. That is not the case here, as MVP has no customers that are not its own corporate affiliates. Ps' Ex. 1, FERC Certificate at 5–6 & nn. 12–16.

///

///

---

[3] As discussed further below, the injunction sought by MVP is not necessary to comply with the FERC completion deadline in this case, distinguishing the facts here from *Sage*, where the condemnor faced an expiring FERC certificate.

6

## 2. MVP Has No Evidence It Will Suffer Irreparable Injury (Even Economic Injury) Without Immediate Possession.

MVP's efforts to establish irreparable harm fall far short of the requisite clear, strong showing. Evidence presented at the motions hearing established that MVP's claimed harms are an unrealistic maximum projection—not actual, concrete, imminent threats. Day 1 Tr. at 197:2–4. That necessarily defeats MVP's preliminary-injunction request, and the Court need not proceed further. *See Winter*, 555 U.S. at 20–21 (holding irreparable harm must be likely, not merely possible). Even leaving this aside, all of MVP's claims of alleged harm still fail.

### a. MVP's Claim That it Will Lose Revenue Cannot Withstand Scrutiny.

MVP alleges it will lose $40-$50 million in revenue for every month the in-service date of the proposed pipeline is delayed. Day 1 Tr. at 169:16–19.[4] As a threshold matter, "lost revenue" is not the same as "lost profits," and MVP has not even attempted to show that delayed possession will cause the latter. That is, although MVP has identified its claimed *gross* revenue, it has not offered evidence of its monthly operation and maintenance costs, which are needed to determine the true *net* loss to MVP of a month's delay. The costs to operate and maintain a 303-mile long, 42" natural gas pipeline with four compressor stations are substantial. Without evidence of operation and maintenance costs, MVP's gross revenue numbers are meaningless.

Moreover, MVP's alleged sources of revenue are all from its corporate affiliates. MVP bases its claims of lost revenue on the revenue it would generate from shipping natural gas once the pipeline is in service. MVP has precedent agreements with five "shippers"—all of whom have a corporate familial relationship with the members of MVP, LLC. P's Ex. 1, FERC Certificate at 5–6 & nn. 12–16. As a result, to the extent that MVP "loses" revenue each month

---

[4] Plaintiff has redacted the shipping rates from the contracts under which it claims a right to a seven-figure monthly revenue (*see* P's Ex. 3, Precedent Agreements), leaving its numbers unsupported and falling short of a clear and convincing evidence standard.

7

that its pipeline is not in service, its members or their corporate affiliates *retain that same amount of money*. On this matter, a disadvantage to one member of the corporate family—lost revenue—is an advantage to another member of the same family—avoided shipping costs. Day 2 Tr. at 132:12–4. In other words, it is a wash. Because MVP has not been able to find end-users to buy the gas it would transport, MVP's owners will not actually "lose" anything with delays; their books will simply fail to reflect a transfer of money from one affiliated company to another.

That aside, there are many other reasons to reject MVP's claim that later possession will reduce its revenues. First, the MVP Project as a whole is premised on a 20-year transportation agreement that does not start to run until service begins. *See, e.g.*, P's Ex. 3 at Bates No. MVP_0008025, ¶5(d)(ii). MVP's "lost revenue" is, at worst, merely "delayed revenue." MVP will have 20 years of revenue from the pipeline, regardless of whether the pipeline is placed in service on its target date of December 2018, or at some later time. It will earn the delayed revenue on the back-end of the shipping contracts. Because, as MVP's project manager testified, the shipping rates under MVP's contracts turn, in part, on gas commodity prices (Day 1 Tr. at 170:14–25), a delayed beginning to the agreed 20-year transportation period could actually *benefit* MVP if gas prices rise over time, so MVP cannot demonstrate that delayed possession will decrease its revenues. Any such alleged harm is purely speculative.

MVP claims no contractual penalties under its shipping contracts; indeed it cannot. Those contracts expressly provide that MVP "shall not be liable in any manner to [its] Shipper[s] due to [its] failure to complete the construction of the Project within the timeframe contemplated herein." P's Ex. 3 at Bates No. MVP_0008028, ¶7(c)). Moreover, its shipping contracts expressly allow it until June 1, 2020, to place the pipeline in service and trigger the "Service

8

Commencement Date." *Id.* at Bates No. MVP_0008029, ¶8(b).[5] As discussed below, MVP has contemplated alternative schedules under which it begins tree felling and clearing in November 15, 2018, and still places its pipeline in service by November or December 2019. Ds' Ex. Nos. 3 & 4. In short, the terms of MVP's shipping contracts would not impose any harm on MVP—economic or otherwise—if MVP does not obtain the injunction that it seeks.

Finally, to the extent that MVP claims that delays in possession will cause it to lose the "time value of money" from delayed revenues, that effort fails to establish clear irreparable harm. MVP's sole harm witness admitted that he was not qualified to calculate such a figure and was not offering one. Day 1 Tr. at 176:13–23.

Merely suggesting that there is a concept known as the time-value-of-money is a far cry from providing "clear" and "strong" evidence of how much it will lose if its revenue stream is delayed. Moreover, whether such loss would occur—and the amount of such potential loss—is too speculative and uncertain to support an injunction. *Bloodgood*, 784 F.2d at 476. Further, as explained above, the "revenue" MVP could start "earning" absent delays is actually its affiliates' money. P's Ex. 1, FERC Certificate at 5–6 & nn. 12–16; Day 1 Tr. at 172:13–16. If that money is not sitting in MVP's coffers, it will sit in its affiliates' coffers, and MVP's ultimate owners can earn interest on it either way. In all events, gas prices may rise in the future, which may more than offset the (unquantified) time value of money that MVP may claim it will lose if its revenue stream is delayed. MVP has put on no evidence either way, making it wholly speculative for MVP to complain that later possession will cause it net losses.

### b. MVP's Claim That it Will Incur Contractor Penalties Cannot Support an Injunction.

MVP claims that construction delays may force it to pay up to $200 million in

---

[5] That allowance for a later date establishes that the MVP corporate family was content to assume the risk that the pipeline may not be in service by December 2018 as hoped.

"[p]enalties and delay charges" to its contractors. Day 1 Tr. at 191:9–15. Those delay charges and cancellation fees are included in the terms of the purchase orders issued under MVP's contracts with its three main contractors on the pipeline. MVP contends that the terms of those contracts and purchase orders allow MVP's contractors to collect incremental and cumulative charges based on delays in starting work on the project. Day 1 Tr. at 197:13–16. The evidence shows that MVP wildly exaggerates the amount of delay and cancellation charges it would actually pay, however.

As a threshold matter, MVP's alleged contractual penalties do not directly stem from lack of access to Landowner's property. Rather, they are self-inflicted by MVP's entry into construction contracts, and issuing purchase orders under them, that include the penalty provisions about which MVP now complains. MVP voluntarily entered into those contracts. Day 1 Tr. at 191:16–17. MVP executed one of the contracts, and issued multiple purchase orders thereunder, *before* it even received its FERC Certificate. *See, e.g.*, P's Ex. 5 at Bates Nos. MVP_0010080 & MVP_0010153; Day 1 Tr. at 196:2–5. All of the contracts were executed and purchase orders issued *before* MVP obtained access to all of the properties along the pipeline route. *See generally* P's Ex. 5. By doing so, MVP assumed the risk that the delay charges and cancellation penalties might kick in. Day 1 Tr. at 227:13–18. A party should not be permitted to enter prematurely into third-party contracts and then use those contracts as justification to seek a court-ordered alteration of the *status quo* to avoid penalties under those contracts. Equity does not demand that Landowners bear the burden of MVP's poor contractual choices and it does not allow MVP to justify early entry by strategically entering into contracts.

This case is like *Davis v. Mineta*, in which the Tenth Circuit, in the preliminary injunction context, rejected claims of financial penalties from delay as "self-inflicted" because

the parties prematurely entered into "contractual obligations that anticipated a *pro forma* result." 302 F.3d 1104, 1116 (10th Cir. 2002). Because the parties in question were "largely responsible for their own harm," such harm could not tip the balance of equities in their favor. *Id.* In *Long v. Robinson*, the Fourth Circuit held that "a party may not claim equity in his own defaults" when the claimed injury "is of their own making." 432 F.2d 977, 981 (4th Cir. 1970). Likewise, the Eighth and Third Circuits discount self-inflicted harm in the preliminary injunction analysis. *Sierra Club v. U.S.A.C.O.E.*, 645 F.2d 978, 997 (8th Cir. 2011); *Pappan Enters., Inc. v. Hardee's Food Sys., Inc.*, 143 F.3d 800, 806 (3d Cir. 1998).

Although the Fourth Circuit considered "self-made harm" in its injunction analysis in a false-advertising case, the harm that it considered was *harm to the non-moving party*. *Scotts Co. v. United Indus. Corp.*, 315 F.3d 264, 284 (4th Cir. 2002). It reasoned that giving less weight to self-made harm to a defendant in a false advertising case would essentially always tilt the balance of the harms to the plaintiff. *Id.* Its entire analysis was driven by the fact that the self-inflicted harm was the non-movant's harm. *Id.* at 284–85. In all events, the Court ultimately concluded that the harm to the non-movant was minimal, rendering its statements regarding the relevance of self-made harm dicta. *Id.* at 285.

Characterizing MVP's freely-bargained-for contractual liabilities as threats of irreparable injury invites real moral hazard. Doing so would allow firms to benefit from entering into premature contracts and from a failure to mitigate damages or to insulate themselves from liability. Those concerns are especially acute where the party claiming irreparable injury does so offensively rather than defensively. That is, rather than *resisting* an injunction on the basis of self-made harm, like the defendant in *Scotts Co.*, here MVP, as plaintiff, seeks to alter the *status quo* through a mandatory injunction. Accordingly, courts considering requests for preliminary

11

injunctions in light of traditional principles of equity agree that self-inflicted injuries should be appropriately discounted. *See, e.g.*, *Sierra Club*, 645 F.3d at 997 (Clean Water Act permit); *Salt Lake Tribune Pub. Co. v. AT&T Corp.*, 320 F.3d 1081, 1106 (10th Cir. 2003) (breach of contract); *San Francisco Real Estate Investors v. Real Estate Investment Future of Amer.*, 692 F.2d 814, 818 (1st Cir. 1982) (transfer of securities). To hold otherwise would allow parties to contractually obligate themselves to extraordinary penalties and then use those penalties to justify injunctive relief against innocent third parties.

Moreover, MVP's contractual penalties are highly unlikely to reach the $200 million mark, if they occur at all, rendering them legally irrelevant. *Winter*, 555 U.S. at 20 (alleged irreparable harm must be "likely"); *Bloodgood*, 783 F.2d at 475–76 ("bare allegations of what is likely to occur are of no value since the court must decide whether the harm will *in fact* occur"). MVP's project manager admitted in his testimony that the $200 million is an absolute maximum and that he had multiple ways to mitigate the contractual penalties MVP might incur. Day 1 Tr. at 196:23–25, 197:1–4, 198:3–6. Indeed, he admitted that he would be unlikely to retain his job if he allowed the contractual penalties to reach the $200-million mark. *Id.* at 197:21–25, 198:1–2.

According to the testimony of its project manager, MVP has voluntarily obtained access to approximately 85% of the parcels needed to construct the pipeline. *Id.* at 112:8–16. Mr. Cooper further testified that he could direct MVP's contractors to work on those parcels and substantially mitigate the delay charges that it would face under the purchase orders. *Id.* at 196:20–25; 197:1. MVP's construction contracts also contemplate "Move Around Events" in which its contractors have to relocate their labor and equipment because of MVP's inability to obtain access to a particular site. P's Ex. 5 at Bates No. MVP_0010162. Move Around Events do not entitle MVP's contractors to any time extensions, although they do allow the contractor to

increase certain contract pricing. *Id.* at Bates No. MVP_0010170.[6] Accordingly, MVP could also mitigate its delay penalties by directing its contractors to work on parcels out of sequence.

MVP's construction contracts also contemplate suspension of obligations on the basis of "Force Majeure Events," which are events and circumstance that are unavoidable or that could not be prevented or overcome by the reasonable efforts and due diligence of the Party claiming the event. P's Ex. 5 at Bates No. MVP_0010161. If, despite its reasonable efforts and due diligence, MVP were unable to obtain early possession in this action, it could invoke the Force Majeure event provisions of its contracts in Section 5.8 and/or issue a Change Order to modify the penalties in its purchase orders under Section 4.6. *Id.* at Bates Nos. MVP_0010172–73; MVP_0010170. Consequently, the Force Majeure provisions of MVP's contracts may allow it to eliminate any delay charges imposed by its prematurely issued purchase orders.

Moreover, MVP's construction contracts allow it to terminate the agreements "or any part thereof" "for its convenience and without cause, at any time" on 48 hours' notice. *Id.* at Bates No. MVP_0010175, ¶6.3.1. At the hearing, MVP's project manager could not identify anything in the purchase orders that would not allow MVP to exercise its option to terminate its contracts and purchase orders without penalty. Day 1 Tr. at 194:7–10. Thus, MVP could cancel its improvidently issued Purchase Orders and greatly mitigate its delay charges. Even if the purchase orders themselves carry *cancellation* charges, timely acceptance by MVP of those charges would avoid cumulative *delay* charges and substantially reduce MVP's proffered $200-

---

[6] MVP offered no evidence on the financial implications of working around unacquired parcels and did not quantify any increased costs. Rather, MVP merely asserted that it was impractical to "skip around a large number of properties." Day 1 Tr. at 151:9–11. Impracticality does not equate to irreparable harm, however. *Aurora Co-op. Elevator Co. v. Aventine Renewable Energy Holdings, Inc.*, No. 4:12-CV-3200, 2014 WL 895669, at *5 (D. Neb. Mar. 6, 2014) (impracticality is not the same as irreparable); *Citifinancial, Inc. v. Lightner*, Civ. No. 5:06-CV145, 2007 WL 3088087, at *2 (N.D. W. Va. Oct. 22, 2007) (agreeing that future inconvenience and inefficiency are too remote and speculative to constitute irreparable harm).

million penalty figure. MVP need not cancel the entire construction contract and could retain its contractors under Section 6.3. Even if it were forced to cancel the entire contract, MVP's project manager testified that it was possible he could retain other contractors or enter into a new agreement with the parties to any cancelled contracts. Day 1 Tr. at 274:11–17.

Finally, even if the "worst-case-scenario" were accurate, in the context of this massive project, $200 million is a small percentage of the total cost of the project and nearly within the contingency amount projected by MVP. MVP's management has approved capital expenditures in the amount of $3.7 billion for the construction of the pipeline. Day 1 Tr. at 165:9–12. Mr. Cooper testified that the $3.7 billion figure included approximately $180 million dollars in contingencies, and MVP's claimed $200 million in additional contract charges for delays is substantially similar to that approximately 5% contingency. *Id.* at 165:23–25, 166:1–24. In the scale of the $3.7 billion approved budget, the contractual penalties are the same size as the built-in contingency. Mr. Cooper further admitted that a 5 percent increase in projected construction costs is not unusual. *Id.* at 198:12–14. Even large monetary losses must be compared to the project's overall costs. For example, in *Air Transport Association of America, Inc. v. Export-Import Bank of the U.S.*, the district court held that "an extreme hypothetical" was not sufficient to constitute irreparable harm for preliminary-injunction purposes because it represented "less than 7% of [the movant's] business, a figure that hardly seems ruinous." 840 F. Supp. 2d 327, 338 (D.D.C. 2012). MVP's claimed penalties of approximately 5% in a $3.7 billion budget are likewise not ruinous, especially considering that Mr. Cooper testified that MVP will likely construct the project even without an injunction from this Court. Day 1 Tr. at 209:21–23.

   c. **MVP's Claim That it Will Incur Excessive Administrative Costs Cannot Withstand Scrutiny.**

MVP's final category of claimed irreparable injury are "project administration" costs of

approximately $40 million. Day 1 Tr. at 204:9–16. MVP's claims are exaggerated and do not support a finding of irreparable injury.

As with MVP's contractual penalties, its administrative costs are self-inflicted and therefore should be excluded from the irreparable harm analysis under *Long*, 432 F.2d at 981, and the other cases cited above. MVP's project manager testified that these costs are the carrying costs that MVP would incur to maintain the project in stasis until entry is allowed. Day 1 Tr. at 203:9–16. Those costs do not stem from lack of access to Landowners' properties, but rather they result from MVP's self-imposed schedule. FERC did not mandate that MVP start tree-cutting in the winter of 2017-2018. MVP decided to buy the materials that it needed for its preferred schedule of its own volition and it accepted the risk that it would not have early property access. *Id.* at 227:13–18. MVP's business decision to purchase materials early may not now be used to justify preliminary relief to which it would otherwise not be entitled.

Moreover, MVP provided no evidence outside of Mr. Cooper's testimony to support its claims regarding its administrative costs. For that reason, the Court should not give any weight to MVP's unsupported claims. Day 1 Tr. a 139:3–10.

MVP summarily claims that its $40 million figure is the aggregate of costs for retaining project staff, holding needed construction equipment, leasing warehouses and storage yards, capitalized property taxes, legal fees, "compression fees," protecting its purchased pipes from the elements, and retaining inspection staff. Day 1 Tr. at 133:9 to 134:24; 204:20 to 206:7. More than half of the $40 million is allocated to salary and benefits for retaining project staff during the delay, *id.* at 208:12–14, but MVP's project manager testified that MVP could receive services from its retained staff for activities other than caretaking services. *Id.* at 208:12–25, 209:1–3. In short, MVP's claimed administrative costs are just the cost of remaining a going

enterprise—or, according to MVP's project manager, are costs for personnel who could work on other issues for MVP or its affiliates. *Id.* Importantly, such administrative costs are in fact costs only to MVP's corporate affiliates; the project manager and other "staff" are the employees of corporate affiliates, not of MVP, LLC. *Id.* at 174:16–17. MVP cannot both rely on its nature as a technically independent corporate entity for purposes of its "lost" gross revenues, discussed above, and then treat all affiliates as one when it comes to bearing such administrative costs.

In any event, MVP's claimed $40 million in administrative costs are approximately 1% of its approved $3.7 billion capital budget. *Id.* at 209:5–7. Indeed, MVP's project manager admitted in his testimony that he would certainly advise his supervisors to proceed with a project based on a 1% increase in cost. *Id.* at 209:9–12. Further, MVP admits that it can mitigate its claimed administrative costs (*id.* at 209:25, 210:1–9), undermining MVP's assertion that those costs constitute irreparable harm. *Cf. HCI Techs., Inc. v. Avaya, Inc.*, 446 F.Supp.2d 518, 521 (E.D. Va. 2006) (preliminary-injunction movant's "ability to mitigate its losses" undercuts claim of irreparable harm). Accordingly, MVP's claimed additional administrative costs are not clear evidence of likely irreparable harm.

### 3. MVP Cannot Show that Denial of Early Entry Would *Cause* Its Alleged Injuries.

If a preliminary-injunction movant "will suffer the same harm with or without an injunction, th[at] "undermin[es] the need for injunctive relief in the first place." *Apple Inc. v. Samsung Elecs. Co., Ltd.*, 735 F.3d 1352, 1363 (Fed. Cir. 2013). *See also Wisc. Gas*, 758 F.2d at 674 (holding that "the movant must show that the alleged harm will directly result from the action which the movant seeks to enjoin."). That principle defeats MVP's motion.

MVP's corporate representative admitted in his testimony that later entry onto Landowners' properties is but one of many events that could equally delay the Project and

16

financially harm MVP: for example, (1) FERC could deny or delay the Notices to Proceed that MVP needs to proceed with construction or even tree-cutting;[7] (2) MVP has not yet even requested, let alone obtained, all the necessary permissions to proceed with construction or even tree-cutting on the properties it seeks to condemn;[8] (3) MVP has not yet received a Virginia permit for erosion and sediment control;[9] (4) the end users of the vast majority of the gas that would flow through the proposed pipeline are currently unknown;[10] and (5) MVP has not yet completed the §106 certification process under the National Historical Preservation Act.[11] MVP cannot pretend, therefore, that land acquisition via an injunction is the bottleneck that threatens its February 1, 2018 start date. Accordingly, MVP cannot show that a preliminary injunction will prevent its alleged irreparable harm, making the issuance of an injunction pointless. *Apple*, 735 F.3d at 1363; *Wisc. Gas*, 758 F.2d at 674. MVP's project manager testified that there were many potential causes for delay and, fatal to this injunction request, that there was "nothing unique" about a potential delay from a denial of early entry. Day 1 Tr. at 207:21–25, 208:1–10.

Indeed, these facts undermine MVP's credibility. At the outset of this action, MVP submitted a declaration from Mr. Cooper in support of MVP's motion for preliminary injunction in which he averred that "if MVP is unable to begin the tree clearing and construction activities of the MVP Project on the Landowners' properties by February 1, 2018, it will be unable to complete work according to its construction schedule, and it will incur additional delay fees and

---

[7] Day 1, Tr. at 183:5–8, 184:8–11, 185:1–5, 207:21–25, 208:1–6.

[8] Day 1 Tr. at 183:14–25, 184:1–11.

[9] P's Ex. 9 at Bates No. MVP_0013621; Day 1 Tr. at 190:16–25, 191:1.

[10] P's Ex. 1, FERC Certificate at 101 n. 286.

[11] P's Ex. 9 at Bates Nos. MVP_0013620–21; Ds' Ex. 2.

17

contractor costs." ECF # 4-1 at ¶ 24. But, as of January 120, 2018, *MVP has not even requested from FERC the permission that it needs to conduct tree cutting on any property that it seeks to condemn.*[12] February 1, 2018, is just 12 days away and MVP has not even submitted the paperwork—which FERC will take time to approve—that would allow it to begin tree-cutting and construction on condemnation proceeding properties. Even if this Court were to grant MVP the injunction that it seeks, MVP will likely find itself lacking the necessary approvals from FERC to do the tree-cutting it insists that it must begin, due to the time it takes FERC to approve notices to proceed. Day 1, Tr. at 183:5 to 185:5. FERC still has not approved the limited notice to proceed that MVP requested on January 5, 2018. Accordingly, it is unlikely that MVP can obtain the necessary approvals before February 1, 2018, particularly since it has not even requested those approvals. It is not access to Landowner's properties that jeopardizes MVP's schedule, it is its own failure to navigate the FERC process.

**4. MVP's Alleged Injuries Are Not "Imminent:" MVP Can Complete its Pipeline in Compliance With its FERC Certificate and Shipping Agreements Even if Access to Landowners' Properties Were Delayed Until November 2018 or Later.**

MVP's FERC-imposed project-completion deadline is October 13, 2020—still roughly 33 months away. P's Ex. 1, FERC Certificate at 108. That takes this case beyond the purview of *Sage*, where harm was imminent because the pipeline company had just nine months to complete construction and would miss that FERC-imposed deadline without immediate possession. 361 F.3d at 829. MVP's contingency plans and ability to mitigate delays (discussed above) further underscore the remoteness of its alleged harm.

MVP emphasizes that it must complete tree clearing by March 31, 2018 to protect certain bat species (Day 1 Tr. at 122:2–17), but the tree-clearing window will re-open on November 15,

---

[12] Day 1 Tr. at 180:3–6, 183:14–17. Landowners request that the Court take judicial notice of the FERC docket and the fact that MVP's three requested notices to proceed are not applicable to properties that MVP seeks to condemn.

2018. *Id.* at 122:25, 123:1. Thus, if MVP is unable to complete tree clearing by March 31, 2018, it can resume that activity on November 15, 2018—a delay of less than eight months. Even if there were a 9-month delay in tree-clearing, MVP could still complete all activities on pipeline construction and reclamation long before FERC's project-completion deadline of October 13, 2020. Accordingly, MVP's assertion that land-acquisition delays will impact its ability to meet project deadlines is untrue.

The only MVP project deadline that is not self-imposed is FERC's project-completion date of October 13, 2020. P's Ex. 1, FERC Certificate at 108. Denying preliminary relief would not jeopardize that deadline. As a result, MVP is not facing the same kind of irreparable harm that the Fourth Circuit recognized in *Sage*, where delays threatened the pipeline developer's ability to meet its FERC deadline. 361 F.3d at 829. The schedule that MVP insists it needs equitable relief to execute is a mere preference and is not mandated by any governmental agency.

The evidence adduced at the motions hearing establishes that, if MVP were to begin tree-cutting when the species window reopens in November 2018, it would place its project in-service by late 2019, and complete reclamation before October 2020. Day 1 Tr. at 215:14–17, 218:11–13; Ds' Ex. Nos. 3 & 4. Mr. Cooper testified that, in the summer of 2017, MVP created at least two alternative schedules for implementation in the event that it was unable to timber the pipeline route during the winter of 2017-2018. Day 1 Tr. at 210:25, 211:1–11. Under one of those schedules, MVP would conduct construction activities on its compressor stations (where it owns the property that it needs) during 2018, conduct tree-cutting on the pipeline route beginning November 15, 2018, and achieve an in-service (or "turn in line") date of November 28, 2019. Ds' Ex. 3. Under the other schedule, MVP could delay *all* activities on pipeline construction until commencing tree-cutting on November 15, 2018, and still achieve an in-

service date of December 7, 2019. Ds' Ex. 4. Mr. Cooper testified that, under either of those schedules, MVP would complete reclamation prior to October 2020, and neither of those schedules jeopardized either FERC's October 13, 2020 deadline or the June 1, 2020 in-service date deadline in MVP's shipping agreements. Day 1 Tr. at 214:13–25, 215:1–17, 218:11–15. MVP's project manager also admitted in his testimony that MVP would most likely build the pipeline under one of those schedules in the event that it could not gain access to all properties in time to cut trees in the winter of 2018. *Id.* at 209:13–23.

In short, the emergency claimed by MVP is a false alarm. MVP can comply with all species-protection restrictions and meet the FERC-imposed completion date even if it does not obtain access to Landowners' properties now. The only "deadline" that it will miss is its self-imposed in-service date of late 2018. But MVP voluntarily assumed that risk when it designed its preferred schedule—with full knowledge that that schedule might be unworkable at least as early as the summer of 2017. Landowners do not deny that MVP might find immediate possession convenient. Convenience, however, is not the legal standard for the extraordinary equitable relief of a mandatory preliminary injunction. *See, e.g.*, *Citifinancial, Inc. v.* Lightner, Civ. No. 5:06-cv-145, 2007 WL 3088087, at *2 (N.D. W. Va. Oct. 22, 2007) (agreeing that "future inconvenience and inefficiency" are "too remote and speculative to constitute irreparable harm"). Instead, MVP must demonstrate that it needs an injunction to prevent imminent, non-speculative, irreparable harm. *Dickson v. Morrison*, 187 F.3d 629 (4th Cir. 1999). It has failed to do so.

**5. MVP's Claimed "Intangible" Harm is Speculative.**

Mr. Cooper testified that MVP would suffer certain "intangible" harm from delay, described as harm to it "ability to elicit other business from other shippers that may wish us to become their transporter and build them a project. It will bring great doubt in their mind that we

can complete the project as contracted. It also has the ability to make it difficult for us in our negotiations when we resume with the other pipeline contractors to come back." Day 1 Tr. at 139:20 to 131:1. Mr. Cooper thus attempted to identify two forms of alleged intangible harm: (1) increased difficulty in soliciting shippers for other, non-MVP pipeline projects and (2) increased difficulty in securing contractors on favorable terms on a later schedule. Neither type of harm is cognizable. As to soliciting other business, there is no evidence even hinting that MVP has another pipeline at any stage of development. Accordingly, the alleged harm is pure speculation and insufficient. *Direx Israel*, 952 F.2d at 812. Likewise, the alleged harm vis-a-vis contractors is a direct result of MVP's voluntary entry into contracts with ill-advised deadlines, rendering it self-inflicted and not cognizable. *See, e.g.*, *Davis*, 302 F.3d at 1116.

### B. Plaintiff Grossly Underestimates the Significant Burdens on Defendants.

#### 1. Early Possession Threatens Premature Destruction of Landowners' Properties and Their Environmental and Cultural Resources.

##### a. Although the Harm to the Non-Movant Need Not Be Irreparable In The Injunction Analysis, It Is In This Case.

As discussed above, MVP's alleged harm is purely economic and speculative. Landowners' potential harms, in contrast, *are* irreparable because they include irreversible environmental damage. Further, any harm that would befall MVP stems directly from the fact that MVP entered into contracts and shipping agreements in anticipation of a FERC certificate to which it had no guarantee. Accordingly, from the beginning of this venture, MVP voluntarily assumed risk to its time and capital. Nothing in its FERC Certificate (or any other source of law) requires the schedule that MVP is urging. Landowners, in contrast, stand to suffer irreversible environmental and property injuries if early entry is allowed and MVP subsequently fails to obtain authorization to complete construction. *See Ohio Valley Envtl. Coalition v. U.S. Army*

21

*Corps of Eng's*, 528 F. Supp. 2d 625, 632 (S.D. W. Va. 2007) ("Money can be earned, lost, and earned again; a valley once filled is gone").[13]

Unlike MVP's purely monetary losses, courts have routinely recognized that environmental harm, such as timber removal, constitutes irreparable harm. *See Amoco Prods. v. Village of Gambell*, 480 U.S. 531, 545 (1987) ("Environmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, *i.e.*, irreparable.").[14] Large-scale timber removal changes the landscape and alters forests, waterways, viewsheds, and ecosystems. Early entry for timber removal would profoundly damage many Landowners' properties. Moreover, expert hydrogeologist Dr. Pamela Dodds testified extensively about the potential harms to ground and surface water from pipeline construction activities. *See generally* Day 2 Tr. at 89–102. The type of harm that Dr. Dodds testified about is irreparable harm sufficient to support a preliminary injunction, *see e.g.*, *Sierra Club v. U.S. Forest Service*, 843 F.2d 1190, 1194–95 (9th Cir. 1988), so it is certainly sufficient

---

[13] *See also League of Wilderness Defs. v. Connaughton*, 752 F.3d 755, 765 (9th Cir. 2014) (finding that temporary delay of one year resulting in economic harm to ski resort developer was not so substantial as to outweigh irreparable environmental harm faced by plaintiffs); *Sierra Club*, 645 F.3d at 996–97 (finding that harm to an endangered mussel outweighed the possibility that a power company would incur $11 million per month in economic loss if an injunction issued); *Alaska Ctr. for the Env't v. West*, 31 F. Supp. 2d 714, 723 (D. Alaska 1998) (longer permit processing time was "not of consequence sufficient to outweigh irreversible harm to the environment"); *Citizen's Alert Regarding the Env't v. U.S. Dep't of Justice*, Civ. No. 95-1702 (GK), 1995 WL 748246 at *11 (D.D.C. Dec. 8, 1995) (potential loss of revenue, jobs, and monetary investment that would be caused by project delay did not outweigh "permanent destruction of environmental values that, once lost, may never again be replicated").

[14] *See also Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011) (finding timbering and loss of use of enjoyment of forested areas to constitute irreparable harm); *Cronin v. U.S. Dep't of Agriculture*, 919 F.2d 439, 445 (7th Cir. 1990) (recognizing timbering as an irreparable harm); *Environmental Defense Fund v. Tenn. Valley Authority*, 468 F.2d 1164, 1183–84 (6th Cir. 1972) (holding that cutting and burning of timber is the type of "permanent defacing [of] the natural environment" to constitute irreparable harm supporting an injunction); *Sierra Club v. Bosworth*, Civ. No. C-04-02588-CRB, 2005 WL 3096149 at *11 (N.D. Cal. Nov. 14, 2005) ("Timber cutting that has an environmental impact always has a strong potential of causing irreparable harm justifying preliminary relief.").

to constitute harm to the non-moving party in the balance of the equities. Harm to Landowners' cultural and historical resources, as established at the hearing and described below, also constitutes irreparable harm. *Quechan Tribe of Fort Yuma Indian Reservation v. U.S. Dept. of Interior*, 755 F. Supp.2d 1104, 1120–21 (S.D. Cal. 2010) (holding that balance of equities tipped in favor of protecting historic and cultural resources pending completion of National Historic Preservation Act procedures); Day 1 Tr. at 243:21 to 244:2 (Mr. Cooper agreeing that his construction activities for the pipeline would irreparably alter areas with historic resources). As an archeological expert averred in his declaration admitted into evidence, that harm would be mitigated by delaying pipeline construction for a season to allow further study of historic and cultural resources in the pipeline's path. Ds' Ex. 11 at ¶ 10. Finally, because MVP's FERC Certificate, or its underlying approvals, may be invalidated or modified on judicial review, there is the real threat that activities under an early possession order from this Court could be for naught and the pipeline may not be completed. Day 1 Tr. at 275:8–12. In such circumstances, MVP's early possession would constitute the wrongful exercise of eminent domain, which constitutes irreparable harm. *See Carpenter Tech. Corp. v. City of Bridgeport*, 180 F.3d 93, 97 (2d Cir. 1999) (finding threat of irreparable injury presented by potentially wrongful exercise of eminent domain); *Tioranda, LLC v. N.Y.*, 386 F.Supp.2d 342, 350 (S.D.N.Y. 2005) (holding that deprivation of an interest in real property, and damage that would result from wrongful condemnation, constitute irreparable harm); *Monarch Chem. Works, Inc. v. Exon*, 452 F.Supp. 493, 502 (D. Neb. 1978) (holding condemnation of land can result in irreparable injury).

### b. Evidence At The Motions Hearing Established Irreparable Harm to Numerous Landowners.

Numerous landowners testified as to the harm they expect to incur if the Court grants MVP a preliminary injunction. New River Conservancy ("NRC") is unique among those

landowners. Its president, George Santucci, testified that NRC is a land trust that acquired an easement, referred to as the Sizemore easement, on Giles County property because of its unique environmental values. Day 2 Tr. at 197:23; 200:5-11. NRC does not hold the Sizemore Easement for any pecuniary purpose. *Id.* at 203:15. Accordingly, when its property interests are injured, those injuries cannot be fully remedied by money damages. *Id.* at 203:23.

NRC acquired the Sizemore Easement because of its important natural and environmental resources, including forests and streams such as Little Stony Creek of the New River. *Id. at* 200:5–11. The property features globally rare species, migratory bird breeding habitat, and aquatic habitat, all of which would be permanently degraded by the proposed 6.5-acre MVP easement. *Id.* at 208:10–11, 208:15, 208:19–20, 209:4, 203:11–12. The controlling NRC deeds expressly prohibit the type of activity contemplated by MVP. *Id.* at 202:24–25. NRC's obligations to protect the easement in perpetuity even prohibit it from accepting an easement offer from MVP. *Id.* at 208:4. For those reasons, NRC opposes the construction of the pipeline and has requested a rehearing and a stay from FERC. *Id.* at 202:15.

None of the cases addressing early possession under the NGA have involved a conservation easement, where a property owner cannot be made whole by just compensation. Because this is a case of first impression, the Fourth Circuit's harm analysis in *Sage* is inapplicable. 361 F.3d at 829. The timing of harm from early possession of the Sizemore Easement cuts against allowing Plaintiff access prior to final judgment because each day that the Sizemore Easement exists, protecting the property from development and making its environmental resources available to the flora and fauna of the New River Watershed, provides incalculable value to NRC that cannot be justly compensated. Day 2 Tr. at 209:5–22.

Fern Echols, a landowner in Giles County, testified that the pipeline would be 40 feet from her kitchen window and would require her and her husband to move from the home they own outright and do not have the money to replace. Day 2 Tr. at 238:19–20, 239:9. Michael Williams, managing member of Dowdy Farm, LLC, testified that the proposed pipeline would cut his farm in half, impacting numerous springs used for domestic and livestock purposes. *Id.* at 278:12 to 279:18. Georgia Haverty, president of Doe Creek Farm, Inc., explained that she currently has 21 weddings booked for 2018 on her 400-acre farm east of Pembroke, all of which would have to be canceled because of the incompatibility of a wedding and pipeline construction, resulting in lost profits and reputational harm that are likely not compensable in an eminent domain case. *Id.* at 255:8–21. Such damages would not occur if construction were delayed to November of 2018.

Dawn Cisek testified about the impact of an access road that would come within feet of her front porch, restricting her ability to access multiple areas of her property. *Id.* at 230:21–24. Martin Morrison also testified as to the impact of an access road located less than fifteen feet from his rental property, on a parcel he owns that was omitted from the plat MVP served upon him. *Id.* at 331:13; 331:1-2. Richard Sizemore testified that the loss of income from seminary students on the properties owned by Sizemore, Inc., and Eagles' Nest Ministries, Inc., would result in an inability to make mortgage payments on the property. *Id.* at 219:17-18; 220:5-10. James Scott testified that MVP's repeatedly-changing route, along with its recent letter indicating that it is still searching for the best route for its pipeline, exposes him to the risk that MVP could begin cutting trees on one route, and then abandon it for another. *Id.* at 273:9-14.

David Werner testified that Four Corners Farm, a business he and his family members operate, would be irreparably harmed by the pipeline's crossings of Teel Creek and Little Creek

and by early pipeline construction during the 2018 growing season. Day 2 Tr. at 310:19 to 311:2. Kathy Chandler testified that MVP's proposed route through her property threatens irreparable harm to her well and numerous springs that supply water supply to her family and other residents in the Bent Mountain Community. *Id.* at 319:14–24; 323:5–14; 324:12–13. She also testified that the character of the Bent Mountain Apple Orchard Historical District, including Green Hollow Lane (which MVP proposes to use as permanent access road), will be irreparably harmed by the pipeline's right-of-way and access roads. *Id.* at 326:4–12. Landowner Grace Terry testified that the Coles Terry Historic District on her family's property would similarly lose its historical nature and designation due to the pipeline. *Id.* at 306:10–14. She also testified that MVP's agents unearthed 10,000+-year old artifacts on her family's property, and that pipeline construction in 2018 would irreparably harm their ability to have experts study the archeological value of their property. *Id.* at 307:1–12; Tom Triplett testified about the numerous springs on his property that would be irreparably harmed by MVP's proposed route.[15] *Id.* at 303:10–11.

Steven Hodges testified that the proposed MVP route will run across the steep rim of one sinkhole on his property and directly down the slope of a second sinkhole. Day 2 Tr. at 167:1–4; 167:10–13. He testified that due to the pipeline location and the steep slope, 96% of the soil in the sinkhole area will erode into the open sinkhole, causing both surface and groundwater damage. *Id.* at 168:18-23. Erosion into the sinkhole contaminates drinking water for Mr. Hodges and his neighbors. *Id.* at 170:1–4. Mr. Hodges' testimony establishes practically unquantifiable harm to his own property and to the aquifer that the area residents rely upon. Don Jones, who

---

[15] Mr. Triplett also testified that, prior to receiving MVP's complaint, he never received any plat of the proposed route through his property with MVP's offer to purchase an easement. That is, MVP never identified to Mr. Triplet the easement that it sought. As a result, MVP's motion for partial summary judgment must fail because MVP cannot establish that it was unable to acquire the property by contract as required by 15 U.S.C. § 717f(h).

holds Power of Attorney for Defendant George Lee Jones, testified that his property is characterized by springs and sinkholes, all of which are at risk due to MVP's proposed route. *Id.* at 176:4; 178:23; 179:6. Mr. Jones planned to build a family cabin on a ridge overlooking the historic Jones family property. *Id.* at 180:1–3. However, the proposed MVP route eliminates the cabin site as a feasible building location. *Id.* at 180:8. Water quality is also a chief concern for Keith Wilson. His Franklin County property is subject to a proposed MVP access road that would run directly over the well that supplies his home with drinking water. *Id.* at 184:4–5. The road would pass no more than 40 feet from the Wilson home. *Id.* at 184:8. The road would lead to the pipeline route, which would require the removal of old-growth forest on the Wilson property. *Id.* at 185:22-23. The construction would be uphill from the only well supplying the Wilson home with water. *Id.* at 186:17. Anne Bernard's unique property has been a working art studio for more than 20 years. *Id.* at 189:2. The proposed pipeline route goes directly adjacent to the Bernard water well, residence, and art studio. *Id.* at 190:7-9. The pipeline would cross the Bernard's creek and field, while an MVP access road would occupy the Bernards' driveway, the sole access to the residence and art lesson space. *Id.* at 190:9–11, 191:17. The MVP route would irreversibly disrupt the Bernard home, business, and art studio setting.

Defendant Robert A. Pegram submitted an affidavit about the harm he will suffer if MVP were awarded immediate possession. Ds' Ex. 10. Mr. Pegram averred that pipeline construction would sever his septic system from his home. Mr. Pegram further averred that his land does not "perc," requiring placement of his septic field on a neighboring parcel, and that the septic and plumbing structure on his property is specially designed to meet his particular health needs. *Id.* ¶¶ 4–8. Hence, severance of the septic field from the home renders the property virtually

27

*unlivable*. If construction were delayed until November 2018, Mr. Pegram would have time to get his affairs in order and mitigate the impact of the accelerated construction schedule.

Archaeologist Mark Joyner submitted a declaration on behalf of Defendants Dale E. Angle and Mary E. Angle, who own three parcels at issue in this action. Ds' Ex. 11. Mr. Joyner averred that the Angles' property contains valuable archeological sites dating back 15,000 years that will be irreparably damaged by the construction of the pipeline. *Id.* ¶ 6. Study of these archeological sites would assist to deepen scholars' understanding of previous eras of human development. *Id.* ¶¶ 6–8. Although delaying entry does not permanently preserve these sites, Joyner notes that delay does provide the opportunity to excavate undiscovered and undisturbed archeological artifacts in advance of construction. *Id.* ¶ 9. In the absence of this opportunity, those artifacts will likely be destroyed forever.

### c. The Harm To the Landowners Is Not Simply A Question of Timing.

Because MVP's FERC certificate and other environmental approvals are subject to multiple petitions for judicial review in the United States Courts of Appeals for the Fourth Circuit and the District of Columbia Circuit, and because several regulatory agencies have not rendered final determinations about whether they will issue necessary approvals to MVP, this Court may not assume, as MVP would have it do, that the only question for the Court is whether the pipeline should be built now or later. Even MVP concedes that its FERC Certificate and other regulatory approvals could be vacated or modified on judicial review. Ex. 3, Tr. at 275:8–12. If early possession is allowed, and judicial review confirms deficiencies in MVP's regulatory approvals or if an agency denies a necessary approval, then harms to Landowners and their treasured environmental and historical resources will have occurred unnecessarily. In that way, this case is different from *Sage*, where there was no indication that approvals for that pipeline

28

were subject to judicial review. 361 F.3d at 808. Harm to Landowners is not "simply a timing argument" as it was in *Sage* because construction of this pipeline is far from certain.

Completion of the pipeline is also in doubt because MVP refuses to provide evidence even attempting to establish that it has sufficient financial resources to complete the Project. If MVP runs out of money before completing the project, Landowners will be left with cleared rights-of-way, blasting damage, potential water loss and a useless pipeline on their properties. The risk of such harm to Landowners outweighs MVP's claimed injuries.

Finally, the conditional nature of MVP's FERC certificate also threatens to work irreparable harm to Landowners if MVP is awarded a mandatory preliminary injunction. A recent NGA condemnation action highlights how important it is for the Court to consider the conditional nature of MVP's FERC certificate before allowing early possession. In *Constitution Pipeline Co., LLC v. A Permanent Easement for 1.77 Acres*, a landowner argued that an NGA condemnation action against her was premature because the pipeline developer's FERC certificate was conditioned on an approval under Section 401 of the Clean Water Act from the State of New York that had not yet been issued. Civ. No. 3:14-cv-2094, 2015 WL 1638370 at *1–*2 (N.D.N.Y. Mar. 16, 2015). The district court rejected that argument and allowed the pipeline developer early possession of the landowners' property. *Id.*

The State of New York subsequently denied the required Section 401 approval, and the Second Circuit upheld that denial. *Constitution Pipeline Co., LLC v. New York State Dep't of Envtl. Conservation*, 868 F.3d 87, 90–91 (2d Cir. 2017). The Constitution Pipeline project is essentially stalled, rendering pointless the destructive early construction in Pennsylvania under an injunction like that sought by MVP.

The saga of the Constitution Pipeline underscores the harm to landowners that can result

from allowing early possession under a conditional FERC certificate. If the Court allows early possession in this uncertain environment, it risks allowing MVP to irreparably damage the environmental values of Landowners' properties without any guarantee that MVP will complete its project. Those harms outweigh MVP's claimed irreparable injuries—which, as explained above, are unlikely to materialize and are, in any event, not "irreparable."

### 2. Immediate Possession Threatens Landowners With Unnecessary, Long-Term Damage to Their Property Because of MVP's Continuing Route Adjustments.

MVP continues to make changes to its proposed route, even as it asks the Court to allow it to permanently alter properties along the route identified in the Complaint. Specifically, MVP acknowledges that, although the FERC Certificate directs it to implement a route adjustment in Montgomery County known as "Variation 250" (P's Ex. 1 at App.C, p. 7), the route set forth in the Complaint does not conform to Variation 250. After certain landowners identified this issue in their opposition to MVP's Summary Judgment motion on December 5, 2017, MVP waited until January 2 and 8, 2018, to file an Amended Complaint purporting to implement parts of Variation 250. *See* ECF Nos. 259, 260, 272, & 273.

Variation 250 is no slight tweak. It involves substantially different routes across numerous parcels of land. *Compare, e.g.*, Exs. 78-A (ECF # 259-1), 79-A (ECF # 259-2), 80-A (ECF # 259-3), 97-A (ECF # 259-4), and 98-A (ECF # 259-5) *to* Exss 78 (ECF # 1-78), 79 (ECF # 1-79), 80 (ECF # 1-80), 97 (ECF # 1-97), and 98 (ECF # 1-98). MVP's rush to condemn has deprived Variation 250 landowners of the ability to fully use and enjoy their properties. The uncertainty of where the proposed pipeline route will cross their properties makes it well nigh impossible for them to sell, develop, mortgage, or otherwise exercise *all* the strands in their bundle of property rights. *See, e.g. Kaiser Aetna v. United States*, 444 U.S. 164, 176 (1979); *Klemic v. Dominion Transmission Inc.*, 138 F.Supp.3d 673, 688 (W.D. Va. 2015).

30

The Variation 250 landowners, who include Michael and Margaret Slayton, Trustees, Delwyn Dyer, Trustee, Robert and Donna Jones, Sandra Townes Powell, Thomas and Bonnie Triplett, Phyllis Hutton, Henry Cox and Janet Degroff, and J. Garrett and Suzanne Baker, have a right to know where MVP is actually seeking to construct its pipeline across their properties and to not be deprived of the important rights of possession and use without due process of law. U.S. Const., amend V. At base, due process requires strict compliance with the requirement of Rule 71.1 and allowing these owners (and any others affected by MVP's numerous amendments to its Complaint) the right to answer those amendments and raise appropriate objections and defenses thereto, which otherwise would be waived under Rule 71.1(e)(3) if not timely asserted.

At the hearing, the Court expressed its concern over MVP's recent route changes, which also includes a route adjustment for the pipeline's Pigg River crossing in Pittsylvania County (ECF Nos. 274 & 275), filed with the Court on January 8. Day 1 Tr. at 83:12–16. These route changes are the reasonable and foreseeable consequences of MVP's decision to file its Complaint only two weeks after issuance of the FERC Certificate. Because the FERC Certificate includes numerous conditions which require route adjustments and coordination with numerous affected landowners (*see, e.g.*, Ps' Ex. 1, FERC Certificate at App. C, Conditions 16, 17, 18, 23, 30, 32, & 33), and because MVP's own evidence reveals that it is still working to meet those conditions, MVP is attempting on-the-fly route adjustments in this confused condemnation action and cannot even identify for the Court where, specifically, it seeks early possession.

The situation of James and Karen Scott of Bent Mountain in Roanoke County perfectly illustrates the schizophrenic nature of MVP's routing. Mr. Scott testified that, over the past three years, MVP has made no fewer than four route proposals to the Scotts, each different from the previous. Day 2 Tr. at 260–72. The route set forth in the Complaint for the Scott property goes

directly through the proposed building site of a home for the Scotts' eldest son, which already has a septic drainfield approved and installed, as well as through a historic cemetery. *Id.* at 262. Between April 2017 and January 2018, MVP did additional surveying on the Scotts' property, which revealed that MVP's plats—which were based off Roanoke County tax maps—were incorrect. *Compare* Ds' Ex. 18 to Ds' Ex. 19. Additional problems with the boundaries depicted on those plats result in the Scotts' neighbors being offered compensation for easements actually located on the Scotts' land.

Despite being directed by FERC to coordinate with the Scotts to address the concerns created by MVP's proposed route, MVP has failed to do so. Instead, MVP recently provided the Scotts with yet another new drawing showing a new proposed route across their property (Ds' Ex.t 19), but also showing numerous additional acquisition areas not previously provided to the Scotts. Instead of coordinating with the Scotts, MVP seeks to bully them into agreeing to a proposed new route with the threat of cutting trees on their property along the route identified in the Complaint. Yet MVP has acknowledged that the route which avoids the cemetery and the house under construction is preferable to it from a number of perspectives.

Under normal circumstances, MVP would be working out route changes with the Scotts and other affected landowners before commencing a condemnation action and asking for early possession. But in its desperation to meet a self-imposed deadline, MVP has abandoned all pretense of fairness and due process. And even though MVP's own witness acknowledged that there are numerous unmet conditions, any one of which could postpone construction of the pipeline, it recklessly asks the Court for a preliminary injunction under which it would enter the Scotts' property and begin clearing trees along a route it may never use. Irreparable harm to the Scotts would follow if MVP obtains approval from FERC of the route change it claims to prefer.

Evidence at the hearing established that MVP is open to additional route changes on other properties as well. The Town of Chatham, which owns property in Pittsylvania County on which a closed landfill is located, introduced evidence that MVP never investigated the environmental condition of the Town's property before filing the Complaint and Motion for Partial Summary Judgment. Although MVP's representative testified that MVP would consider route adjustments as it learns more about the status of the Town's property, such tests and investigations should have been done months if not years ago. MVP's proposed construction, involving clearing and grubbing the site, and excavating a trench across the site could create an environmental disaster at the landfill property because MVP does not know the condition or contents of the landfill.

MVP's routing problems are of its own creation, as it has had the ability to perform numerous surveys on properties along its entire route in Virginia, whether with landowner permission or under Section 56-49.01 of the Code of Virginia. Portions of its proposed route in West Virginia remains unsurveyed, in part because the Supreme Court of Appeals of West Virginia ruled MVP's proposed pipeline was not for public use and, therefore, MVP could not avail itself of the involuntary survey provisions of W.Va. Code § 54-1-3. *Mountain Valley Pipeline, LLC v. McCurdy*, 238 W.Va. 200, 212 (2016). In contrast, this Court and others, including the Supreme Court of Virginia, have held that entry without landowner permission for survey purposes under Section 56-49.01 of the Virginia Code is permissible. *See Klemic* 138 F.Supp.3d at 698; *Palmer v. Atlantic Coast Pipeline, LLC*, 293 Va. 573, 584 (2017).

The very purpose of Section 56-49.01 is to permit companies like MVP to "select[] . . . the most advantageous location or route" in order to avoid the very circumstance in which MVP, by its haste, finds itself—with an approved route that it cannot build and numerous unanswered questions as to where, precisely, it does intend to build. MVP's communications to the Scotts

reveal that MVP is still trying to select the best route for its proposed pipeline, *see* Ds' Ex. 20, all the while asking this Court for a disfavored mandatory injunction permitting it to enter onto private property and build along a route it long ago abandoned as not constructible.

MVP's rush to condemn without ensuring that it even knows what it is condemning has resulted in significant confusion as to what rights are being condemned and over what areas. Landowners in this case have been hard pressed to understand the impact of the proposed taking of their property rights. This confusion has led to what MVP's own representative testified was a surprisingly high number of properties over which MVP was unable to acquire easement rights by purchase. Tr. at 167–68. Yet MVP's response to the confusion it has sown is to insist that it be permitted to enter properties and begin massive construction operations, even as it continues to make route adjustments. Consequently, an order from this Court allowing MVP immediate possession for construction would result in irreparable harm to Landowners.

**C. MVP Fails to Show It Is Likely to Succeed on the Merits.**

For reasons explained in the responses filed to MVP's motion for partial summary judgment, MVP is not likely to succeed on the merits. Landowners incorporate those arguments by reference.

**D. The Public Interest Weighs Against Granting MVP an Injunction.**

**1. MVP's FERC Certificate Does Not Establish That Immediate Possession Serves the Public Interest.**

MVP seems to suggest that it conclusively carries its burden of proof on the public-interest prong merely by possessing a FERC certificate. *See* ECF # 7 at 11. If possessing a FERC Certificate were sufficient, though, the public-interest prong would effectively drop out of every NGA pipeline case. Injunctions are not automatic or awarded as of right. *Winter*, 555 U.S. at 24; *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 313 (1982). Consequently, the Court should reject

34

MVP's efforts to limit the public-interest analysis to whether or not it has a FERC certificate.

Even if FERC's issuance of a certificate to MVP were to indicate public interest, nothing in the FERC certificate suggests that immediate access to Landowners' properties is necessary to serve that interest. In fact, MVP's FERC certificate suggests that any public interest the Mountain Valley Pipeline will serve will be met so long as the pipeline is completed by October 13, 2020. *See* ECF # 1-2, FERC Certificate at 108. If FERC thought that the public need for the Project was so urgent that construction needed to immediately commence, it surely would not have given MVP three years to complete the Project when MVP admits that it can do so in less than one year. As shown by the testimony of Mr. Cooper and MVP's alternative schedules, tree cutting can be delayed until November 15, 2018, with no impact on compliance with the FERC Certificate. Day 1 Tr. at 214:13–25, 215:1–17, 218:11–15; Ds' Ex. 3; Ds' Ex. 4. That alone shows that there is no public interest in immediate possession based on the FERC Certificate.

Moreover, the Court should not treat MVP's FERC Certificate as conclusive on the question of whether the Project serves the public interest. This is an "affiliate pipeline," as there is common ownership of the members of Mountain Valley Pipeline, LLC, and the entities that will ship gas on the pipeline. ECF # 1-2, FERC Certificate at 5–6 & nn. 12–15. MVP still has not found end users for 87% of the pipeline capacity. *Id.* at 101 n. 286.[16] In that way, this case is distinguishable from *Sage*, where the project would "bring natural gas to portions of southwest Virginia for the first time[, which will] make gas available to consumers, and it will help in the efforts of local communities to attract much-needed new business." 361 F.3d at 830. Here, in contrast, MVP has proven no such benefits, instead generally alleging that its gas will be sold somewhere—wherever supply and demand dictate—without yet finding the necessary end-users

---

[16] The remaining 13% of the capacity could be used by customers of Roanoke Gas Company (0.5%) and customers of Consolidated Edison (12.5%). ECF # 1-2 at 5–6, 101 n. 286.

of the gas. ECF # 6-1 at ¶ 6. *Sage* simply does not help MVP's public interest argument.

### 2. Constitutional Concerns Weigh Against An Injunction.

As the Fourth Circuit recently observed, "upholding the Constitution undeniably promotes the public interest." *International Refugee Assistance Project v. Trump*, 857 F.3d 554, 604 (4th Cir. 2017), *vacated on other grounds*, 138 S.Ct. 353 (2017).[17] Landowners' rights to private property protected by the Fifth Amendment to the United States Constitution. Even if the public were to experience some inchoate, marginal benefit from having MVP's pipeline come on line a few months earlier than contemplated by FERC, such a benefit—which MVP has not even attempted to quantify—would pale in comparison to the weight of public interests on the other side: the risk that the Court will wrongfully bless the invasion of Landowners' property and the cutting of their trees in violation of the NGA, the Constitution, and other federal law.

### 3. Environmental Concerns Weigh Against An Injunction.

Here, MVP has yet to show that its project will comply with all federal laws designed by Congress to protect the environment, and because denying an injunction would prevent permanent environmental damage, the public interest weighs heavily in favor of denying MVP's requested extraordinary relief. MVP has yet to obtain requisite approvals for its erosion and sediment controls from the Virginia Department of Environmental Quality. P's Ex. 9 at Bates No. MVP_0013621. Obtaining those approvals is a condition of MVP's Section 401 Water Quality Certificate under the Clean Water Act, and, as a result, is now a condition of its FERC Certificate. Day 1 Tr. at 185:15–22; 33 U.S.C. §1341(d) (providing that conditions of Section

---

[17] *See also Giovanni Carandola, Ltd. v. Bason*, 303 F.3d 507, 521 (4th Cir. 2002) ("[U]pholding constitutional rights surely serves the public interest."). There is always a "strong public interest in preserving constitutional rights." *Doe v. LaDue*, 514 F.Supp.2d 1131, 1138 (D. Minn. 2007); *see also G & V Lounge, Inc. v. Mich. Liquor Control Comm'n*, 23 F.3d 1071, 1079 (6th Cir. 1994) ("[I]t is always in the public interest to prevent the violation of a party's constitutional rights.").

401 certifications become conditions of the federal licenses to which they relate). Preventing harm to the environment that would result from allowing early possession and construction is in the public interest. *See Nat'l Wildlife Fed'n v. Burford*, 676 F. Supp. 271, 279 (D.D.C. 1985). The public "has a strong interest in maintaining the balance Congress sought to establish between economic gain and environmental protection." *Ohio Valley Envtl. Coalition*, 528 F.Supp.2d at 633. Because outstanding federal regulatory approvals remain, the public has an interest in maintaining the status quo to ensure that congressional mandates are fulfilled.

Moreover, the public interest lies in ensuring that conservation easements such as that held by NRC are not prematurely extinguished. Preserving open spaces in their natural state in perpetuity serves the public interest. *See, e.g.*, *Feduniak v. Calif. Coastal Comm'n*, 148 Cal. App. 1346, 1378 (2007). Congress's encouragement of conservation easements by providing tax deductions for them in the Internal Revenue Code (26 U.S.C. § 170(h)) shows that conservation easements serve the public interest. *Johnson v. USDA*, 734 F.2d 774, 788 (11th Cir. 1984).

### 4. Historical and Cultural Concerns Weigh Against An Injunction.

Additionally, the public interest is served by the protection of historical and cultural resources, as indicated by the enactment of the National Historic Preservation Act of 1966 ("NHPA"), 16 U.S.C. § 470 *et seq.* Under Section 106 of the NHPA, FERC must consult with the Advisory Council on Historic Preservation before allowing activity to proceed under a FERC certificate. 16 U.S.C. § 470f. MVP concedes that it must demonstrate compliance with Section 106 prior to construction under Condition 9 to its FERC Certificate, as demonstrated in its status reports to FERC regarding satisfaction of Condition 9. Ex. 1 at 3–4. Those consultations are not complete. Although MVP asserted to FERC that it has executed a Programmatic Agreement under Section 106, it admits that it is awaiting concurrences on a number of issues from the

historical resource agencies in West Virginia and Virginia. *Id.* Section 106 consultation is not complete just because a Programmatic Agreement has been executed. *Quechan Tribe of Fort Yuma Indian Reservation v. U.S. Dep't of Interior*, 755 F.Supp.2d 1104, 1109 (S.D. Cal. 2010). Rather, under the applicable federal regulations, compliance with the procedures set out in the programmatic agreement is what results in satisfaction of an agency's section 106 responsibilities. 36 C.F.R. § 800.14(b)(2)(iii). Because of the outstanding concurrences that MVP needs under Section 106, the procedures set out in the December 15, 2017 Programmatic Agreement have not been satisfied, leaving FERC Certificate Condition 9 itself unsatisfied.

Even if MVP were to take the position that the Programmatic Agreement is sufficient to satisfy Condition 9, there is no indication in the record, or in FERC's publicly available docket, that FERC agrees that Condition 9 has been satisfied. Moreover, FERC Certificate Condition 15 also relates to historic and cultural resources and also remains unsatisfied, by MVP's own admission. Day 1 Tr. at 190. MVP cannot predict when that condition will be met. *Id.* at 190:4–12, 16–25, 191:1. On December 26, 2017, FERC requested further information from MVP on state review of cultural and historic resource issues, and asked MVP to advise FERC of projected filing dates for state concurrences. *Id.* at 189:13–17. In its response to FERC on January 5, 2018, MVP informed FERC that seven of the nine issues in West Virginia remained outstanding, and that it had only sought West Virginia's concurrence on those issues on December 22, 2017. Ds' Ex. 2 at 17. Eighteen outstanding issues in Virginia still required concurrence. *Id.* at 13–14. MVP failed to advise FERC of projected concurrence dates. *Id.*

By enacting the NHPA, Congress acknowledged the public interest in protecting historic and cultural resources. *Johnson*, 734 F.2d at 788 (congressional intent and purpose establish public interest). The record establishes that MVP has not resolved all outstanding issues related

38

to historic and cultural resources. Even MVP's project manager conceded that, once MVP starts construction in areas with historical and cultural resources, the areas would be irreparably altered. Ex. 3, Tr. at 243:21–25, 244:1–2. The public interest favors protecting those resources until the federal and state regulators conclude their review of the effects of the project on those resources. That too weighs against issuing the injunction sought.

### 5. Due Process Concerns Weigh Against An Injunction.

Finally, denying immediate possession is in the public interest in light of FERC's abuse of so-called "tolling orders" on requests for rehearing, which FERC maintains preclude judicial review. The NGA provides that, before seeking judicial review, a party must first request rehearing by FERC. 15 U.S.C. § 717r(a). Although the NGA gives FERC 30 days to act on a request for rehearing, FERC insists that certificates are not final for purposes of judicial review until it has ruled on the merits of such a request. *Moreau v. FERC*, 982 F.2d 556, 559–62 (D.C. Cir. 1993). FERC has purported to delegate authority to its Secretary to "toll the time for action on requests for rehearing." 18 C.F.R. § 375.502(v).

FERC issued a tolling order on requests for rehearing related to MVP's FERC Certificate on December 13, 2017. ECF # 119-1. If this Court allows MVP early possession of Landowners' property while those requests are in administrative purgatory, then Landowners may be deprived of due process with no way to meaningfully exercise their statutory right to judicial review of the very certificate on which MVP relies to assert that it has the authority to condemn Landowners' property. To treat Plaintiff's conditional certificate as final for one purpose—allowing it early possession—yet treat it as not final for others—including for purposes of judicial review—violates the public's interest in the fair and equitable administration of the law.

In short, Landowners respectfully submit that the protection of fundamental private

property rights, the environment, and historical and cultural resources serve far more important public interests that the immediate distribution of fossil fuels to already served markets. Accordingly, this Court should preserve the status quo to protect the Landowners' constitutional rights and the environment, cultural, and historical resources along the pipeline route by denying the mandatory injunction sought by MVP.

## II.  MVP May Not Take Private Property Based On the Evidence in the Record Regarding the Appropriate Security.

Well-established principles of law relating to federal eminent domain make it clear that MVP must establish the amount of the security by an independent appraisal. That requirement is especially important in this case because MVP refused to provide any information about its revenues, assets, debts, or even its general ability to pay for the taking after the fact. There is no competent evidence before the Court regarding the value of MVP's proposed take, and MVP is obviously proceeding without the full faith and credit of the United States Treasury as a backstop. No relevant principles of equity would allow MVP to take and cause significant irreparable injury to Landowners' property without absolute assurance that the landowners can be made whole at the end of the day. It is indisputable that there is no such evidence before the Court. The Court is not in a position to determine, pursuant to Rule 65(c), the "proper" security that would make Landowners whole. Landowners respectfully assert that the Court may not allow such substantial takings on the limited evidence presented by MVP.

The Constitutional dimensions of this case remove it from the realm of run-of-the-mill business disputes where injunctive relief is at issue. Indeed, so far as Landowners have determined, none of the many Rule 65(c) bond burden cases addressed by federal courts and relied on by MVP are takings cases. Just compensation is a Constitutional right, however, and a landowner "is entitled to reasonable, certain, and adequate provision for obtaining compensation

*before* his occupancy [(*i.e.,* possession)] is disturbed." *Cherokee Nation v. S. Kan. Ry. Co.*, 135 U.S. 641, 659 (1890) (emphasis added). As one law journal article analyzing *Sage* observes, "[i]n a procedure for immediate entry, the property owner's right to reasonable, certain and adequate security for payment of just compensation is one of his or her most significant legal protections. The protection is constitutional." Jim Behnke & Harold Dondis, *The* Sage *Approach to Immediate Entry*, 27 Energy L. J. 499, 529 (2006). Accordingly, applying principles from non-eminent domain cases such as *Gonzales v. O Centro Espirita Beneficente União do Vegetal*, 546 U.S. 418 (2006), or, respectfully, *Volvo Group North America, LLC v. Truck Enterprises, Inc.*, Civ. No. 7:16-cv-00025, 2016 WL 1479687, *6 (W.D. Va. Apr. 4, 2016), is not justified because the Constitutional guarantee was not at issue in those cases.

As the Fourth Circuit observed, "the entire concept of the burden of proof does not lend itself too readily to application in condemnation proceedings." *Bank of Edenton v. United States*, 152 F.2d 251, 253 (4th Cir. 1945). There, the Fourth Circuit refused to hold that the trial court's "assignment of the burden of proof to the Government" was reversible error. *Id.* Because an "applicant's right to [a mandatory injunction] must be indisputably clear," *Communist Party of Indiana*, 409 U.S. 1235 (Rehnquist, J., opinion in chambers), the burden of establishing all prerequisites to that relief—including the amount of a bond—should be borne by the applicant. To hold otherwise would not only risk violation of the Constitutional guarantee of adequate assurance, it would inappropriately sanction rapid mandatory injunctions; condemnors could rush the preliminary injunction process and seek an injunction with an insufficient nominal bond when condemnees do not have the time or information necessary to prove the appropriate bond amount. In *Sage*, the Fourth Circuit pointed out that "to obtain this intermediate relief, the gas company must satisfy the strict requirements for a preliminary injunction. … In this case ETNG

41

was awarded possession only after it engaged in five months of intensive litigation that analyzed and determined its right to take and its right to equitable relief (an injunction)." 361 F.3d at 825. Here, in contrast, MVP jumped the gun; it was unable, in this abbreviated action, to meet the elements of Rule 65, including Rule 65(c).

Placing the burden to assure just compensation on MVP is also consistent with *Sage*'s observation that, in NGA cases under Rule 65, the procedural safeguards in the preliminary injunction context are sufficiently comparable to the provisions of the Declaration of Takings Act ("DTA") to protect landowners. 361 F.3d at 825. Further, to comply with the Uniform Relocation Assistance and Real Property Acquisition Policies Act (the "Relocation Act"), 42 U.S.C. § 4261 *et seq.*, when it initiates a "quick-take" under the DTA, a federal agency should have already obtained an appraisal of the property at issue, prior to taking possession, in order to "deposit[] with the court in accordance with [the DTA] . . . an amount not less than the agency's *approved appraisal of the fair market value*[.]" *Id.* § 4651(4) (emphasis added). The Relocation Act defines an "appraisal" as "a written statement independently and impartially prepared by a qualified appraiser setting forth an opinion of defined value of an adequately described property as of a specific date, supported by the presentation and analysis of relevant market information." *Id.* § 4601(13). In other words, when a federal agency acts under the DTA, the Relocation Act provides that it should arrive in court with an impartial appraisal—not with an estimate and not with its last offer. To be true to *Sage*'s reasoning, the Court should place a comparable burden on MVP to appraise each parcel before allowing early possession.

**A. NGA Caselaw Is Neither Persuasive Nor Binding.**

In *Sage* and other cases, bonds were set based on appraisals. 361 F.3d at 824 (deposit set "in an amount equal to the appraised value of the interests condemned"); *In re Transcon. Gas*

*Pipeline Co., LLC*, Civ. No. 1:16-cv-02991, 2016 WL 8861714, at * 11 (N.D. Ga. Nov. 10, 2016) (requiring the submission of appraisals to allow the establishment of a bond amount prior to entry onto 43 parcels); *Sabal Trail Transmission, LLC v. +/- 1.44 Acres of Land*, Civ. No. 5:16-cv-164, 2016 WL 2991151, at *6 (M.D. Fla. May 24, 2016) (pipeline developer posted "two times the amount of [its] most recent appraisal of the compensation owed"); *Rockies Exp. Pipeline, LLC v. 4.895 Acres of Land*, Civ. No. 2:08-cv-554, 2008 WL 4758688, at *4 (S.D. Ohio Oct. 27, 2008) (setting bond based on appraisal). In other cases, something other than an appraisal has been allowed to establish a bond amount, but condemnees do not always vigorously contest early possession the way they have here. *See, e.g.*, *Columbia Gas Transmission, LLC v. 252.071 Acres*, nos. ELH-15-3463, -3560, 2016 WL 1248670, at *7 (D. Md. Mar. 25, 2016) (valuations on which bond was based were not contested by any landowner).

There are dozens of non-binding and frequently unreported district court cases, but they establish no clear and consistent rule. The Court should, therefore, follow *Sage*—which involved appraisals—rather than try to cobble together coherent law from inconsistent cases from district courts, most from outside of the Fourth Circuit. The Court should recognize this case for what it is. Equity cannot allow a private party without the full faith and credit of the U.S. Treasury to take and cause significant irreparable harm to private property before the proper amount of a security to compensate landowners can be determined by the Court. Because, as explained below, MVP has not provided sufficient evidence to establish the amount of money necessary to compensate landowners for harm from MVP's early entry, MVP has deprived the Court of the ability to set a bond prior to entry. Accordingly, entry should be denied.

**B. MVP Relies Wholly on Inadmissible Evidence.**

MVP failed to produce appraisals of each parcel, as a federal agency would pursuant to

the Relocation Act, despite having worked on this project for years. Instead, it offered only inadmissible evidence. MVP hired an appraiser in May 2017, but did not request the preparation of any appraisals until December 2017. Tr. at 302:2–4, 309:9–11. In 11 days, that firm produced 9 appraisals. *Id.* at 309:12–20. Mr. Long is not the only appraiser in Virginia. MVP could have easily obtained admissible appraisals from other qualified appraisers, but chose not to do so.

In discovery, Landowners submitted requests for document production and interrogatories to MVP regarding the bond and MVP's estimates of just compensation.[18] MVP's responses stated that it was relying entirely on the opinions and anticipated testimony of Mr. Long.[19] Landowners also took the deposition of MVP pursuant to Fed. R. Civ. P. 30(b)(6), including on "[f]acts and information relating to the statements contained in the Declaration of Robert J. Cooper on Access for Construction dated October 27, 2017" (ECF #228-5). The Declaration of Robert J. Cooper includes the sworn statement that "MVP is prepared to post a bond equal to its estimate of the just compensation due to the Landowners." ECF #4-1 at ¶31. The only evidence MVP identified in discovery was from Mr. Long, whom Landowners also deposed. When asked about Paragraph 31 of his Declaration, Mr. Cooper stated that Mr. Long would address all bond issues.

**1. Mr. Long's Testimony and Supporting Exhibits Are Inadmissible.**

MVP decided that its sole evidence on the amount of the bond would be the estimates of Mr. Long. It misjudged the credibility and admissibility of that evidence. In *U.S. v. Certain Parcels of Land in Arlington County*, 261 F.2d 287 (4th Cir. 1958), the Fourth Circuit clearly

---

[18] Landowners' Post-Hearing Ex. 1 (Ps' Responses to Ds' Common Set of Requests for Production); Landowner's Post-Hearing Ex. 2 (Ps' Responses to Ds' Common Request for Answers to Interrogatories).

[19] *See* Landowners' Post-Hearing Ex. 1 at 6, 7 (Document Request Nos. 12 & 13 and Responses thereto); Landowners' Post-Hearing Ex. 2 at 16–17 (Interrogatory No. 18 and response thereto).

44

barred admission of evidence as to assessed value. "We think the sound reason for ruling out evidence of assessed valuation is that it merely represents the opinion of persons who are not called as witnesses and not subject to examination as to the factors on which they based their opinion." *Id.* at 290. *See also id.* (noting assessments to be "notoriously unreliable as a criterion of true value"). On cross-examination, Mr. Long acknowledged many of the reasons why tax assessed values may not represent fair market value. Day 1 Tr. at 304–08.

Moreover, Mr. Long's methodology fails to meet the requirements Federal Rule of Evidence 702. "Rule 702 imposes a special gatekeeping obligation on the trial judge to ensure that an opinion offered by an expert is reliable." *Nease v. Ford Motor Co.*, 848 F.3d 219, 230 (4th Cir. 2017). With respect to reliability, the district court must ensure that the proffered expert opinion is "based on scientific, technical, or other specialized knowledge and not on belief or speculation, and inferences must be derived using scientific or other valid methods." *Oglesby v. Gen. Motors Corp.*, 190 F.3d 244, 250 (4th Cir. 1999).[20]

Federal Rule of Evidence 702 permits opinion testimony where the expert grounds his or her testimony on technical or specialized knowledge that has been found through reliable "principles and methods" that have been applied in a reliable way. In *Daubert v. Merrell Dow*

---

[20] As the Court noted at the hearing, the Fourth Circuit has held that preliminary injunction hearings are governed by "less strict rules of evidence" than would otherwise apply at trial. *G.G. ex rel. Grimm v. Gloucester Cty. Sch. Bd.*, 822 F.3d 709, 725 (4th Cir. 2016), *vacated on other grounds by Gloucester Cty. Sch. Bd. v. G.G. ex rel. Grimm*, ___ U.S. ___, 137 S.Ct. 1239 (2017) (mem.). The reasoning of *Grimm*, however, does not apply to this proceeding for a preliminary *mandatory* injunction. In *Grimm*, the Fourth Circuit reasoned that loosening the evidentiary restrictions in preliminary injunction hearings is permissible because the purpose of a preliminary injunction "is merely to preserve the relative positions of the parties until a trial on the merits can be held." *Id.* (quoting *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981)). The mandatory injunction sought in this case would not preserve the relative positions of the parties, however. Rather, it would permanently alter the status quo. That, and the Constitutional nature of the rights at issue in this proceeding, render it inappropriate to loosen the standards of Rule 702 merely because this is a preliminary injunction proceeding. To allow the evidence would, in this case, produce the inequitable result of allowing harm to private property without assurance that the landowner will be compensated.

45

*Pharmaceuticals, Inc.*, the Supreme Court explained that "[t]he focus, of course, must be solely on principles and methodology, not on the conclusions that they generate." 509 U.S. 579, 594–95 (1993). The Court created an illustrative list of factors to guide courts in evaluating the reliability of expert testimony. *Id.* at 592. Those factors include the error rate, peer review or publication of the methodology, and standards of control of the methodology. *Id.* The Supreme Court further explained, in *Kuhmo Tire Co., Ltd. v. Carmichael*, that the trial court's role is to "make certain that an expert...employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." 526 U.S. 137, 152 (1999). Mr. Long's appraisal and testimony are inherently unreliable because he based his appraisals on tax assessments, widely considered to be unreliable even in his own field of expertise.[21] Tr. 302–03. His estimates, therefore, carry none of the intellectual rigor used in his field. *Id.*

Mr. Long admitted this method was unorthodox and not employed by peers in his field. Tr. 319. As a result, not only was the basis for the appraisal—tax assessments—unreliable, his adjustment of the assessments was invented solely for the purposes of this litigation, and it has no relationship to the way an expert in Mr. Long's field would practice. As the Seventh Circuit has held, to admit evidence under Rule 702, the Court must be satisfied that "the expert is being as careful as he would be in his regular professional work outside his paid litigation consulting." *Sheehan v. Daily Racing Form, Inc.*, 104 F.3d 940, 942 (7th Cir. 1997). Mr. Long admitted that his estimate was not the way that he would normally determine the value of property in a condemnation proceeding and that he had never estimated the value of property in this way

---

[21] Mr. Long insisted that what he had done was not an "appraisal." Tr. 331. Notwithstanding, the professional standards imposed by his own field would consider what he had done as an appraisal. The USPAP defines an appraisal alternatively as either "[t]he act or process of developing an opinion of value" or "an opinion of value." Day 1 Tr. 328. As Mr. Long explained, he rejiggered the tax assessments somewhat to create the valuation he presented to the Court. It is undeniable therefore that what he did was an "appraisal" as defined by the USPAP and, accordingly, Mr. Long should have followed the professional standards of his field.

before. Day 1 Tr. at 312:4–10. Mr. Long also admitted that his methodology had never been subjected to peer review. *Id.* at 319:16–17. There are, therefore, no standards to apply to Mr. Long's methodology to ensure its reliability, and in fact there is evidence from his own field that casts doubt on the reliability of appraisals of the type performed here. *See Cuyuga Indian Nation v. Pataki*, 83 F. Supp. 2d 318, 323 (N.D.N.Y. 2000) (finding novel appraisal method inadmissible under *Daubert*). It is MVP's burden to establish the admissibility of expert opinion, *id.* at 322, and MVP has failed to carry its burden. Accordingly, the Court should exclude Mr. Long's testimony regarding the values he assigned to the easements at issue.

**2. Mr. Wagner's Testimony is Inadmissible.**

After realizing its error in attempting to offer Mr. Long's inadmissible opinions, MVP asked this Court to ignore the rules of discovery and fair play and allow it to offer new and previously undisclosed testimony from an undisclosed witness at the last minute. The evidence was presented after Landowners had rested their case and did not rebut any testimony offered by Landowners. The testimony is inadmissible because MVP failed to disclose it in discovery (or anywhere else), because it would violate Federal Rule of Evidence 408, and because offers are not competent evidence of value under Fourth Circuit precedent.

To compound the difficulties, MVP called Mr. Wagner at the end of the hearing and attempted to provide the landowners for the first time, at about 7:00 p.m., a thumb drive of offers it alleges were sent to the property owners. The Court rightly sustained objection to the admission of those documents. Although MVP identified Mr. Wagner in its disclosures as a potential witness, the disclosure only states "Mr. Wagner is in charge of acquiring easements needed for the project and, in addition, can testify that offers were made to acquire the easements." ECF #118 at 3. He was not qualified as an expert witness nor identified as a fact

witness who would testify about MVP's estimate of just compensation in support of the bond or even about the *amount* of any offers, merely "that offers were made."[22]

In contrast, MVP made it clear both in written discovery answers and during the Rule 30(b)(6) deposition that Mr. Long was its only source of evidence as to the bond sum, expressly stating that "Mr. Long will testify as to values to assist the court in setting a bond." ECF #118-1. MVP had the opportunity to disclose that Mr. Wagner would testify on the bond issue and declined to do so, thereby prejudicing the Landowners, who had no reason to depose him to discover the nature of his testimony. Accordingly, Mr. Wagner's testimony must be excluded under Fed. R. Civ. P. 37(c).

Mr. Wagner admitted that MVP's internal studies were prepared to make offers, not to determine just compensation. The admission of settlement offers to either prove or disprove the validity or amount of any disputed claim is prohibited. Fed. R. Evid. 408(a)(1). Further, Mr. Wagner had no personal knowledge of how the offers were calculated, and merely relied on others who actually calculated the offers. The persons who actually created the offers were not identified in discovery, not produced for deposition, and did not testify at the hearing. As with the evidence the court rejected in *Certain Parcels of Land in Arlington County,* Mr. Wagner's testimony relied on hearsay opinions of others not in court to be cross-examined. 261 F.2d at 290. *See also Bank of Edenton v. United States*, 152 F.2d 251, 253 (4th Cir. 1945) (explaining that the law is well-settled that testimony regarding offers should be excluded in eminent domain proceedings, citing *Sharp v. United States*, 191 U.S. 341, 348 (1903)). This Court should exclude in its entirety Mr. Wagner's testimony and any documents MVP sought to introduce through

---

[22] In argument, MVP's counsel tried to rearrange the words in its disclosure to change its meaning, insisting that it disclosed that Mr. Wagner would testify "to offers *that* were made." Tr. Day 2 at 352:1-2 (emphasis added).

him.[23]

**C. MVP Successfully Precluded Landowners from Inquiring Into its Financial Strength and Ability to Provide Just Compensation.**

Under *Sage* and other cases like it, MVP had alternative means to provide this Court with evidence of reasonable, certain, and adequate security: by presenting evidence that MVP had sufficient financial strength to ensure payment. *See Sage*, 361 F.3d at 824 (finding adequate assurance of just compensation based on $1.17 billion in revenue by taker in year before taking); *Wash. Metro. Area Transit Auth. v. One Parcel of Land*, 706 F.2d 1312, 1321 (4th Cir. 1983). MVP elected not to do that, instead vigorously opposing any inquiry into its financial circumstances and succeeding in blocking discovery on that issue. At the discovery hearing, Landowners argued that such evidence was relevant to the determination of the proper security and the assurance that MVP could actually provide just compensation, in light of evidence in public filings that MVP does not have sufficient assets to meet its burden. MVP made a tactical decision to exclude evidence of its financial strength, and must live with the consequences of that decision.

**D. Alternatively, If the Court Were Inclined to Grant the Injunctive Relief Sought, It Should Require Further Discovery and Proceedings to Determine the Bond Amount.**

Because MVP will not suffer irreparable injury and because the bond amount proffered by MVP does not meet the standards of the rules or of equity, the Court should not allow early entry. If, however, the Court were to determine that early entry is appropriate, it should first require competent evidence on the bond amount. In at least two cases, courts have refused to allow early possession until competent evidence to support a bond is submitted. *See In re*

---

[23] Mr. Wagner's testimony is further deficient because it consists merely of an aggregate, leaving the Court no ability to determine the security required for early entry on individual parcels. An average will not suffice.

*Transcon. Gas Pipeline Company, LLC*, No. 1:16-cv-02991-ELR, 2016 WL 8861714, at *11 (N.D. Ga. Nov. 10, 2016) (directing the parties to submit appraisals in the absence of evidence in the record of the condemned easements' appraised value); *Columbia Gas Transmission, LLC v. 76 Acres More or Less, in Baltimore and Harford Ctys., Md.*, No. ELH-14-0110, 2014 WL 2960836, at *16 (D. Md. Jun. 27, 2014) *aff'd in part, vacated in part, and remanded by*, 701 F. App'x 221 (4th Cir. Jul. 2017) (holding that "Columbia will be required to post a bond in an amount approximating the value of the easements to be condemned, which will be determined after additional briefing"). In accordance with those cases, Landowners request that, if the Court were to determine that MVP has met the *Winter* factors motion for preliminary injunction, it prohibit entry until the constitutional requirement of providing adequate security is satisfied through competent evidence.

## CONCLUSION

For the foregoing reasons, Landowners respectfully request that the Court deny Plaintiff's Motion for Partial Summary Judgment and Immediate Possession (ECF #4).

DATED:   January 20, 2018                                    Respectfully submitted,

<div style="margin-left:50%">

**/s/ Derek O. Teaney**
DEREK O. TEANEY (*pro hac vice*)
JOSEPH M. LOVETT (VBN 89735)
APPALACHIAN MOUNTAIN ADVOCATES, INC.
P.O. Box 507
Lewisburg, WV 24901
Telephone: (304) 793-9007
Facsimile: (304) 645-9008
dteaney@appalmad.org
*Counsel for Appalachian Mountain
Advocates Defendants*

**/s/ Isak J. Howell**
ISAK J. HOWELL (VBN 75011)
LAW OFFICE OF ISAK HOWELL
119 Norfolk Ave. SW # 330

</div>

50

Roanoke, VA 24011
Telephone: (540) 998-7744
Facsimile: (304) 645-9008
isak@howell-lawoffice.com
*Counsel for Law Office of Isak Howell*
*Defendants*

**/s/ Christopher S. Johns**

CHRISTOPHER S. JOHNS (*pro hac vice*)
JOHNS MARRS ELLIS & HODGE LLP
805 West 10th Street, Suite 400
Austin, TX 78701
Telephone: (512) 215-4078
Facsimile: (512) 215-4078
cjohns@jmehlaw.com
*Counsel for JMEH Law Defendants*

**/s/ Kevin DeTurris**

KEVIN DETURRIS (VBN 65400)
PAUL TERPAK (VBN 20209)
BLANKINGSHIP & KEITH, P.C.
4020 University Dr., Suite 300
Fairfax, VA 22030
Telephone: (703) 691-1235
Facsimile: (703) 691-3913
kdeturris@bklawwva.com
*Counself for B&K Defendants*

**/s/ Stephen J. Clarke**

STEPHEN J. CLARKE (VBN 72835)
WALDO & LYLE, P.C.
301 W. Freemason St.
Norfolk, VA 23510
Telephone: (757) 622-5812
Facsimile: (757) 622-5815
sjc@waldoandlyle.com
*Counsel for Waldo & Lyle Defendants*

**/s/ Charles M. Lollar**

CHARLES M. LOLLAR (VBN 17009)
CHARLES M. LOLLAR JR. (VBN 88635)
LOLLAR LAW, PLLC
109 E. Main St., Suite 501
Norfolk, VA 23510
Telephone: (757) 644-4657
Facsimile: (757) 644-4659

chuck@lollarlaw.com
*Counsel for Lollar Law Defendants*

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | | |
|---|---|---|
| MOUNTAIN VALLEY PIPELINE, L.L.C., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 7:17cv492EKD |
| | ) | |
| AN EASEMENT TO CONSTRUCT, | ) | |
| OPERATE AND MAINTAIN A 42-INCH | ) | |
| GAS TRANSMISSION LINE OVER TRACTS | ) | |
| OF LAND IN GILES COUNTY, CRAIG | ) | |
| COUNTY, MONTGOMERY COUNTY, | ) | |
| ROANOKE COUNTY, FRANKLIN COUNTY, | ) | |
| AND PITTSYLVANIA COUNTY, VIRGINIA, | ) | |
| et al., | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

**CERTIFICATE OF SERVICE**

I hereby certify that, on January 20, 2018, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send notification of such filing to counsel of record. I will serve the foregoing by United States mail, postage prepaid, on January 22, 2018, on the following defendants at the following addresses:

0.11 Acres of Land, Owned by Delmar Wayne Howard
2740 Reese Mountain Road
Elliston, VA 24087

0.28 Acres of Land, Owned by Elijah D. Howard
0.37 Acres of Land, Owned by Elijah Howard and Kristin Howard
2219 Willis Hollow Road
Shawsville, VA 24162

1.74 Acres of Land, Owned by Derek T. Hanes and Marion C. Hanes
7681 Grassy Hill Road
Boones Mill, VA 24065

///

///

David Cannon Helscher
OSTERHOUDT PRILLAMAN NATT HELSCHER YOST MAXWELL & FERGUSON, PLC
PO Box 20487
Roanoke, VA 24018-0049

　/s/ Isak Howell
Isak Howell (VA Bar No. 75011)