IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

MOUNTAIN VALLEY PIPELINE, LLC,    )
    )
    Plaintiff,    )
    )
    v.    )    Civil Action No. 7:17-cv-00492
    )
EASEMENTS TO CONSTRUCT,    )    By: Elizabeth K. Dillon
OPERATE, AND MAINTAIN A    )    United States District Judge
NATURAL GAS PIPELINE OVER    )
TRACTS OF LAND IN GILES COUNTY,    )
CRAIG COUNTY, MONTGOMERY    )
COUNTY, ROANOKE COUNTY,    )
FRANKLIN COUNTY, AND    )
PITTSYLVANIA COUNTY, VIRGINIA, *et*    )
*al.*,    )
    )
    Defendants.    )

## MEMORANDUM OPINION

On October 13, 2017, the Federal Energy Regulatory Commission (FERC) issued an order (the Certificate Order) authorizing plaintiff Mountain Valley Pipeline, LLC (MVP) to construct and operate approximately 300 miles of a new 42-inch diameter natural gas pipeline through Virginia and West Virginia (the Project). That order granted to MVP a certificate of public convenience and necessity under 15 U.S.C. § 717f, a provision of the Natural Gas Act (NGA).[1] The NGA grants private natural gas companies the federal power of eminent domain where they hold a FERC certificate and either cannot acquire property by contract or are unable to agree with the owner of the property on the amount of compensation to be paid for a necessary right of way for the transportation of gas. 15 U.S.C. § 717f(h).

---

[1] *See Mountain Valley Pipeline, LLC*, 161 FERC ¶ 61,043 (October 13, 2017 Order Issuing Certificates and Granting Abandonment Authority), docketed in this case as Exhibit 1 to the Complaint. (Dkt. No. 1-1.)

Relying on the Certificate Order, MVP filed this action on October 24, 2017, pursuant to Federal Rule of Civil Procedure 71.1. Its complaint seeks to condemn portions of almost 300 properties located within this district, both for permanent easements for the path of the pipeline itself and for temporary easements to allow access needed during the construction of the pipeline.[2] Most of the properties needed for pipeline construction—about 85% of the properties in both states—MVP has acquired by agreement. (Day 1 Hr'g Tr. 112, Dkt. No. 300.) The remaining properties in Virginia are identified in this lawsuit, and the defendants in this case are the landowners of (or easement holders on) the Virginia properties that MVP seeks to condemn.[3] According to its complaint and the declaration of Robert J. Cooper, who is MVP's Senior Vice President of Engineering and Construction, MVP has been unable to acquire the properties identified in the complaint by agreement, despite having offered at least $3,000 for each such property.[4]

Shortly after it filed its original complaint, MVP filed a motion for partial summary judgment and for a preliminary injunction seeking immediate possession of the properties. (Dkt. No. 4.) One group of defendant landowners filed a motion to dismiss (Dkt. No. 132), and four different groups filed motions to stay the proceedings on various grounds (Dkt. Nos. 234, 241,

---

[2] MVP also filed a companion action in the United States District Court for the Southern District of West Virginia, and a portion of that action was later dismissed and refiled in the Northern District of West Virginia. *See generally Mountain Valley Pipeline, L.L.C. v. An Easement to Construct Operate & Maintain A 42-Inch Gas Transmission Line Across Properties in the Counties of Nicholas, Greenbrier, Monroe, & Summers*, No. 2:17-cv-4214 (S.D.W. Va.); *Mountain Valley Pipeline, L.L.C. v. Simmons*, No. 1:17-cv-211 (N.D.W. Va.).

[3] Although many of the defendants have made, or incorporated by reference, the same arguments, not every defendant or every attorney in the case has made precisely the same arguments. Identifying which defendants have made each particular argument, however, would be needlessly confusing. So, unless otherwise specified, the term "defendants" used in this opinion means "some or all defendants."

[4] MVP has since reached agreements as to some of the properties, and those have been dismissed from the complaint. It has also amended its complaint to account for a variation in the route ordered by FERC, Variation 250. Amended answers by parties affected by that amendment were filed on January 23 and 24, 2018. In light of the entire history of the case and the parties' filings, the court construes MVP's motion for partial summary judgment and for immediate possession as relating to its complaint and all amendments thereto.

243, 247), including their asserted need for discovery.  The court allowed limited discovery on certain topics (*see* Dkt. No. 205 (allowing expedited discovery)), and it held a hearing to resolve all outstanding discovery objections on December 28, 2017, issuing its order the next day.  (Dkt. Nos. 254, 255.)

After extensive briefing, the court held a hearing on all pending motions on January 12 and 13, 2018, which included testimony from a number of different witnesses, including landowners, related to MVP's motion for immediate possession.  (*See generally* Day 1 & 2 Hr'g Trs., Dkt. Nos. 300, 306.)  The court took all of the pending motions under advisement, but it permitted the parties to file post-hearing briefs (including written closing arguments), which have now been filed and which the court has considered.

For the reasons discussed in more detail below, the court will deny the motion to dismiss because it is procedurally improper, although the court has considered the arguments raised therein when ruling on other motions.  The court also denies the motions to stay for several reasons, all discussed below.

As to MVP's motion for partial summary judgment and for a preliminary injunction, the court considers that motion in two parts.  First, the court concludes that MVP has established that there are no disputes of fact and that it is entitled to condemn the land as a matter of law.  Thus, it will grant MVP's motion for partial summary judgment.

Finally, as to MVP's motion for immediate possession, the court has carefully considered the evidence before it and concludes that MVP has shown that it can satisfy the four factors required under *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 22 (2008), to receive a preliminary injunction.  As to most of the properties, however, MVP has not yet presented sufficient evidence to ensure that it can provide the landowners with "reasonable,

certain, and adequate provision for obtaining compensation," which it must do before their "occupancy is disturbed." *Cherokee Nation v. S. Kansas Ry. Co.*, 135 U.S. 641, 659 (1890); *see Sweet v. Rechel*, 159 U.S. 380 (1895). Consequently, as to all but nine properties, the court cannot yet set adequate security in this matter. Thus, the court will conditionally grant the motion for immediate possession but possession will not be permitted until MVP presents sufficient additional evidence to satisfy this constitutional requirement. As to the nine properties for which the court currently has appraisals, the court will conditionally grant the motion for immediate possession and, upon MVP's posting of a deposit equal to three times the amount of each appraisal—which will be subject to a draw-down procedure by those landowners—and the posting of a bond conditioned on payment of just compensation, the court will enter an order allowing MVP immediate possession of those properties.

## I.   BACKGROUND

### A.  Pertinent Provisions of the Natural Gas Act

The NGA, 15 U.S.C. §§ 717-717z, permits FERC to grant certificates that confer the NGA's power of eminent domain on gas companies for the purpose of constructing or maintaining pipelines and related facilities. Once a FERC order or certificate is granted, there are limited routes for challenging it. As this court recently explained in a related case,

> [t]he NGA provides its own framework for challenges to FERC orders. Effectively, to challenge a FERC order, a party must first apply for rehearing before FERC and, thereafter, may obtain judicial review before either the United States Court of Appeals for the D.C. Circuit or any other court of appeals where the natural gas company related to the order "is located or has its principal place of business." 15 U.S.C. § 717r(b).

> The pertinent language from NGA § 19, codified at 15 U.S.C. § 717r, provides that "[a]ny person . . . aggrieved by an order issued by the Commission in a proceeding under this chapter to which such person . . . is a party may apply for a rehearing within

4

> thirty days after the issuance of such order." § 717r(a). If, and only if, a person files for rehearing, however, may the person obtain judicial review: "No proceeding to review any order of the Commission shall be brought by any person unless such person shall have made application to the Commission for a rehearing thereon." *Id.* Subsection (b) explains that a person may obtain review of FERC's order "in the court of appeals of the United States for any circuit wherein the natural-gas company to which the order relates is located or has its principal place of business, or in the United States Court of Appeals for the District of Columbia." § 717r(b). It describes that review as "exclusive," noting that "[u]pon the filing of such petition such court shall have jurisdiction, which upon the filing of the record with it shall be exclusive, to affirm, modify, or set aside such order in whole or in part." *Id.*

*Berkley v. Mountain Valley Pipeline*, No. 7:17-cv-357, 2017 WL 6327829, at *3 (W.D. Va. Dec. 11, 2017).[5]

In addition to the process for review of a FERC order, a separate provision of the NGA expressly grants district courts authority to decide a condemnation proceeding like this one. 15 U.S.C. § 717f(h). The role of courts in such proceedings is circumscribed, however. *Millennium Pipeline Co. v. Certain Permanent & Temp. Easements*, 777 F. Supp. 2d 475, 481 (W.D.N.Y. 2011), *aff'd*, 552 F. App'x 37 (2d Cir. 2014). That is, "[t]he NGA does not allow landowners to collaterally attack the FERC certificate in the district court, it only allows enforcement of its provisions." *Transwestern Pipeline Co. v. 17.19 Acres*, 550 F.3d 770, 778 n.9 (9th Cir. 2008); *see also Columbia Gas Transmission, LLC v. 252.071 Acres More or Less*, No. 15-cv-3462, 2016 WL 1248670, at *5 (D. Md. Mar. 25, 2016) ("The jurisdiction of this court is limited to evaluating the scope of the FERC Certificate and ordering condemnation as authorized by that Certificate . . . . This court's role is mere enforcement." (quoting *Guardian Pipeline, L.L.C. v.*

---

[5] The landowners in the *Berkley* case have appealed the judgment of this court, and that appeal is pending. *See Berkley v. Mountain Valley Pipeline, LLC*, No. 18-1042 (4th Cir.). The Fourth Circuit has ordered accelerated briefing, which should be complete by March 6, 2018. *Id.* (January 16, 2018 Order Granting Accelerated Briefing).

*529.42 Acres*, 210 F. Supp. 2d 971, 974 (N.D. Ill. 2002))).  Condemnation cases under the NGA are governed procedurally by Federal Rule of Civil Procedure 71.1.

**B.  *East Tennessee Natural Gas Co. v. Sage*, 361 F.3d 808 (4th Cir. 2004)**

The Fourth Circuit's decision in *East Tennessee Natural Gas Co. v. Sage*, 361 F.3d 808 (4th Cir. 2004), bears at least a brief discussion at the outset because it is a focal point of the parties' arguments and the court's analysis, especially as it pertains to MVP's request for immediate possession.[6]  In *Sage*, the Fourth Circuit affirmed the district court's grant of partial summary judgment to a natural gas company, ETNG, where the district court determined that ETNG had established its right to exercise eminent domain over the landowners' properties based on a FERC certificate of public convenience and necessity.  The court also affirmed the district court's grant of the remedy of immediate possession through the issuance of a preliminary injunction.  The bulk of the appellate opinion consisted of analysis leading to two conclusions: (1) district courts have equitable authority to grant immediate possession in this circumstance; and (2) the district court did not abuse its discretion in granting a preliminary injunction, based on the facts before it.  *Sage* has been followed by a number of courts throughout the country, and MVP has cited to a long list of cases in which immediate possession has been similarly granted, both before and after *Sage*.  (*See, e.g.*, Dkt. No. 219 at 25–27) (collecting authority).)  *Sage* will be discussed in more detail in context.

**C.  Procedural Background**

Before FERC issued MVP its certificate, it considered MVP's application for approximately three years.  As part of that process, FERC received public comments and input from landowners and other interested parties.  Indeed, many of the witnesses who testified before

---

[6] Although some of the defendants urge that *Sage* was wrongly decided, they nonetheless acknowledge that it is binding on this court.  (*See, e.g.*, Dkt. No. 305 at 1–3.)

this court indicated that they had previously provided statements to FERC. Many of the challenges and arguments raised by the parties here were addressed explicitly by FERC in the Certificate Order, and others formed the basis for one commissioner's dissent from the order. FERC, however, largely rejected those arguments. The Certificate Order concludes that the "public at large will benefit from the increased reliability of natural gas supplies" and that "upstream natural gas producers will benefit . . . by being able to access additional markets for their product." (FERC Cert. Order ¶ 62, Dkt. No. 1-1.) It also considered potential impacts to landowners, geologic resources, groundwater, rivers and streams, wetlands, wildlife, and cultural and historical resources, concluding that the project's benefits outweigh any adverse impacts. (*Id.* ¶¶ 41, 55, 57, 62, 74, 157, 177, 190, 209, and 286.)

The Project is designed to take natural gas from the producing regions in the Marcellus and Utica shales south through West Virginia and Virginia. It will connect, in Pittsylvania County, Virginia, to the Transco pipeline system, which provides gas to the east. It will also interconnect with a gas line supplying gas to the Washington, D.C. area, and a very small portion of its capacity (about a half-percent of total capacity) will supply gas to Roanoke Gas Company, a local natural gas distributor. (Cooper Decl. ¶ 6, Dkt. No. 4-1.)

The Certificate Order requires that the Project be constructed and placed in service by October 2020, and MVP contends that it will be unable to meet that deadline if it cannot obtain possession of the properties until the conclusion of the proceedings in this case. Additionally, MVP plans to place the Project in service even earlier—by the end of 2018. (Cooper Decl. ¶ 20.) MVP claims that, to meet its preferred schedule, for which it has already hired various contractors, it needs possession of the properties in this case by February 1, 2018. (*Id.* ¶¶ 12,

24.)  The claimed reasons for this urgency are described in the context of addressing the motion

for immediate possession below.

MVP filed its action in this court less than two weeks after the FERC Certificate Order

issued.  As already noted, the court allowed expedited discovery prior to holding a hearing on

MVP's motion for partial summary judgment and for preliminary injunction.  All of the motions

have been fully briefed and are ripe for disposition.

## II.  DISCUSSION

### A.  Motion to Dismiss for Lack of Jurisdiction and for Failure to State a Claim (Dkt. No. 132)

The motion to dismiss is based on two contentions: (1) that the "conditional" nature of

the FERC Certificate Order precludes these condemnation proceedings and means that MVP

does not have the authority to condemn property until is satisfies all of the conditions; and (2)

that a private entity cannot condemn private property unless it first demonstrates an ability to pay

just compensation to all those whose property they seek to take and that "MVP has not even

attempted to do" so.  (Dkt. No. 132 at 3; *see id.* at 40.)  Based on these two arguments,

defendants argue both that MVP has failed to state a claim and that this court lacks jurisdiction

over the case.[7]

The court does not reach the merits of the motion to dismiss —although it addresses the

arguments it raises in the context of the partial summary judgment motion—because a motion to

dismiss is not permitted under the plain language of Rule 71.1 and *Atlantic Seaboard Corp. v.*

*Van Sterkenburg*, 318 F.2d 455 (4th Cir. 1963).  Rule 71.1(e)(3) allows defendants to file a

notice of appearance and an answer, and it expressly states:  "No other pleading or motion

---

[7] Defendants also argue that FERC does not make a determination of "public use" as is required to render a taking constitutional under the Fifth Amendment.  This argument is a collateral challenge to the FERC Certificate Order, which this court may not entertain.  Furthermore, established authority holds that a FERC certificate is sufficient to confer eminent domain authority on a natural gas company.  *See generally Sage*, 361 F.3d 808.

asserting an additional objection or defense is allowed." Fed. R. Civ. P. 71.1(e)(3). Based on

this language, the *Atlantic Seaboard Corp.* court held that a motion to dismiss for failure to state

a claim is "unallowable" in a condemnation action, but noted that all defenses could be raised in

an answer. 318 F.2d at 458 (explaining that Rule 71.1's "prohibition of any pleading other than

an answer is clear and unequivocal");[8] *see also Columbia Gas Transmission, LLC v. 370.393*

*Acres*, No. 1:14-cv-0469, 2014 WL 2919709, at *1 (D. Md. June 26, 2014) (denying motions for

more definite statement on that ground and citing *Atlantic Seaboard Corp.*). Based on this clear

authority, the court denies the motion to dismiss as procedurally improper.

**B.  Motions to Stay (Dkt. Nos. 234, 241, 243, 247)**

Two of the four motions to stay simply incorporate a third by reference, and so these

three motions to stay make the same arguments. (Dkt. Nos. 234, 241, 247.) The fourth motion

(Dkt. No. 243) raises some different arguments, and the court will address that motion first. In

that motion to stay, defendants argue that the lawsuit has become a "hyper-accelerated litigation

driven by the self-proclaimed necessity" of MVP to begin construction early, despite not having

all the approvals. (Dkt. No. 244 at 2.) Defendants also note the court's inherent power to stay

proceedings and to control its cases.

The motion also points to landowners who claim the property sought in the complaint

differs from what MVP previously offered to purchase. Specifically, it relies on the declarations

of James Scott and Michael Slayton. Scott's property contains a historic cemetery, and he avers

that MVP offered to purchase a different route from him (that would avoid the cemetery), but

that the complaint references the original route of the FERC application, which would go

---

[8] *Atlantic Seaboard* cited Rule 71A, which was renumbered as Rule 71.1 by the 2007 Amendments to the federal rules, although the text remained largely unchanged. Fed. R. Civ. P. 71.1 advisory committee's note to 2007 amendment.

through the cemetery.  The Slayton declaration is similar, although the route in the complaint would go through an area with a known sinkhole (Slusser's Chapel sinkhole).

These discrepancies are purportedly offered to show that the pipeline route is not yet firmly established and that MVP may still amend it.  (Dkt. No. 264.)  Based on this, defendants argue that granting immediate possession would be premature and that the case should be stayed until MVP can provide assurances that the route they are seeking to condemn is in fact the proper route.

In response, MVP offers several assertions that the court finds persuasive.  First, as to the Slayton property, the complaint in this matter has been amended to conform with a variation required by FERC known as "Variation 250."  This is a variation to the pipeline route in Montgomery County that the FERC Certificate Order required MVP to adopt.  (Cert. Order ¶¶ 152–54.)  The variation did not require the addition of any new landowners, but instead adjusted the route as to several landowners already in the case, including Slayton.  As is undisputed, MVP has made the necessary filings with FERC to adjust the route and also amended its complaint in this case to incorporate Variation 250.  The defendants affected by Variation 250 were served with that amendment and their answers, if any, were due and have been filed since the hearing.[9]  Thus, the amended complaint seeks to condemn the same property that FERC required as part of Variation 250.

---

[9]  The amended complaint served as another basis for defendants' requested stay.  Defendants affected by the amendment argued that the hearing should not have gone forward and no decision should be issued because they had not had the full 21-day period to file their answers. The court concludes that, as a procedural matter, a summary judgment motion can be asserted and addressed even before the filing of an amended answer and nothing in the federal rules expressly precludes the court from addressing the summary judgment motion.  The court also acknowledges, though, that it would have the discretion to delay a ruling on summary judgment until after the filing of the amended answers.  At this point, however, the answers have been filed, and they do not appear to raise different or additional defenses.  Thus, the court declines to grant a stay on this basis.

As to the Scott property, MVP acknowledges that it seeks to condemn the original route, instead of the route that would avoid the cemetery.  As MVP correctly notes, the only route that it has authority to condemn is the FERC-approved route.  Put differently, it cannot unilaterally alter the route across properties that it has to obtain by condemnation.  If it reaches an agreement with a landowner, however, the owner and MVP can jointly seek approval from FERC for a route variation, and those requests are usually granted.  So MVP is going forward with the original route on the Scott property—the only FERC-approved route—because that is the only route it is authorized to obtain by condemnation and it has been unable to obtain it by agreement. Nonetheless, MVP explains that it continues to survey the property and that it is willing to consider an alternative route if it can reach an agreement with the Scotts.  In the absence of an agreement, however, it will condemn the original route approved by FERC, and that is where it will build.

The fourth motion to stay also argues that the discovery permitted by the court, while "appreciate[d]," was so limited in time and scope that "meaningful review and preparation" were made "nearly impossible."  Defendants assert that forcing such hurried discovery "raises significant due process implications, especially when coupled with the extraordinary relief requested by MVP and the fundamental nature of the property rights of which MVP seeks to divest the Defendants."  (Dkt. No. 244 at 6.)  Despite these complaints, defendants presented a spirited defense at the hearing and did not identify any specific discovery that they believed they needed to adequately respond to the motions, aside from evidence regarding MVP's financial strength and viability (on which the court declined to allow discovery), and perhaps discovery as to offers on all outstanding properties (which the court excluded in any event).  Thus, the court

does not believe that equity required a stay postponing the hearing or that it requires the postponement of its decision to allow for unspecified discovery.

In the other three motions to stay (Dkt. Nos. 234, 241, and 243), defendants argue that the court should not grant immediate possession to MVP or consider injunctive relief until the landowners can obtain further review of the Certificate Order. They are not asking that this proceeding be stayed in its entirety, but only that the court withhold ruling on the motion for immediate possession. The court does not believe the requested stay is appropriate in this case.

The defendants' arguments are two-fold. First, they argue that there are a number of other legal proceedings that could affect, delay, or halt the building of this pipeline and so to allow immediate possession before it is assured that the pipeline will be completed will irreparably harm defendants and their property, especially if the pipeline ultimately is not built. They cite often to the example of a woman with a maple syrup business whose property was left littered with felled maple trees after a court granted immediate possession and the pipeline project subsequently ceased.

Second, they argue that the combined effect of the statutory review scheme and FERC's so-called "tolling order" is to allow MVP to obtain possession under a FERC Certificate Order that is effectively insulated from any judicial review. That is, in this case, a number of defendants and others filed petitions for rehearing with FERC, a step that the NGA requires before seeking judicial review of a FERC order in a court of appeals. As has become commonplace, FERC issued an order essentially taking the petition under advisement and stating that it needed more time to consider rehearing. (Dkt. No. 234-1.) That tolling order allowed FERC to give itself additional time to consider the petition for rehearing. Such orders also typically prevent challengers to a FERC order from obtaining judicial review because courts

have held there is no jurisdiction in the courts of appeals until FERC actually rules on the petition for rehearing. *See, e.g.*, *Clifton Power Corp. v. FERC*, 294 F.3d 108, 110 (D.C. Cir. 2002); *City of Glendale v. FERC*, No. 03-1261, 2004 WL 180270, at *1 (D.C. Cir. Jan. 22, 2004); *see also Allegheny Defense Project v. FERC*, No. 17-1098 (D.C. Cir. Nov. 8, 2017) (denying emergency motion for a stay where FERC tolling order was in effect and petition for rehearing had not yet been ruled on).[10] Defendants argue that the entire scheme denies them due process because the Certificate Order is "final" for purposes of MVP condemning property, but not "final" so as to allow review in the court of appeals. (Dkt. No. 234 at 3–4; *id.* at 4 (asserting that the tolling order "gores Landowners on the horns of a dilemma").) In short, they argue that they are left without recourse to challenge the Certificate Order before their property is condemned.

The court addresses each of these arguments in turn. First, as to the argument that the court should stay the request for injunctive relief until other judicial challenges can be decided or until all conditions on the FERC Certificate Order are satisfied, defendants cite to no authority for their request. Moreover, a stay of the order by this court is not permitted under the plain language of the statute. *See Steckman Ridge GP v. Exclusive Nat. Gas Storage Easement Beneath 11.078 Acres*, No. 08-cv-168, 2008 WL 4346405, at *3–4 (W.D. Pa. Sept. 19, 2008) (analyzing issue); 15 U.S.C. §717r(c) (FERC order is not stayed unless specifically ordered by the Commission, nor does the commencement of judicial proceedings operate as a stay of the FERC order unless ordered by the court). Instead, requests for a stay must be directed to FERC or to the appropriate court of appeals. By the express provisions of the statutory scheme and the cases interpreting it, then, this court does not have authority to stay the Certificate Order. And

---

[10] Despite this precedent, some of the landowners have filed an appeal in the United States Court of Appeals for the D.C. Circuit challenging the FERC Certificate Order. Some defendants have also filed motions to stay with that court and with FERC, but no action has been taken on those requests.

despite the landowners' claim that they are not seeking to stay the order, that seems to be the relief they ask for, albeit "indirectly." *See Sabal Trail Transmission, LLC v. Real Estate*, No. 1:16-cv-63, 2016 WL 8919397, at *3 (N.D. Fla. May 23, 2016) (declining defendants' "invitation to indirectly stay FERC's order").

Defendants urge, though, that this court has inherent authority to stay proceedings and that a stay is warranted if the party seeking it makes out a "clear case of hardship or inequity in being required to go forward." (Dkt. No. 234 at 2 (quoting *Landis v. N. Am. Co.*, 299 U.S. 248, 254–55 (1936)).) Put differently, they seem to be requesting that the court circumvent the statutory scheme in the name of equity. (Dkt. No. 287 at 3–4, 6 (arguing that this court's role as "chancellor" allows it to stay the proceedings to ensure the landowners receive due process).) This court will not stay this action where other courts statutorily authorized to do so have not. Again, this court's task is to enforce the Certificate Order, not stay its own proceedings to give the landowners more time to challenge it. Thus, the court does not believe that equity requires a stay in this case.

As to defendants' second argument—that the tolling order denies defendants due process—defendants argue that this is an issue of first impression. They contend that "no court has addressed a request for a stay of proceedings on a motion for a preliminary mandatory injunction on the basis of" a FERC tolling order, although they admit that the decision in *Transcontinental Gas Pipe Line Co. v. Permanent Easement for 2.14 Acres* ("*Transco*"), No. 17-cv-1725, 2017 WL 3624250 (E.D. Pa. Aug. 23, 2017), "comes the closest." According to defendants, though, the *Transco* court's reasoning was "wrong" because it incorrectly concluded that process delayed was not process denied.

Nonetheless, both *Transco* and the decision in *Steckman Ridge* (which did not involve a motion to stay, but did involve a FERC tolling order) rejected the landowners' argument that the court should not address the condemnation claims until after FERC rehearing was concluded, and granted the pipeline company's request for immediate possession. The court finds the reasoning in these cases persuasive. Furthermore, it is worth noting that FERC tolling orders have been repeatedly upheld against challenges. *See, e.g.*, *Kokajko v. FERC*, 837 F.2d 524, 525–26 (1st Cir. 1988) (holding that the delay in FERC's final resolution of a challenge to a rate order, which involved both a five-year delay from the filing of the case, in which two prior FERC orders on rehearing had been issued, and a four-month delay from the last tolling order, was insufficient to constitute a due process violation and thus declining to issue a writ of mandamus to compel agency action); *see also City of Glendale*, No. 03-1261, 2004 WL 180270, at *1 (denying petition for review of FERC order and dismissing appeal where tolling order left petition for rehearing pending, although not addressing a due process argument); *Towns of Wellesley, Concord, & Norwood v. FERC*, 829 F.2d 275, 278 (1st Cir. 1987) (denying writ of mandamus in case challenging FERC rates where FERC had taken 14 months to issue its final order, after court had remanded and instructed FERC to issue ruling).

The court must also acknowledge the numerous district court cases to which MVP cites for two propositions: (1) a FERC certificate is binding in eminent domain proceedings even if subject to rehearing as long as neither FERC nor a court of appeals has issued a stay; and (2) the fact that rehearing is pending is no reason to delay summary judgment or immediate possession. (*See* Dkt. No. 263 at 3–4.) Those cases further support the court's conclusion that a stay here is inappropriate.

For the reasons set forth above, all of the motions to stay will be denied.

## C.  Motion for Partial Summary Judgment

MVP's motion for partial summary judgment seeks a declaration that it is entitled to condemn the properties referenced in the complaint.  Although the Fourth Circuit's decision in *Sage* is instructive on a number of issues, the landowners there did not challenge on appeal the district court's ruling that ETNG had the right to take their property.  As a result, that case did not address the requirements for determining that an entity has the right to exercise eminent domain as outlined in a FERC certificate of public convenience and necessity.  In other cases, though, courts have laid out three requirements, all of which come from 15 U.S.C. § 717f(h).  It provides:

> When any holder of a certificate of public convenience and necessity cannot acquire by contract, or is unable to agree with the owner of property to the compensation to be paid for, the necessary right-of-way to construct, operate, and maintain a pipe line or pipe lines for the transportation of natural gas, and the necessary land or other property, in addition to right-of-way, for the location of compressor stations, pressure apparatus, or other stations or equipment necessary to the proper operation of such pipe line or pipe lines, it may acquire the same by the exercise of the right of eminent domain in the district court of the United States for the district in which such property may be located, or in the State courts. The practice and procedure in any action or proceeding for that purpose in the district court of the United States shall conform as nearly as may be with the practice and procedure in similar action or proceeding in the courts of the State where the property is situated: Provided, That the United States district courts shall only have jurisdiction of cases when the amount claimed by the owner of the property to be condemned exceeds $3,000.

15 U.S.C. § 717f(h).

Based on this provision, courts have explained that, "[o]nce a [certificate of public convenience and necessity] is issued by the FERC, and the gas company is unable to acquire the needed land by contract or agreement with the owner, the only issue before the district court in the ensuing eminent domain proceeding is the amount to be paid to the property owner as just

16

compensation for the taking." *Maritimes & Northeast Pipeline, L.L.C. v. Decoulos*, 146 F. App'x 495, 498 (1st Cir. 2005); *Millennium Pipeline Co.*, 777 F. Supp. 2d at 479.

Thus, courts have held that a plaintiff must satisfy three requirements to exercise eminent domain under § 717f(h): (1) it holds a valid FERC certificate; (2) the easements it seeks are necessary; and (3) it has been unable to acquire easements by agreement. *See Columbia Gas Transmission Corp. v. An Easement to Construct, Operate, & Maintain a 24-inch Gas Transmission Pipeline*, No. 3:07-cv-28, 2007 WL 2220530, at *3 (W.D. Va. July 31, 2007). Some courts have omitted the "necessary" second element and instead added as a third element that the "value of the subject property claimed by the owner exceeds $3,000.00." *See, e.g.*, *Steckman Ridge*, 2008 WL 4346405, at *13 (setting forth three elements).

Some of the defendants argue that there is also a requirement that the certificate holder have negotiated in "good faith" in order to obtain the easements, and at least one court has so stated. *See Transcon. Gas Pipe Line Corp. v. 118 Acres*, 745 F. Supp. 366, 369 (E.D. La. 1990). But MVP correctly notes that that court cited no authority for the proposition. And numerous district courts in the Fourth Circuit (and elsewhere) have rejected any requirement of "good faith negotiation." *See, e.g.*, *Columbia Gas Transmission Corp. v. Easement to Construct, Operate & Maintain 24-Inch Pipeline*, No. 5:07-cv-04009, 2008 WL 2439889, at *2 n.4 (W.D. Va. June 9, 2008) ("[N]othing in the NGA or Rule 71A requires the condemnor to negotiate in good faith."). (*See also* Dkt. No. 219 at 22–23 (collecting authority).) Although MVP has not cited to a case from the Fourth Circuit rejecting a "good faith" requirement, the overwhelming lower court authority does, and there is no firm basis for it in the statute. Thus, the court rejects defendants' argument that MVP must show it engaged in "good faith" negotiations.[11]

---

[11] Mr. Keuling-Stout, who is representing himself, also notes that the Certificate Order itself references assurances by MVP that it "will make good faith efforts to negotiate with landowners for any needed rights, and will

Defendants also raise a number of factual and legal challenges to MVP's right to condemnation, which the court addresses next.

### 1. MVP's alleged failure to show it can pay just compensation is not part of the summary judgment inquiry.

One of the primary arguments raised by the defendants is that MVP has not proven it can pay just compensation for all of the easements it seeks, which is a requirement that is imposed by the Fifth Amendment of the United States Constitution (in addition to requirements that it holds a certificate, needs the land, and could not acquire it by agreement). (Dkt. No. 196 at 15–19.) While the court agrees that the Fifth Amendment confers the due process protection of an assurance of just compensation before occupancy is disturbed, *Cherokee Nation*, 135 U.S. at 659, the court does not agree that this issue is properly considered as part of the motion for summary judgment.

Defendants attempt to include the payment of just compensation as an element of MVP's condemnation claim, but it is not identified that way in the cases they cite, including *Sage* itself. Indeed, *Sage* first addressed the district court's grant of summary judgment. Separately, as part of determining whether immediate possession could be permitted, it addressed the landowners' argument that their possession could not be disturbed unless an owner has "reasonable, certain, and adequate provision for obtaining compensation." *Sage*, 361 F.3d at 824 (quoting *Cherokee Nation*, 135 U.S. at 659). Thus, the court concludes that this issue does not affect MVP's right to condemn, as implicated by its motion for summary judgment. Rather, this issue is properly addressed as part of MVP's request for immediate possession. Accordingly, the court will

---

resort only when necessary to the use of eminent domain." (Dkt. No. 98 at 2 (citing FERC Cert. Order ¶ 57).) He cites to no authority suggesting that MVP has an obligation to negotiate in good faith, however, or that its assurances to FERC somehow translate into an added statutory requirement to do so. Compliance with any condition in the certificate is an issue for FERC, not this court.

discuss this issue—and all of the related issues concerning who bears the burden to establish

value, or a sufficient amount for security—in ruling on MVP's motion for immediate possession.

### 2. The conditional nature of the certificate does not preclude entry of summary judgment.

Defendants also argue that, because the FERC order at issue here is conditional, summary

judgment is precluded until all conditions are satisfied.[12] They note that MVP has satisfied most,

but not all of the conditions FERC imposed in its Certificate Order.

At the hearing, Cooper testified about the status of various conditions in the FERC

Certificate. He noted that, in Virginia, MVP does not yet have approved erosion and sediment

control plans from the Virginia Department of Environmental Quality, which are required to

conduct earth-disturbing tree-cutting, but not to fell trees using chainsaws and leaving the

stumps. (Day 1 Hr'g Tr. 123–24, 154–55, 185–86.) MVP also has not yet received approval to

proceed from certain Virginia historical agencies and the concurrence of those agencies is one of

the conditions set by FERC. (*Id.* at 186–90.) Other approvals it has obtained are being

challenged in court. *See, e.g.*, *Rasoul v. State Water Control Bd.*, No. 17-2433 (4th Cir.); *Sierra

Club v. State Water Control Bd.*, No. 17-2406 (4th Cir.) (consolidated cases challenging approval

given to MVP by Virginia's State Water Control Board).

The NGA itself allows conditions on the "issuance of the certificate" as well as on the

"exercise of the rights granted thereunder." 15 U.S.C. § 717f(e). Defendants acknowledge this,

but argue that the conditions set in this case are more like "prerequisites." They assert that when

Congress allowed FERC to place conditions on a certificate, it only meant the types of conditions

that limit performance under the certificate. Thus, they argue, many of the conditions issued

---

[12] They also make the related argument that because MVP has not yet satisfied pre-construction conditions, it cannot show irreparable harm. The court addresses that argument in the context of the motion for preliminary injunction.

here—which are effectively prerequisites—are not permitted by the statute. Defendants therefore claim that MVP's conditional certificate is not the sort of certificate contemplated by Congress when it drafted § 717f(h) to allow the exercise of eminent domain.

While creative, this argument is unsupported by any case authority. Indeed, the cases that have addressed the issue head-on reject the argument. Instead, those cases make clear that where a condition to the FERC certificate expressly limits eminent domain authority—which was the situation in *Mid Atlantic Express, LLC v. Baltimore Cty.*, 410 F. App'x 653 (4th Cir. 2011)—then such authority is limited; otherwise, it is not. In *Mid Atlantic Express*, the court reversed the district court's grant of an injunction to allow immediate possession to a company building a natural gas pipeline because one of the conditions set forth by FERC in the certificate said that "Mid–Atlantic shall not exercise eminent domain authority granted under [the Natural Gas Act] section 7(h) to acquire permanent rights-of-way on [residential] properties until the required site specific residential construction plans have been reviewed and approved in writing by the Director of [the Office of Energy Projects ("OEP") ]." *Id.* at 657. Because of the condition, the Fourth Circuit concluded that Mid-Atlantic did not have the authority to condemn property and thus that the district court lacked jurisdiction over the condemnation proceedings. *Id.* Defendants have not pointed to any similar condition in this case and acknowledged at the hearing that no such limitation on MVP's eminent domain authority was set forth in the FERC Certificate. (Day 1 Hr'g Tr. 60.)

Furthermore, there are a number of cases holding that a conditional FERC certificate does not preclude exercise of eminent domain. *McCurdy v. Mountain Valley Pipeline, LLC*, No. 1:15-cv-03833, 2015 WL 4497407, at *3 (S.D.W. Va. July 23, 2015) ("[E]ven conditional Certificates can provide a party with a route to condemnation . . . ."); *Columbia Gas Transmission, LLC v.*

*370.393 Acres,* 1:14-cv-0469, 2014 WL 5092880, at *4 (D. Md. Oct. 9, 2014) (collecting

authority and holding that FERC may address a holder's failure to comply with certain

conditions, but the court's role in the condemnation proceeding is only to determine whether the

complaint "complies with the scope of the FERC Certificate"); *Columbia Gas Transmission LLC*

*v. 0.85 Acres*, No. 14-cv-2288, 2014 WL 4471541, at*4 (D. Md. Sept. 8, 2014) ("Even assuming,

for argument's sake, that the certificate holder is violating the FERC Certificate conditions, this

would not affect the validity of the FERC Certificate or the certificate holder's ability to exercise

its authority of eminent domain."); *Portland Nat. Gas Transmission Sys. v. 4.83 Acres of Land*,

26 F. Supp. 2d 332, 336 (D.N.H. 1998) ("Compliance with FERC conditions cannot be used as a

defense to the right of eminent domain and cannot be cited to divest the court of the authority to

grant immediate entry and possession to the holder of a FERC certificate."); *Tenn. Gas Pipeline*

*Co. v. 104 Acres of Land More or Less*, 749 F. Supp. 427, 432–33 (D.R.I. 1990) (reasoning that

conditions in FERC order did not preclude "condemnation of property based on the possibility

that approval will not be granted" because they "do not operate as a 'shield' against the exercise

of eminent domain power").[13]

3. **The pendency of other cases or other legal challenges with the potential to halt construction does not render the motion for partial summary judgment premature.**

As discussed with regard to the motion to stay, generally district courts in NGA

condemnation proceedings do not have authority to consider other legal challenges to the FERC

---

[13] Defendants acknowledge this authority, but claim that the cases are unpublished, mostly out-of-circuit district court decisions that are not binding on this court. While these cases may not be binding, the court is convinced by this authority and thus concludes that a conditional FERC certificate is sufficient to confer eminent domain authority. The other authority cited by defendants (*see, e.g.*, Dkt. No. 187 at 5) does not alter the court's conclusion because defendants cite those cases for far broader propositions than the cases actually support. *Cf. Columbia Gas Transmission, LLC v. 76 Acres More or Less*, No. 14-cv-0110, 2014 WL 2960836, at *4 (D. Md. June 27, 2014), *aff'd in part and vacated in part,* 2017 WL 2983908 (4th Cir. July 13, 2017) (noting an argument was made about a failure to satisfy conditions, but concluding it was mooted by subsequent events); *Del. Dep't. of Nat. Res. v. FERC*, 558 F.3d 575, 579 (D.C. Cir. 2009) (stating that a FERC conditioned certificate "cannot possibly authorize" the project, but in an unusual factual context involving an issue of standing).

order, nor does this court have the ability to stay condemnation proceedings to wait until other legal challenges are resolved. Instead, the NGA directs that a petition for rehearing does not stay a FERC order, unless FERC itself says so. 15 U.S.C. § 717r(c). A court of appeals could also stay enforcement, *id.*, because those courts are tasked with reviewing FERC orders. MVP cites to ample authority showing that this court does not have authority to stay enforcement of the Certificate Order to allow other legal challenges to proceed or be completed. (Dkt. No. 219 at 42–44.) As MVP summarizes, "[d]efendants do not cite a single case in which immediate possession was denied because the rehearing process was incomplete, and MVP is aware of none." (*Id.* at 44.) For these reasons, and the reasons discussed above in denying the requested stay, this argument does not defeat summary judgment.

### 4. *Sage* addressed and rejected the argument that courts cannot grant equitable relief similar to quick-take authority without violating the separation of powers doctrine.

Next, some of the defendants argue that the lack of quick-take authority granted in the NGA precludes the judicial branch from effectively granting such authority because it would violate the separation-of-powers doctrine. Whatever the merits of this argument might be, *Sage* addressed this argument and rejected it. In *Sage*, the court disagreed that "only Congress can grant the right of immediate possession." 361 F.3d at 824. It further noted that "the Constitution does not prevent a condemnor from taking possession of property before just compensation is determined and paid." *Id.* Instead, the court explained that the substantive right to condemn was conferred by Congress in the NGA itself and that the court could implement the procedural right to take the land early, where the right to condemn had already been established, such as via an order granting a motion for partial summary judgment. *Id.* at 828. *See also Columbia Gas Transmission, LLC v. 76 Acres*, 701 F. App'x 221, 231 n.7 (4th Cir. 2017) (explaining that even

though *Sage* did not mention the words "separation of powers," the *Sage* court rejected the argument "that only Congress can grant the right of immediate possession" and further stated that "the Constitution does not prevent a condemnor from taking possession of property before just compensation is determined and paid.") (quoting *Sage*, 361 F.3d at 824).  Thus, this argument is foreclosed by *Sage*.[14]

### 5.  Other legal arguments by defendants as to the summary judgment motion fail.

Before turning to the issue of whether there are any factual disputes precluding the entry of summary judgment, the court notes that defendants have also raised some other arguments in opposition to MVP's motion.  These include arguments that: (1) MVP has no right to condemn because it failed to comply with the requirements of, for example, the Uniform Relocation Assistance and Real Property Acquisition Policies Act, 42 U.S.C. § 4651 (Dkt. No. 187 at 16); and (2) that MVP's failure to define "temporary" in its complaint is either misleading or unclear such that the reference to "temporary access easement" cannot be granted.  (Dkt. Nos. 98, 218.) The court has considered those arguments, but concludes that they do not prevent the grant of summary judgment.

### 6.  There are no factual disputes that preclude entry of summary judgment.

Having rejected defendants' legal challenges to the entry of summary judgment in MVP's favor, the court turns to whether any factual disputes prevent the entry of summary judgment. This issue is a narrow one since MVP need only establish three elements to prevail: (1) it holds a valid FERC certificate; (2) the easements it seeks are necessary; and (3) it has been unable to

---

[14]  The other cases cited by defendants, including *Northern Border Pipeline Co. v. 86.72 Acres of Land*, 144 F.3d 469, 472 (7th Cir. 1998), and *Transwestern Pipeline Co. v. 9.32 Acres,* 544 F. Supp. 2d 939, 948–49 (D. Ariz. 2008), *aff'd sub nom., Transwestern Pipeline Co. v. 17.19 Acres,* 550 F.3d 770 (9th Cir. 2008), are factually distinguishable.  In those cases, equitable power to condemn did not exist because neither summary judgment nor any order had yet been issued by a court conferring the power to condemn.  Furthermore, although the district court in *Transwestern* noted its disagreement with *Sage*, this court is bound by *Sage*.

acquire easements by agreement.  *See Columbia Gas Transmission Corp*, No. 3:07-cv-28, 2007 WL 2220530, at *3.  There are no genuine disputes of fact about any of these three elements.

As to the first, it is clear that MVP holds a valid FERC certificate and, under the authority already discussed, that certificate confers the power to condemn.  To establish the second element and show that the easements are necessary, MVP need only show that the easements it seeks align with the FERC-approved route.  *Id.* (citing only to the FERC certificate as proof that the easements to be condemned are necessary for the pipeline).  No landowner has offered any testimony raising a genuine dispute as to that fact.

As to this second element, the court has considered carefully the arguments of two of the *pro se* defendants, Elijah Howard and Delmar Howard.  Both challenged the taking of their property for a temporary easement as unnecessary since MVP had already acquired a forty-foot easement over their neighbor's property for the same temporary access road.  It appears, however, that MVP requested, and FERC approved, use of an existing road that crosses back and forth over their respective properties and their neighbor's, sometimes entirely on the neighbor's property and sometimes entirely on one of the Howards' properties.  Because MVP has sought and obtained approval to use the existing road, the court cannot say that seeking an easement from the Howards is unnecessary, because portions of the road run only on one of their properties.  The court also has considered the testimony of one landowner who testified that MVP's map of his property is incorrect, but he claimed that the "parcels shown by the county are not reflected accurately on the map." (Day 2 Hr'g Tr. 330–31.)  This discrepancy, however, does not alter the fact that the route in the complaint matches the FERC alignment sheets.

In short, none of the landowners have shown that the routes that MVP seeks to condemn differ from the routes in the FERC certificate. Thus, MVP has established that the routes it seeks to condemn are "necessary."

As to the third element, MVP has offered testimony that it has made offers of at least $3,000 to every landowner before this court. The fact that it has not been able to reach an agreement with those landowners is further evidenced by its acquiring approximately 85% of the properties by agreement and its having to litigate to obtain the remaining properties.

For all of these reasons, the court concludes that there are no factual disputes preventing the entry of summary judgment. Accordingly, the court will grant partial summary judgment as to MVP's right to condemn all of the properties referenced in the complaint, as amended.

## D. Motion for Immediate Possession

Having determined that MVP is entitled to partial summary judgment as to all of the tracts it seeks to condemn, the court turns to whether MVP is entitled to immediate possession. This determination—at least as it has developed in the argument and evidence in this case—is more involved than in many of the cases that the parties have cited.

First, there is the typical inquiry: whether MVP has shown an entitlement to injunctive relief under the factors set forth in *Winter v. Natural Resources Defense Council*, 555 U.S. 7 (2008). Second, there is the issue of security upon the granting of any such injunctive relief. As noted herein, *Sage* instructs that the issue of security is intertwined with the inquiry of whether there are adequate procedural assurances of just compensation. The parties dispute a whole host of issues arising from this interplay, which the court will address. The court turns to the *Winter* factors first.

### 1.  The *Winter* Factors[15]

As the Supreme Court explained in *Winter*, a preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." 555 U.S. at 22.  Under the applicable standard articulated in *Winter*, the movant "must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *Centro Tepeyac v. Montgomery Cty.*, 722 F.3d 184, 188 (4th Cir. 2013) (en banc) (quoting *Winter*, 555 U.S. at 20); *see also League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 249 (4th Cir. 2014) (discussing and applying *Winter* standard); and *Dewhurst v. Century Aluminum Co.*, 649 F.3d 287, 290–93 (4th Cir. 2011) (discussing and applying *Winter* standard).  A plaintiff must satisfy all four of these requirements to obtain preliminary injunctive relief.  *Real Truth About Obama, Inc. v. FEC*, 575 F.3d 342, 345–46 (4th Cir. 2009), *vacated on other grounds*, 559 U.S. 1089 (2010).[16]

"The traditional office of a preliminary injunction is to protect the status quo and to prevent irreparable harm during the pendency of a lawsuit ultimately to preserve the court's ability to render a meaningful judgment on the merits." *In re Microsoft Corp. Antitrust Litig.*, 333 F.3d 517, 525 (4th Cir.2003).  A mandatory injunction, however, disturbs the status quo

---

[15]  Some of the defendants have asserted that the defense of unclean hands bars MVP from receiving any equitable relief based on its failure to negotiate in good faith.  (*See,e.g.*, Dkt. No. 191 at 3–4.)  Having heard the evidence presented, the court does not find an absence of good faith by MVP that would preclude granting it injunctive relief.  While MVP may have done a poor job of communicating with at least some of the landowners, there is no evidence that it has not made good faith attempts to purchase the properties it seeks to condemn.

[16]  Some defendants argue that Virginia law applies to the possession decision.  (*See* Dkt. No. 187 at 8–10).  The court follows the decision in *Sage*, however, in which the court applied federal law (the *Blackwelder* standard) to determine whether the district court had correctly granted immediate possession.  As *Sage* indicates, the determination of *when* to allow condemnation, once the substantive right to do so has been established, is a procedural issue governed by federal law.  *See Sage*, 361 F.3d at 828.

ante, which "in any circumstances is disfavored." *League of Women Voters of N.C.*, 769 F.3d at 235 (citation omitted).

Although *Sage* is controlling precedent on many of the issues before the court, *Sage* was decided before *Winter* and applied the standard from *Blackwelder Furniture Co. of Statesville v. Seilig*, 550 F.2d 189 (4th Cir. 1977), for granting injunctive relief, which is similar but easier to satisfy than *Winter*. *Real Truth About Obama, Inc.*, 575 F.3d at 346. So, in addition to the fact that entitlement to injunctive relief is a fact-intensive issue that must be decided on a case-by-case basis, the court cannot rely on *Sage* to conclude that injunctive relief under the *Winter* standard is warranted, even if this case were factually identical.

### a. *Likelihood of success on the merits*

In this context, success on the merits simply means that MVP has shown an entitlement to condemn the property. Some defendants seem to be arguing that in order to establish a likelihood of success on the merits, MVP must show that it will be able to satisfy all the conditions and complete the pipeline. But if MVP is legally entitled to condemn the property, then that is sufficient to show a likelihood of success on the merits. MVP need not make a further showing that it is likely to complete the pipeline or that it is likely to be able to satisfy all the conditions in the Certificate Order. *See, e.g.*, *Dominion Carolina Gas Transmission, LLC v. 1.169 Acres*, 218 F. Supp. 3d 476, 479 (D.S.C. 2016) ("This Court has granted partial summary judgment to DCGT with respect to its right to condemn the requested easements. Thus, DCGT has already succeeded on the merits of this issue.").

### b. *Irreparable harm*

MVP's alleged irreparable harms were first set forth in Cooper's declaration. (Dkt. No. 4-1.) He then discussed them in more detail at the hearing. The construction of the pipeline is

divided into 11 segments of approximately 30 miles of pipeline each. Ideally, contractors will be working in straight lines down the path of the pipeline, in which the crew tasked with step 2 follows immediately behind the crew tasked with step 1. (*See, e.g.*, Pl.'s Hr'g Ex. 6 (setting forth a broad pictorial overview of the typical pipeline construction sequence); Cooper Decl. ¶¶ 12–20, Dkt. No. 4-1.) As Cooper explained, skipping parcels to which MVP does not yet have easement access is less than ideal for tree felling, although it can be done to some extent. It does not work for the actual pipeline construction, however. (Day 1 Hr'g Tr. 124–25); *see also Sage*, 361 F.3d at 828 (discussing irreparable harm and noting with approval district court's statement that requiring the gas company to "build up to a parcel of land [it] do[es] not possess, skip that parcel, and then continue on the other side would prove wasteful and inefficient"). Thus, possession of all of the tracts along the route is needed for efficient construction. MVP had hoped to begin mobilizing construction crews in February 2018, to begin welding pipe in April to early May 2018, and to place meters in late November or December 2018. (Cooper Decl. ¶¶ 15–20.)

Due to environmental restrictions in "species impact areas," Cooper explained that tree clearing may occur only during certain times of the year and that tree clearing had to be done before other steps in the process. For locations with protected bats,[17] the tree clearing can occur only between November 15 and March 31. In areas with protected migratory birds, the tree clearing must be completed by May 31, 2018. Additionally, MVP must comply with regulations of the United States Fish and Wildlife Service, which require that certain clearing be complete by March 31, 2018, and certain roads constructed by March 31, 2018. (Day 1 Hr'g Tr. 121–23; Cooper Decl. ¶¶ 22, 25.)

---

[17] Cooper testified that, of the approximately 100 miles of pipeline being laid in Virginia, at least 20 miles are affected by the bat restrictions, but the number of miles could be up to 75. MVP does not have the ability to determine the full extent of the bat habitats currently because it is "outside of a window where we can . . . mist-net or catch the bats." (Day 1 Hr'g Tr. 123.) Instead, it must "assume they might live there" and stop tree felling in those areas as of March 31, 2018. (*Id.*)

Cooper further claimed that, if MVP is unable to complete the work according to its construction schedule, it will incur "delay fees and contractor costs" and be unable to meet its agreements with others to ship gas. (Cooper Decl. ¶¶ 24–26.) He described three categories of harm from a delay in construction. The first was lost revenue (or delayed revenue, as he admitted) due to not shipping gas during the period of delay, which he estimated as $40 to $50 million per month of delay. The second category was penalties to be paid to contractors who have been retained, and the maximum amount for that category would be approximately $200 million if the in-service date were delayed a full year. The third category was for project overhead expenses to keep the project going, such as expenses associated with storing and managing materials and salaries for project personnel, which he estimated at approximately $40 to $50 million. (Day 1 Hr'g Tr. 127–140.) He also stated that a delay could cause intangible damages to MVP in terms of its reputation and the willingness of contractors to work with it in the future.

Although defendants elicited testimony from Mr. Cooper on cross-examination suggesting that some of the claimed damage amounts might be lower and that these damages were a small percentage of the overall budget of $3.7 billion, they do not offer any evidence to dispute that these harms will occur to MVP. Instead, they offer several theories as to why MVP has failed to make a clear showing of irreparable harm.

Defendants first argue that monetary harm alone cannot constitute irreparable harm, citing *Di Biase v. SPX Corp.*, 872 F.3d 224, 230 (4th Cir. 2017), and *Long v. Robinson*, 432 F.2d 977, 980 (4th Cir. 1970).[18] MVP counters with cases under the NGA where economic losses *are*

---

[18] Additionally, the court in the *Long* case, on which defendants also heavily rely, did not actually say that the harm was not irreparable, but only that any irreparable harm was not entitled to "much weight in light of the historical context in which the litigation" arose. There, it was also a significant factor that that the irreparable injury claimed by defendants was "of their own making." 432 F.2d at 981.

considered irreparable because they are not recoverable from the defendants. (*See* Dkt. No. 314 at 24 (collecting authorities).)

As discussed in more detail below, the court finds that MVP has shown that it will suffer non-monetary harm from not being granted immediate possession. In any event, even if only monetary damages were shown, other cases in this context have found such damages sufficient. While there are cases stating the general principle that mere economic damages do not constitute "irreparable harm," the reasoning behind most of those cases, including one of the primary cases relied upon by defendants, is that the economic damages are recoverable against the opposing party at the time of judgment. *See, e.g.*, *Di Biase*, 872 F.3d at 230 ("The possibility that adequate compensatory or other corrective relief will be available at a later date . . . weighs heavily against a claim of irreparable harm. A [party seeking an injunction] must overcome the presumption that a preliminary injunction will not issue when the harm suffered can be remedied by money damages at the time of judgment.") (citations and internal quotation marks omitted). Such a remedy is not available to MVP from defendants.

Second, as noted, the court disagrees that only monetary damages have been shown here. Defendants contend that this case differs from *Sage* because there ETNG had evidence that it would be unable to meet the FERC deadline if delayed, while here MVP acknowledges it does not need access in February 2018 to comply with the FERC deadline. In the court's view, that is an inaccurate characterization of the evidence.

In *Sage*, the Fourth Circuit affirmed the district court's finding of irreparable harm to ETNG if made to wait until all condemnation proceedings had been concluded before possession. 361 F.3d at 828. The court noted that it would "not be possible [for ETNG] to meet FERC's deadline without a preliminary injunction," *id.* at 829, and also pointed to ETNG's

contractual obligations to provide gas by certain dates. *Id.* Here, there seems to be slightly less urgency, at least with regard to the FERC deadline. Indeed, Cooper admitted during his testimony that MVP should still be able to complete the pipeline and have it operational by the deadline in the certificate (October 2020), even if it cannot begin tree clearing until the window opens again in November. (Day 1 Hr'g. Tr. 213–17.)

Based on that testimony, defendants contend that the harm to MVP does not implicate its ability to complete the Project by the FERC deadline. But that assertion simply is not accurate if the court were to preclude all possession until completion of these proceedings entirely. Instead, it appears plain that MVP would be unable to satisfy the FERC deadline for completion in October 2020 if it were required to wait until the completion of condemnation proceedings. This case involves almost 300 properties. As MVP points out, in other condemnation cases involving large numbers of properties, the proceedings can take more than three years to complete. (*See* Dkt. No. 219 at 33 (noting 4-, 5-, and 6-year time-frames to complete condemnation proceedings).)

Thus, while MVP may not need to begin in February 2018 to comply with the FERC deadline, there is certainly evidence it would be unable to meet that FERC deadline if it is not given possession of these properties until after nearly 300 hearings on just compensation. It has shown non-monetary harm.

In short, this case is sufficiently similar to *Sage* (both as to the monetary damages and as to the likelihood that the Project will not be completed by FERC's deadline if delayed until the completion of these proceedings), that the court finds MVP has established irreparable harm. Many other cases, too, relied on harms similar to those articulated by MVP to find that irreparable harm had been shown. *See, e.g.*, *Transcon. Gas Pipe Line v. Permanent Easement*

*for 0.03 Acres*, No. 4:17-cv-565, 2017 WL 3485752, at *3 (M.D. Pa. Aug. 15, 2017) (finding irreparable harm because company would "suffer substantial costs and loss of profits if it cannot begin the project as soon as possible"); *Columbia Gas Transmission LLC v. 171.54 Acres*, No. 2:17-cv-070, 2017 WL 838214, at *8 (S.D. Ohio Mar. 3, 2017) (finding irreparable harm where pipeline "would be subjected to significant monthly revenue losses unless and until it both completes the Pipeline and replaces any volume lost as a result"); *Sabal Trail Transmission, LLC v. +/- 1.44 Acres*, No. 5:16-cv-164, 2016 WL 2991151, at *4 (M.D. Fla. May 24, 2016) (additional construction costs due to delays constitute irreparable injury); *Dominion Carolina Gas Transmission, LLC*, 218 F. Supp. 3d 476, 479 (D.S.C. 2016) (finding irreparable harm where "[f]urther delay also will cause financial harm to both DCGT and its customer").

Defendants also challenge MVP's specific alleged categories of harm. Defendants first devote considerable efforts (both at the hearing and in their briefs) to explaining that the Project is an affiliate pipeline, in which MVP's shipping contracts are primarily with "affiliate entities," *i.e.*, companies that are also owned, at least in part, by some of the same "parent" companies that own MVP.[19] Thus, they contend that the lost revenue is not really a harm because it is a gain to MVP's affiliates, who do not pay for shipping until the pipeline is in service. That fact, however, is irrelevant to the court's analysis. MVP is the only entity that is before this court, not its parent company—and the court will not consider arguments about corporate structure when evaluating the issue of harm.[20]

---

[19] MVP is technically an LLC and has "members" that own it rather than a parent corporation. Nonetheless the terms were used interchangeably at the hearing.

[20] FERC also expressly rejected the arguments that the Project, as an affiliate pipeline, should be subject to a heightened scrutiny, although those arguments figured heavily in Commissioner LaFleur's dissent. (Dkt. No. 1-1 at 135–36 (LaFleur dissent at 3–4).)

Defendants also argue that the penalties MVP would suffer do not constitute irreparable harm because they are self-inflicted. That is, they contend that MVP could have chosen not to enter into those contracts or could utilize certain termination provisions of the contracts to avoid paying those penalties. Mr. Cooper testified, however, that there was a "zero" percent chance that the Project could be completed without those contractors lined up ahead of time. (Day 1 Hr'g Tr. 271.) Notably, defendants have not offered any evidence to show that the Project could be completed by the FERC deadline if MVP waited to secure contractors until after being granted possession of the properties. This is a big and involved project with a large construction budget. There is no evidence that proceeding the way defendants suggest is customary or feasible.

Defendants' third argument is that, due to other potential obstacles that stand in the way of building the pipeline, MVP cannot show causation. They argue that, given the uncertainties about whether MVP will satisfy all the conditions of the Certificate Order, it cannot be said that the failure to grant an injunction would be the cause of the harm. Cases that have addressed this argument, though, have repeatedly held that challenges to the FERC conditions or allegations that a pipeline has failed to satisfy them, or will fail to satisfy them, are not proper subjects for an NGA condemnation proceeding, even in the context of considering a preliminary injunction. *See, e.g.*, *Portland Nat. Gas Transmission Sys.*, 26 F. Supp. 2d at 335–36 ("Compliance with FERC conditions cannot be used as a defense to the right of eminent domain and cannot be cited to divest the court of the authority to grant immediate entry and possession to the holder of a FERC certificate."); *see also supra* at Section II.C.2 (collecting authority holding that conditional certificates do not preclude eminent domain proceedings by a certificate holder).

Defendants cite to no case in which a court has denied immediate possession due to unmet conditions in the certificate. This court will not so rule, either.

For all of the foregoing reasons, this court concludes that MVP has shown it will suffer irreparable harm in the absence of an injunction.

### c. Balance of Equities

The court heard testimony from many landowners at the hearing. In part, the court allowed such testimony because of the compressed time-frame for discovery and other limitations the court had placed on discovery, and in order to ensure that any concerns particular landowners had about immediate possession could be adequately brought to the court's attention.

But nearly all of the witnesses testified only about the harms and consequences of the pipeline being built. Harm from the building of the pipeline cannot be considered by the court, though. Those harms are a consequence of the FERC order, not immediate possession. Moreover, as already discussed, harms from the pipeline construction and existence (including environmental harms, harms to water sources, harms to conservation easements, and harms to potential historical sites) are all harms that FERC considered and concluded were outweighed by the benefits of the Project. This proceeding simply is not the forum to challenge those harms anew.

Thus, much of that testimony ultimately has no relevance to the issues before the court. *See Sage*, 361 F.3d at 829. Put differently, "the productive capacity" of the land will "still be disturbed, albeit at a later time, if just compensation was determined first." *Id.* The same is true of the concerns over harms to all the water sources and as to the cutting of trees and other related changes. Similarly, some defendants also claim that the court must consider the harm that would befall them if MVP is granted immediate possession and begins felling trees or other pre-

construction activities and then the pipeline is not built, for whatever reason. The court acknowledges that these are possible harms to the landowners in the event that some other event (whether the outcome of a lawsuit or MVP's inability to fulfill some other condition) stops the building of the pipeline. But again, this court lacks authority to stay the FERC Certificate Order pending resolution of other appeals or pending completion of all conditions. That authority, by statute, resides with FERC and with any appropriate court of appeals. So, those are not harms that would preclude the grant of immediate possession to MVP.

Very little evidence has been offered identifying any harms from allowing MVP access now versus some later date. Several of the landowners argued, though, that they would be harmed by earlier possession, claiming that either the productive capacity of their land would be disturbed, or that they would have to outlay monies and do not currently have funds to sustain their businesses during construction or to move to avoid the construction. As to these landowners, many acknowledged that a draw-down procedure, such as was used in *Sage* and which this court is also going to utilize, would "blunt" the harms from an early loss of use. *See* 361 F.3d at 829.

The court acknowledges that there were a few landowners who testified about particular harms that would occur if construction began now versus in November, as an alternative. These included the property operated by Doe Creek Farms, whose business as a wedding venue and pick-your-own apple orchard would suffer greater harms as a result of construction over the spring and summer than it would if construction occurred over the winter. (Day 2 Hr'g Tr. 249–260.) The court also has evidence before it of certain properties that may contain historical artifacts of archaeological significance, and a delay in construction might allow those sites to be explored and artifacts to be retrieved. (*Id.* at 306–08, 325–26; Defs.' Hr'g Ex. 11.) The court

also heard about potential harms caused by the pipeline's proposed route through the Town of Chatham, which currently proceeds through a closed landfill with unknown contents and thus poses a potential risk to property and people if disturbed. The Town has suggested that a delay in possession would allow additional time to study the possible harms from the landfill and ways to minimize or prevent them.

At least two of the defendants (the Nature Conservancy and the New River Conservancy) hold conservation easements over properties along the pipeline route. While most of the claimed harm to them falls into the category of harm that results simply from the building of the pipeline, they also assert that they will suffer special harms from allowing possession now, as opposed to later. For example, the Nature Conservancy claims giving MVP possession now would affect its ability to work with MVP to develop a "crossing plan" for its property, which FERC has directed be discussed.[21] (See Defs.' Hr'g Ex. 27).

These harms from early possession are real, and this court does not intend to trivialize them. But under established law, a person's right to his or her real property is not absolute. As *Sage* noted, one of the burdens of "common citizenship" is that a person's land is sometimes taken for the common good. 361 F.3d at 829 (explaining that this burden of citizenship can include the loss of "nontransferable values deriving from his unique need for property or idiosyncratic attachment to it.") (citation omitted). The court recognizes that many landowners, and others, vehemently disagree that this Project serves the common good, but that decision is not for this court. Many, if not all of these concerns were considered by FERC over a period of years, and FERC considered various routes and the competing harms associated with them.

---

[21] This issue may be particularly urgent since the Nature Conservancy's easement is located on one of the nine properties that has already been appraised. In any event, as already noted, any failure to abide by a FERC condition is an issue for FERC, not this court.

(FERC Cert. Order ¶¶ 297, 306.)  But FERC ultimately selected the route it did, and this court has no authority to alter the route or select a "better" one.

Accordingly, on the one hand, the court must consider the potential harms to MVP of a delay that would result in the pipeline not being built, which includes a consideration of all of the of the benefits that FERC has determined will result from the timely completion of the Project. Balanced against that, the court must consider the harms to the very few landowners who identified harms resulting from earlier possession (as opposed to just harms from the pipeline) Ultimately, the court concludes that the balance of equities favors MVP.  Thus, the court concludes MVP has satisfied this *Winter* factor, as well.

### d.  The public interest

Defendants argue that the public interest in this case does not support allowing the construction of the pipeline, due to the environmental hazards or the other possible effects on historical areas or artifacts as a result of the construction.  The court, however, has no authority in this proceeding to consider collateral attacks on the FERC Certificate Order.  Thus, this court has no authority to conclude that the pipeline itself does not serve the public interest on the grounds cited by defendants.

Tellingly, defendants rely on the dissent from the FERC Certificate Order for their arguments that the project is not in the public interest.  As MVP's counsel repeatedly elicited from landowner witnesses and as the Certificate Order itself makes clear, FERC has considered and rejected the very arguments against the Project raised in the briefing and in court.  Those argument are not properly before the court.  They are indirect and collateral attacks on the order itself.  And, as already noted, although it is true that FERC has not said that immediate possession is in the public interest, the evidence shows that waiting until the conclusion of the

condemnation proceedings would preclude timely completion of the Project. Timely completion of the Project, FERC has expressed, is in the public interest. Thus, the court concludes that MVP has also established this fourth *Winter* factor.

### 2. Assurance of "reasonable, certain, and adequate provision" for compensation

Although the court has concluded that MVP has established its entitlement to a preliminary injunction under *Winter*, there remains to be determined the issue of adequate protections to landowners to ensure that they will receive just compensation. The Supreme Court in *Cherokee Nation* made clear that the constitution does not require that compensation be paid in advance of land occupancy; however, it does require that there be a process in place to give the owner "reasonable, certain, and adequate provision for obtaining compensation before his occupancy is disturbed." 135 U.S. at 659. After approving the grant of summary judgment in *Sage* and before turning to whether the preliminary injunction standard was met, the Fourth Circuit, quoting *Cherokee Nation*, addressed whether district courts have the equitable authority to order immediate possession in appropriate circumstances and affirmed these same principles. It expressly agreed with *Cherokee Nation* that the landowner, prior to any disturbance to his land, is entitled to "reasonable, certain, and adequate provision for obtaining compensation." *Sage*, 361 F.3d at 824. But, "the Constitution does not prevent a condemnor from taking possession of property before just compensation is determined and paid." *Id*.

#### a. Burden of proof is on MVP

While not set forth specifically in any case cited by the parties or found by the court, the court concludes, based on *Sage*, that the condemning entity has the burden to show that it has met this constitutional requirement because it is something to which the owner is entitled. The analysis of this burden issue is made difficult, however, by the overlapping nature of the

constitutional requirement and the requirement that the court set adequate security (whether by bond or deposit) if it grants a preliminary injunction.

In the preliminary injunction context, there are two lines of cases that, at first blush, seem to suggest that the burden should be on defendants. The first line of authority holds that, at the preliminary injunction stage, the burdens of proof "track the burdens at trial." *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 429 (2006). The parties do not dispute that, at trial, the burden is on the property owner in an eminent domain case to prove the fair market value of the property as of the date of the taking. *United States ex rel. Tenn. Valley Auth. v. Powelson*, 319 U.S. 266, 273 (1943).

The cases in the second line, including one from this court, hold that the burden of establishing the proper amount of security for a preliminary injunction rests with the party to be enjoined. *E.g.*, *Volvo Grp. N. Am. v. Truck Enters., Inc.*, No. 7:16-cv-25, 2016 WL 1479687, at *6 (W.D. Va. Apr. 14, 2016). In part, this is appropriate because the potentially enjoined party is "in the best position to determine the harm he will suffer from a wrongful injunction." *Id.* (citing *Lab. Corp. of Am. Holdings v. Kearns*, 84 F. Supp. 3d 447, 466 (M.D.N.C. 2015)).

Based on both lines of cases, MVP argues that defendants have the burden in this case and that they have failed to meet that burden. Defendants counter, though, that the "tracks the burden at trial" language refers only to the *Winter* prong dealing with the likelihood of success on the merits and does not apply to issues like damages or, in a takings case, the *Cherokee Nation* requirement that assurances of just compensation be given before occupancy is disturbed.

Other defendants argue that placement of the burden on the party to be enjoined might be appropriate with regard to a prohibitory injunction, but is not proper for the type of mandatory injunction here, particularly where constitutional rights are at stake. They argue that, at the

preliminary injunction stage, in which MVP must establish its entitlement to an injunction, it "stands to reason" that MVP also bears the burden of establishing the appropriate amount of security. (Dkt. No. 316 at 5.)

In this case, the court concludes that neither line of cases is controlling because a constitutional requirement exists separate and apart from the security requirements of a preliminary injunction. Oftentimes, this constitutional requirement is met by statutory provisions provided under federal and state law when a governmental entity is the party exercising quick-take options to possess the property immediately. In analyzing whether the constitutional requirement was met in *Sage*, the court "compar[ed] the protections of the DTA [Declaration of Taking Act] to those in injunction proceedings," and concluded that "the procedural safeguards in the preliminary injunction process," while "not a perfect match," nonetheless offer comparable protections to the DTA. 361 F.3d at 825. Although the DTA is not applicable here because the United States is not taking the property, under the DTA, the government provides an estimate of just compensation, not the landowner. 40 U.S.C. § 3114(a)(5). Additionally, the policy that guides all federal agencies seeking to acquire real property (and ultimately to condemn property—including under the DTA), also known as the Uniform Relocation Assistance and Real Property Acquisition Policies Act, 42 U.S.C. § 4651, requires that "[r]eal property shall be *appraised* before the initiation of negotiations, and the owner or his designated representative shall be given an opportunity to accompany the appraiser during his inspection of the property." *Id.* at § 4651(2) (emphasis added).[22] In light of this reliance on the DTA by *Sage* and the fact that the constitutional requirement is separate from the preliminary injunction security analysis,

---

[22] This appraisal requirement does not apply to properties where the anticipated value is estimated to be $10,000 or less. 49 C.F.R. § 24.102(c)(1).

the court concludes that the burden is on MVP to come forward with assurances of just compensation.

### b. *What constitutes assurance of "reasonable, certain, and adequate provision"?*

As the Supreme Court recognized as early as *Cherokee Nation*, "[w]hether a particular provision be sufficient to secure the compensation to which, under the constitution, [the owner] is entitled, is sometimes a question of difficulty." 135 U.S. at 659. In that case, a statute required a deposit of double the amount of the estimated property value, determined by referees initially, if the railroad company and landowner disagreed about the property's value. The Court deemed that procedure sufficient. In response to the landowner's concerns about the possibility of insolvency, the Court stated that the "possibility of such insolvency is not … a sufficient ground for holding that the provision made in the act of congress for securing just compensation is inadequate. Absolute certainty in such matters is impracticable, and therefore cannot reasonably be required." 135 U.S. at 660–61.

Here, as in *Sage*, a governmental entity is not the condemnor. As noted above though, the court in *Sage* found that "the procedural safeguards in the preliminary injunction process," while "not a perfect match," nonetheless offer comparable protections to the DTA. 361 F.3d at 825. In concluding that sufficient provision was made in the case before it, the *Sage* court explained:

> Rule 71A provides the procedure for determining just compensation, and ETNG has deposited cash with the court in an amount equal to the appraised value of the interests condemned. If the deposit is somehow short, ETNG will be able to make up the difference. In 2002 ETNG's parent company reported earnings of $1.17 billion from its natural gas transmission division that includes ETNG. There is thus adequate assurance that the landowners will receive their just compensation. *See Wash. Metro. Area Transit Auth. v. One Parcel of Land,* 706 F.2d 1312, 1321

> (4th Cir.1983) (fact that agency could be sued and had substantial
> assets was sufficient to assure just compensation).

*Id.* at 824.  The *Sage* court therefore relied on two things in determining that adequate provision was made to ensure just compensation could be paid at the conclusion of the proceedings: a deposit of cash in an amount equal to the appraised value of the condemned interests, and some level of financial viability on the part of ETNG.

The *Sage* court also explained that landowners are protected by the procedural safeguards in the preliminary injunction process because a bond is required and because title does not pass until the final compensation is awarded.  *Id.* at 825–26.  Further, a gas company that fails to pay any shortfall in the deposit is liable in trespass, *id.*, and "if a FERC-regulated gas company was somehow permitted to abandon a pipeline project (and possession) in the midst of a condemnation proceeding, the company would be liable to the landowner for the time it occupied the land and for any 'damages resulting to the [land] and to fixtures and improvements, or for the cost of restoration.'" *Id.* at 826 (citation omitted).  Based on *Sage*, then, those types of protections are what satisfy the mandates of *Cherokee Nation*.

The court notes that when the landowners requested discovery in this case, they sought discovery about MVP's finances.  MVP opposed discovery on that topic, arguing that the court "can ensure the payment of just compensation through an appropriate bond." (Dkt. No. 106 at 3.)  The court agreed with that reasoning in general terms and said that it would not allow broad discovery as to MVP's financial strength, but it allowed limited discovery as to two related topics identified by defendants which dealt, at least in part, with the "issue of the appropriate amount of a bond." (Dkt. No. 205 at 6.)  Nonetheless, the court warned MVP that it would not be permitted to present evidence of its financial strength after objecting to discovery on that issue as not relevant.  (Dkt. No. 255 at 3 n.1.)

As indicated in its previous ruling regarding discovery, the court does not believe that evidence of MVP's financial strength is the only method by which it, or the court, can assure payment of just compensation. Rather, requiring a bond and/or deposit in excess of reasonable estimates of land value can accomplish the same goal and protect against possible insolvency. Here, however, for the reasons discussed next, the court does not have sufficiently certain estimates of value on which to base its security decision.

### c. Evidence presented as to value

While *Sage* makes clear that protections must be provided prior to granting immediate possession, it leaves many issues unaddressed about how to do so. Surprisingly, moreover, and despite a large number of district court cases that grant immediate possession and require the posting of security, the parties have not pointed the court to any case addressing the issue of what constitutes sufficient evidence of land value such that a bond and/or deposit, or multiple thereof, is adequate. In the vast majority of cases granting immediate possession, as far as is evident from those opinions, either: (1) appraisals were done on the property and the bond or security was set based on the appraised amount, which was the case in *Sage*; or (2) security was set based on some other estimates which the landowners did not argue were improper or inaccurate.

In this case, however, the court does not have adequate assurances that it can provide just compensation through security. At the hearing, MVP offered three types of evidence that it now asks the court to rely upon to set an amount of security: (1) testimony and exhibits entered through Mr. Long, a real estate appraiser, who was permitted to testify as an expert on real estate valuation and appraising; (2) an aggregate amount of the last offer by MVP on each of the outstanding properties;[23] and (3) some of defendants' interrogatory answers as to their own

---

[23] MVP also sought to introduce the offer letters as to individual properties themselves, but the court disallowed that evidence. As the transcript reflects, MVP did not disclose or refer to those documents in discovery

estimated values of the easements sought to be condemned, although these were stated as minimums and done without the benefit of appraisals. Defendants objected to all of this information, and they did not present any of their own evidence as to value. Left unresolved from the hearing is whether some of the testimony of Mr. Long and Mr. Wagner was admissible. Mr. Long's estimates, that were not appraisals, raise the preliminary issue of whether *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), applies in the context of a hearing on a preliminary injunction.

Mr. Long is a real estate appraiser and was called by MVP to provide expert testimony to assist the court in valuing the properties for purposes of setting a bond. Based on his experience and education, and without objection by defendants, the court qualified Mr. Long as an expert. (Day 1 Hr'g Tr. 287.) Mr. Long had appraised only nine of the properties at issue.[24] (*See* Pl.'s Hr'g Exs. 14–22.) As to the remaining properties, he explained that he did not have sufficient time to conduct appraisals consistent with the normal standards for real estate appraisals, and MVP had not asked him to do so. (Day 1 Hr'g Tr. 318–19). Instead, he arrived at valuation figures that he referred to as "estimates" for each of the remaining properties, based on a methodology he created for purposes of this litigation.

---

and provided copies of them only at the time it intended to introduce them. Moreover, the copies were not in an immediately usable form; instead, MVP provided flash drives with hundreds of pages of documents and had only four copies immediately available, despite many more defense counsel and pro se defendants than that in attendance. Defendants simply did not have sufficient time to review or consider the documents. They were properly excluded under Federal Rule of Civil Procedure 37.

[24] The court admitted those appraisals over objections. Mr. Long was questioned specifically about several of the appraisals that were higher than his estimates of value for the same property. As to one of them, the Legges' property, Mr. Long admitted, upon questioning by defense counsel, that if an additional parcel (not subject to the easements) had been considered as part of the same property, based on the unity of use theory, then his appraisal would have been significantly higher. (Pl.'s Hr'g Ex. 18; Day 2 Hr'g Tr. 38–49.) He testified, though, that he did not speak to the landowners for this appraisal. That is the only appraised property where there is evidence that the appraisal may be substantially lower based on such inaccuracies. But disparities between an appraisal and a final award of just compensation are to be expected, especially when the appraisal is preliminary and done without the benefit of being able to speak with a landowner. The court is confident that, overall and on balance, the security it is requiring will suffice to assure just compensation.

The methodology used tax assessed values of the properties (with adjustments based on assessment ratios in 2013, 2014, and 2015), to obtain an "adjusted assessed price" per acre, which considered land only.  Based on research Mr. Long had performed, he concluded that 90 percent of the adjusted assessed price would provide adequate compensation for the permanent easements.  (*Id.* at 292–93.)  In assessing the value of the temporary easements, he relied on another study to conclude that 8 percent per year based on the value of the land is a reasonable rental rate.  Thus, given the three-year period FERC allowed for construction, he calculated the rental rate at 24% of the adjusted assessed price.  (*Id.* at 293–94.)  Then, for each property, he opined that 20% of the value should be included in the estimate as a "reserve," to account for any "inconveniences or damages that might take place to a property."  (*Id.* at 294–95.)  And for purposes of the value used in calculating any reserve, he included improvements to the land, as well as the land itself.  (*Id.* at 295.)  Using this method, he arrived at a "good faith estimate" of value for each of the properties identified in the complaint.

Defendants objected on a number of grounds to Mr. Long's testimony and to some of the exhibits offered through him.  The court took under advisement the admissibility of plaintiff's Exhibits 11 and 12.  Exhibit 11 reflects Mr. Long's individual "estimates" of value for each of the properties, and Exhibit 12 is a summary of the values in Exhibit 11.

First of all, defendants contend that Mr. Long's specific methodology—which is the only evidence offered as to the value of nearly all of the properties—is not admissible under *Daubert* and Federal Rule of Evidence 702.  Defendants also argue that valuations based on tax assessed values are inherently unreliable and inadmissible, and so the two exhibits and his testimony about his estimates should be excluded.

As to each of these contentions, MVP has a ready response. As to the first, it argues that the Federal Rules of Evidence and *Daubert* are not strictly applicable in the preliminary injunction setting. Even if those rules were applicable, moreover, MVP insists that Mr. Long's testimony and the exhibits are reliable and admissible. Further, MVP cites to several cases where estimates based on tax assessed value, as opposed to full-blown appraisals, were admitted to determine property value, albeit not in any condemnation cases.[25]

There is no general consensus on the applicability of *Daubert* in this setting. (*See* Dkt. No. 314 at 28-29 (MVP's post-hearing brief citing some cases applying *Daubert* and others refusing to apply it at preliminary injunction hearing).) For its argument that *Daubert* and Rule 702 are inapplicable in this setting, though, MVP relies on the Fourth Circuit's decision in *G.G. ex rel. Grimm v. Gloucester Cty. Sch. Bd.*, 822 F.3d 709, 725 (4th Cir. 2016), *vacated on other grounds by Gloucester Cty. Sch. Bd. v. G.G. ex rel. Grimm*, 137 S. Ct. 1239 (2017) (mem.). In *Grimm*, the court joined seven other circuits in allowing district courts to "look to, and indeed in appropriate circumstances rely on, hearsay or other inadmissible evidence when deciding whether a preliminary injunction is warranted." *Id.* at 725–26.

Defendants contend that *Grimm* does not apply to this case because it does not address *Daubert* or Rule 702 expressly and because its reasoning was based on the purpose of a *prohibitory* injunction, not a *mandatory* one. That is, *Grimm* allowed the relaxed standard in part because "preliminary injunction proceedings are informal ones designed to prevent irreparable harm before a later trial governed by the full rigor of usual evidentiary standards." *Id.* at 725–26; *see also Tex. Med. Providers Performing Abortion Servs. v. Lakey*, 806 F. Supp. 2d 942, 956

---

[25] The court also has reviewed the other cases cited by MVP for the proposition that real estate valuation is not a precise science and cases that allowed "unorthodox" expert testimony concerning valuation in a condemnation case, and they do not alter its conclusions. Those cases generally dealt with experts who had conducted some individual market analysis or appraisal based on something other than tax assessments. Thus, they do not lead to the conclusion that *any* unorthodox method is sufficiently reliable to be admitted.

(W.D. Tex. 2011), *vacated in part on other grounds*, 667 F.3d 570 (5th Cir. 2012) (refusing to strike affidavits as failing to satisfy *Daubert* and noting that the reason for the relaxed evidentiary standard is because "[t]he purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held") (quoting *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981)). Defendants argue that, because the injunction sought here is a mandatory one, the loosening of the evidentiary restrictions that *Grimm* permitted is not proper.

The court need not resolve this issue conclusively because, even if *Grimm* applied as broadly as MVP suggests, and thus *Daubert* and Rule 702 do not apply to bar the evidence, the evidence can only be given such weight as it deserves.[26] In this case, the court is simply not satisfied that Long's estimates are sufficiently reliable to support a finding of estimated value on each property so that the court can use it to set a bond sufficient to ensure just compensation will be paid. In addition to a general prohibition against admitting tax assessments in condemnation cases, which the court addresses next, Long himself admitted the fact that many issues into which an appraiser would inquire are not accounted for in his analysis.

For instance, Long admitted that "appraisal would be a better way to" evaluate property in a condemnation case than his estimate and that his methodology failed to account for "highest and best use" of a property, like an appraisal would. (Day 1 Hr'g Tr. 307–08.) His methodology, unlike an appraisal, also failed to account for potential damage to related properties that were not being condemned but were part of the same farm, for example. He further agreed that the actual fair market value after an appraisal process "may be many, many times higher" than his estimated value. (Day 1 Hr'g Tr. 306–08.)

---

[26] If the court applied *Daubert*, it would not admit Exhibit 11 or 12 or Long's testimony about his estimates.

He also admitted that his estimates did not include any "cost-to-cure" type items, such as the expenses associated with repairing or replacing fences for animals, or any damages that may result from animals being unable to graze on the property during construction, although he thought those damages "might" be accounted for in his reserve number. (*Id.* at 313–14.) His estimates also did not include timber value, nor did they account for whether or not water sources for people or livestock might be affected.

He admitted that his method is not a standard method used by anybody else and that it had "never been put out to [his] peers." (*Id.* at 319.) With regard to the land owned by the Town of Chatham, moreover, Long admitted that he was unable to use tax assessed values, since it was tax-exempt from the state. Instead, he had to use comparable sales from other parcels that surrounded it. He also did not factor into his consideration the fact that the land contained a landfill. (*Id.* at 323–36.)

Mr. Long also acknowledged the difficulties generally with using tax assessed values, which is another reason why the court cannot credit the estimates as sufficiently accurate or reliable to assure just compensation. Additionally, the parties agree that the Fourth Circuit expressly ruled, in *United States v. Certain Parcels of Land in the County of Arlington*, 261 F.2d 287 (4th Cir. 1958) (*Certain Parcels of Land*), that testimony regarding tax assessed values in condemnation proceedings, regardless of who seeks to introduce those values, is not permitted. In that case, a witness from the appraiser's office testified about what the assessed value of a property was, and he further testified that in general appraisals are about forty percent of market value. 261 F.2d at 289. The court concluded that the district court erred in admitting both the assessment and the related testimony. It noted that some courts have excluded assessments as "notoriously unreliable as a criterion of true value." *Id.* at 290. And although it excluded them

on the grounds that they were inadmissible hearsay, the court also commented that they were "general[ly] unreliab[le] . . . as an indication of market value, which ought to make them suspect in any case . . . ." *Id.* at 291.

In an effort to overcome the clear statement of law in that case, MVP argues first that the case was decided before the effective date of the Federal Rules of Evidence (FRE). It also notes that in a post-FRE case from the Fourth Circuit, *Christopher Phelps & Associates* v. *Galloway*, 492 F.3d 532 (4th Cir. 2007), the court affirmed the district court's admission of a county tax assessment offered to prove the value of a property. *Christopher Phelps & Associates* was not a condemnation case; it dealt with an alleged copyright violation based on an individual's use of an architectural firm's custom-built home design without the firm's permission and without payment. There, the opponent of the valuation evidence argued both that the assessment contained inadmissible hearsay and also because they contained undisclosed expert testimony, which was subject to Rule 702 and *Daubert*. 492 F.3d at 541–42. The court stated, though, that the assessment "could appropriately have been admitted under the agency records exception to the hearsay rule, Fed. R. Evid. 803(8), which holds such documents sufficiently reliable because they represent the outcome of a governmental process and were relied upon for non-judicial purposes." *Id.* at 542. It did not discuss the issue further, nor did it cite to *Certain Parcels of Land*.

The court does not find persuasive the argument that *Christopher Phelps & Associates* implicitly overruled *Certain Parcels of Land* or determined that the FRE would change the

outcome in the earlier case.[27]  Instead, it appears more likely that the prior case was not

addressed or considered.[28]

So, although it is true that some cases allow tax assessment evidence to establish the

value of property, they are not binding on this court and some even question or acknowledge that

assessments are not dispositive of the valuation issue.[29]  Furthermore, a number of cases decided

after the FRE went into effect have continued to cite *Certain Parcels of Land* as good law on this

issue.  *See, e.g.*, *Sun Tr. Mortg., Inc. v. Busby*, No. 2:09-cv-03(L), 2010 WL 3945103, at *8

(W.D.N.C. Oct. 6, 2010) (holding that a tax assessment was not admissible to prove value,

despite the fact that the tax assessor testified and was available for cross-examination); *Heavener*

*v. Quicken Loans, Inc.*, No. 3:12-cv-68, 2013 WL 5966423, at *6 (N.D.W. Va. Nov. 8, 2013)

(relying on *Certain Parcels of Land*); *Hardy Storage Co. v. Prop. Interests Necessary to Conduct*

*Gas Storage Operations*, No. 2:07-cv-5, 2009 WL 689054, at *6 (N.D.W. Va. Mar. 9, 2009)

(same).

For all of these reasons, even if the court were to conclude that *Daubert* and Rule 702 did

not preclude the evidence, the court would either exclude Mr. Long's opinions based on his

estimate methodology, as well as Exhibits 11 and 12, or simply assign them no weight.  In sum,

---

[27]  In any event, a subsequent panel of the Fourth Circuit "cannot overrule a decision issued by another panel," and where there is a conflict between two panels, courts should "follow the earlier of the conflicting opinions."  *McMellon v. United States*, 387 F.3d 329, 332 (4th Cir. 2004) (en banc).

[28]  Even if the assessment records themselves were permitted under Rule 803(8), however, the court concludes that the defendants have shown that they are not trustworthy for the purposes for which they have been offered.  Accordingly, they are inadmissible pursuant to Rule 803(8)(B).

[29]  In one of the non-condemnation cases cited by MVP for the proposition that courts allow evidence of assessed values, for example, the court relied on *Christopher Phelps & Assoc.*, without any reference to *Certain Parcels*.  *See, e.g.*, *In re Chen*, No. 08-17862, 2009 WL 3754672, at *5 nn.1–2 (Bankr. E.D. Va. Nov. 3, 2009) (admitting tax assessments, but refusing to rely on them as objective evidence of value because "even professional real estate appraisers frequently arrive at widely-varying opinions of value for commercial real estate" and any valuation should be understood as "the center-point of a range of values" and there was no evidence as to what variation from the center-point would be normal).  In another, looking to Wyoming law, the court noted that a certified tax assessment record was admissible as to value because it was relevant, even if it was not dispositive.  *Simek v. J.P. King Auction Co.*, 160 F. App'x 675, 685–86 (10th Cir. 2005).  Additionally, the court there noted that the witnesses were not purporting to offer their own opinions of fair market value.  *Id.* at 687 & n.8.

in this particular case, with the sheer number of properties, those properties' varying uses, and the problems that Mr. Long acknowledged with his methodology, the court concludes that Long's estimates are not sufficiently reliable to set an appropriate bond or deposit.[30]

Wagner's testimony about an aggregate amount of the offers does not assuage the court's concerns about its inability to set a proper bond. He testified that the total amount of the highest and best offers from MVP for the remaining properties was approximately $9.5 million. (Day 2 Hr'g Tr. 362). These offers, too, represent simply a rough estimate based on others' opinions and, in any event, that aggregate number is insufficient to allow for meaningful cross-examination regarding individual properties, to assure just compensation for the individual properties, or to allow individual owners to draw down the deposited monies.

Accordingly, based on the information before it, the court is unable to provide the assurance of just compensation through the setting of a bond or deposit, without additional information as to individual properties. Under *Sage* and *Cherokee Nation*, something more is required before the landowners' occupancy can be disturbed.

### III. CONCLUSION

The court acknowledges the large number of cases in which courts have granted partial summary judgment and the same type of injunctive relief sought here—immediate possession by a pipeline construction company, many of them pointing to *Sage* for authority to do so. And it is clear to this court that *Sage* confers that authority on this court. The court also believes that

---

[30] In *Sage*, the court had before it appraisals. Likewise, in most of the reported and unreported cases the court has located that granted immediate possession, the bond or deposit was set based on appraisals. The court acknowledges, though, that some district courts have used other measures, even where there was an argument that an appraisal should be required. *See, e.g., Columbia Gas Transmission LLC v. 0.85 Acres*, No. 14-cv-2288, 2014 WL 4471541, at *6–7 (D. Md. Sept. 8, 2014). Moreover, there may be methods of estimating value (other than appraisals) that would suffice for the court to use in setting security. So, the court is not holding that *only* appraisals will suffice, but something more reliable and certain than the estimates based on tax assessments is required to satisfy the mandates of *Cherokee Nation* and *Sage*.

MVP has established its right to exercise eminent domain over the properties and an entitlement to injunctive relief.

But until MVP can provide a more fulsome basis on which the court can assure that just compensation will be paid, the court cannot allow immediate possession at this time as to nearly all of the properties. As to those properties, the court will direct MVP to provide a statement to the court within seven days providing a time-frame by which it believes it could provide sufficient information to set reliable security, consistent with this memorandum opinion. As to the nine properties for which the court has appraisals, the court will direct MVP to deposit with the court an amount of three times the appraised value of each property and a certified surety bond in an amount two times the total appraised value, conditioned on the payment of just compensation. The court will also require MVP to submit an order for each of those nine properties granting immediate possession and setting forth the terms of that possession. A separate detailed order will be entered.

Entered: January 31, 2018.

/s/ Elizabeth K. Dillon
Elizabeth K. Dillon
United States District Judge