IN THE UNITED STATES DISTRICT COURT FOR
THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | | |
|---|---|---|
| MOUNTAIN VALLEY PIPELINE, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 7:17-cv-00492 |
| | ) | |
| EASEMENTS TO CONSTRUCT, | ) | By: Elizabeth K. Dillon |
| OPERATE, AND MAINTAIN A | ) | United States District Judge |
| NATURAL GAS PIPELINE OVER | ) | |
| TRACTS OF LAND IN GILES COUNTY, | ) | |
| CRAIG COUNTY, MONTGOMERY | ) | |
| COUNTY, ROANOKE COUNTY, | ) | |
| FRANKLIN COUNTY, AND | ) | |
| PITTSYLVANIA COUNTY, VIRGINIA, *et* | ) | |
| *al.*, | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION ON MOTION FOR
ENFORCEMENT REGARDING MVP PARCEL NO. VA-FR-076.01**

On April 20, 2018, Mountain Valley Pipeline (MVP) filed a verified motion asking the

court to enforce a prior order and to hold in contempt the four landowners of a property, MVP

Parcel No. VA-FR-076.01 (the Tract), that is part of this condemnation proceeding. (Mot. to

Enforce, Dkt. No. 791.) The landowners are David J. Werner, Betty B. Werner, Ian Elliott

Reilly, and Carolyn Elizabeth Reilly. (*Id.*) The motion also requests that the court hold in

contempt several unidentified persons (the Tree-sitters) who are occupying tree stands on the

Tract within the limits of the easements (the Easements) over which MVP has been granted

immediate possession by this court.

Specifically, MVP alleges that all four landowners and the Tree-sitters are in contempt of

the court's March 8, 2018 order granting MVP possession of the Easements, because they have

violated the following language in the order:

> It is further ORDERED that defendants and their agents, servants,
> employees, and those in active concert and participation with them,
> are prohibited from delaying, obstructing, or interfering with
> access to or use of the Easements by MVP or its agents, servants,
> employees, or contractors.

(Dkt. No. 658.)

MVP contends that "the Werners and Reillys have condoned the occupation of the Tract by [the Tree-sitters], and they have refused to take the necessary action to remove [the Tree-sitters] from the Tract." (Mot. to Enforce 3.) MVP asks that the court impose measures designed to coerce compliance with its March 8 order and, if necessary, to have the Tree-sitters removed from the tree stands so as to give MVP full access to the Easements, including the ability to fell trees without harming the Tree-sitters. It also attaches letters sent to the landowners' counsel, in which MVP requests that counsel "and the Werners and Reillys take all necessary action to remove the treesitters and others from the easement areas by 9:00 a.m." on April 20, 2018. (Dkt. No. 791-1.)

Upon receipt and review of the motion for enforcement, the court issued an order to show cause, setting the motion for a May 4, 2018 hearing and directing the Werners, the Reillys, and the unknown Tree-sitters to appear and show cause as to why they should not be held in contempt. (Dkt. No. 813.)

The Werners and Reillys already had counsel in the condemnation proceedings, and additional counsel entered an appearance for them with regard to the contempt proceedings. (Dkt. No. 805.) The contempt motion was briefed, and all four landowners, along with their counsel, appeared at the hearing.

With regard to the Tree-sitters, the court does not know if any of them were present at the May 4 hearing, but none made their presence known. Instead, based on the testimony and

argument provided to date, the Tree-sitters' identities are unknown to the court, and they have been wearing masks while up in the tree stands, presumably to obscure their identities. The court's order to show cause thus referred to them as Jane and John Does and directed service on them through the United States Marshals Service's (USMS) reading it aloud and through posting it on a tree in which they are located, both of which were done. (Dkt. Nos. 813, 821.) It is unknown, however, whether any Tree-sitters were present at the time of the USMS reading. Additionally, prior to the issuance of the show cause order, MVP read aloud notice of its motion to enforce and advised any of the Tree-sitters then present of the court's prior order. (*See, e.g.*, Dkt. Nos. 822, 852.) Based on a video recording introduced at the hearing, which clearly was taken from the perspective of a Tree-sitter, at least one of the Tree-sitters had notice of MVP's motion and the court's prior order, although the court does not know which one, or whether that particular Tree-sitter remains in a tree stand in an Easement.

Having considered the arguments of the parties and the evidence adduced at the hearing, the court concludes that both Ian Elliott Reilly and Carolyn Elizabeth Reilly are in contempt of this court's prior order and should be fined for the contempt. The court's reasons are discussed in more detail herein.

As to the Werners, and despite the fact that MVP filed its motion against all four landowners, there was no evidence as to any affirmative action by either Mr. or Mrs. Werner vis-à-vis the Tree-sitters, other than they may have initially purchased the RV where some of the Tree-sitters are staying. They, like the Reillys, have not asked the Tree-sitters to leave. But these two facts, without more, are insufficient to show a concerted effort with the Tree-sitters to violate the court's order, and so the court will deny the motion for contempt as it pertains to the

Werners.  In light of that denial, the court's focus in the remainder of this opinion is properly on the Reillys.

The court further concludes that, due to inadequate evidence of notice to any particular John or Jane Doe Tree-sitter currently in the tree stands in the Easements, the court cannot at this time find any Tree-sitter in contempt.  Thus, MVP's motion as to the Tree-sitters will be denied without prejudice.   The court's reasoning is discussed in more detail below.

## I.   FACTUAL BACKGROUND[1]

In October 2017, after a years-long process of reviewing MVP's application and receiving public comments, the Federal Energy Regulatory Commission (FERC) granted a certificate giving MVP the right to condemn the Easements and other easements under the Natural Gas Act.  MVP then filed this condemnation suit, seeking to condemn all of the easements along the FERC-approved path for the pipeline.  On January 31, 2018, the court granted MVP's motion for partial summary judgment, concluding that the FERC order gave MVP the right to condemn easements on the land parcels along the approved route of its pipeline, which included the Easements on the Reillys' Tract.  (Dkt. Nos. 339, 340.)  The court also determined that MVP was entitled to immediate possession of the Easements before the completion of condemnation proceedings in this case.  Thus, after MVP posted the security required by the court, the court entered an order granting immediate possession of the Easements to MVP.  (Dkt. No. 658.)

As already noted, that order included the following language, which MVP alleges in its motion that the Reillys and the Tree-sitters have violated:

> It is further ORDERED that defendants and their agents, servants, employees, and those in active concert and participation with them,

[1]  Because the legal background of this condemnation case has been discussed extensively in other opinions and orders, the court recites only that background pertinent to the contempt motions.

are prohibited from delaying, obstructing, or interfering with
access to or use of the Easements by MVP or its agents, servants,
employees, or contractors.

(*Id.* at 2.)

After obtaining immediate possession, MVP began tree-felling along the pipeline route,
although as of the date of the hearing, it had not yet attempted to cut trees along its Easements on
the Reilly Tract.  MVP inspected the area, however, in anticipation of the needed tree-clearing,
and it learned that there are Tree-sitters going in and out of tree stands in the Easements.  After
sending a letter to the Reillys' counsel requesting that the landowners take action to have the
Tree-sitters vacate the Easements, and after no responsive action was taken, MVP contends that
the Tree-sitters are interfering with their ability to plan and conduct tree-clearing.  As a result,
MVP brought this motion.

Both Reillys testified at the hearing, and the court finds that many of their answers were
purposefully evasive and sometimes blatantly misleading.  They repeatedly stated that they did
not "know" who the Tree-sitters were, and both offered the justification that their property is an
operating farm and they have a lot of visitors or people coming and going.  But upon being
pressed further and/or instructed by the court that they had to answer specific questions, there
was more forthcoming testimony.

During her testimony, Mrs. Reilly admitted that "some of the people that are in the tents
and campers" are the same people that go up the trees, although she was not sure which specific
person or persons go up the trees.  Mr. Reilly, too, acknowledged knowing nicknames of at least
two people staying in the campers or tents, and that it was "entirely possible" those two had been
Tree-sitters, but due to the masks he was not sure.  Mrs. Reilly also testified that the visitors had
asked for, and received from her, permission to stay on the Tract and that the tree stands

appeared after they arrived.  She further testified that she had allowed the persons to use the tents and the camper from January through the hearing.

The following exchange between MVP's counsel and Mrs. Reilly near the end of her testimony, taken from a rough draft of the transcript, is typical of the reluctance to divulge known information:

> Q.  Is there any other information that you have about the identity
>      of the treesitters that you have not shared with us today?
> A.  No.
> . . .
> Q.  I was prompted to ask a little broader question as far as the
>      identity of the people in the tents and RV camper.  Do you
>      have any information as to who those people are?
> A.  Yes.
> Q.  And who are those people?  What people do you know in the
>      tents and campers?
> A.  The people that come to visit off and on and stay.
> Q.  Who are they?
> A.  I don't remember.  I don't know all the names.  I don't know
>      everybody.
>> THE COURT:  Do you know any names, ma'am?
>> THE WITNESS:  I do.
>> THE COURT:  Can you please tell us those names?  I know you may be
>> nervous, but you need to answer the questions unless I tell you otherwise.
>> THE WITNESS:  Yes, ma'am.
>> THE COURT:  All right.
>> THE WITNESS:  There's someone named Ken.  And I don't – I don't
>> know surnames.  There's then Luca and someone named Dee, Lou.  Sorry,
>> I have to think who.  Those are the four that stand out at this point.  And
>> then we've had just a variety of people that come and visit us at the farm
>> . . . ."

(Draft Transcript of May 4, 2018 Hearing at 46–47.)  Later on, Mrs. Reilly also testified that she knew (or had met) some of the people staying in the tents and camper before they came to her farm and that she had "some" cell phone information for them.[2]

---

[2]  In addition to Mrs. Reilly's testimony about the "Little Teel Crossing" Facebook page, discussed *infra* at note 3, there were other examples of her being evasive at the hearing. In just one other example, Mrs. Reilly was asked a question about a sign on her property: "[D]o you know who installed the sign there?"  She answered, "No."  In response to other questions, she admitted that she knew "someone" brought the sign and that it was from an

From all of the testimony, the court was left with the distinct impression that the Tree-sitters had been careful to keep their full identities from the Reillys and/or the Reillys had tried to avoid knowing exactly who was going up and down the trees. Regardless, there is no doubt that the Reillys knew that at least some of the people staying in the tents and camper were also the Tree-sitters and that the Reillys have continued to allow those Tree-sitters to access the Easements from their property and have been providing them with easily-accessible shelter when they come down from the trees. This also facilitates their quick ascent into the trees.

There was also evidence introduced at the hearing concerning a Facebook page titled "Little Teal Crossing." The Little Teal Crossing Facebook page contains videos and statements purportedly from the Tree-sitters, as well as from others.[3] The page's purposes appear to be to provide information about the opposition on the Reilly property and in the Easements on it, to garner support for that opposition, and to give an opportunity to donate funds "to support the Reilly family and the pipeline fighters resisting the Mountain Valley Pipeline." (Hr'g Pl.'s Ex. 5, at page ID W8-012.) Mrs. Reilly knew that statement was on the page and never asked anyone to omit it or take it down. In addition to admitting being administrator of the site for a "day or two," Mrs. Reilly conceded that she had approved, on behalf of her and her husband, certain statements on the Facebook page that were attributed to each of them. This includes Ian

"organization." Upon even further questioning, she said that it was someone from a group called the Virginia River Healers. Additionally, although it may not be reflected adequately in the transcript, throughout Mrs. Reilly's testimony, there were long pauses after questions, in which Mrs. Reilly appeared to be either trying to avoid answering altogether or trying to craft a way to answer truthfully without giving any real information in response. Notably, her evasive, slow, and begrudging responses to nearly every question which could reveal her ties to the Tree-sitters stood in stark contrast to answers to a question not likely to admit any ties with them, in which she answered without hesitation and in an articulate manner. Thus, the court does not believe that her responses were the result of nervousness, an inability to understand the questions or to process information quickly, or any cognitive deficit. Rather, she seemed to be intentionally evasive.

[3] The court finds that Mrs. Reilly was not forthcoming in her testimony about her knowledge of the "Little Teal Crossing" Facebook page. She first testified that she did not know who set it up and that she did not know anybody involved in setting it up. But she then testified that it came to her attention when "[s]omehow someone made me an [administrator] of it" and she was then administrator for "a day or two" or some other unknown time. At first she denied that she knew who had invited her to be an administrator for the site, saying "I don't know who they are." Later, she acknowledged and identified the woman by name.

Reilly's statement that "[l]aunching Little Teel Crossing is an act of protection for our family's home, land and water." The reference to Little Teel Crossing is a reference to the Facebook page, to the tree stands and the Tree-sitters themselves, or to both.

The adopted statements also include the following quotation from Mr. Reilly: "This is about taking a stand. This is about choosing for ourselves when the fight is over. MVP thought we would just resign when pipeline tree clearing began. But the fight has just begun and we still believe we can stop this destructive project. We will win." (Hr'g Pl.'s Ex. 5, at page ID W8-012.) Mrs. Reilly also acknowledged that she knew about, and did not object to, a statement requesting donations "to support the Reilly family and the pipeline fighters resisting the Mountain Valley Pipeline." Based on the context of that particular post, it is clear that "the pipeline fighters" are meant to refer to the Tree-sitters, among others. Moreover, despite other posts by the page administrator thanking people for donations, Mrs. Reilly testified that her family has not received any money from the page.

## II. DISCUSSION

### A. Preliminary Issues

In their written response to MVP's motion, the landowners raise two preliminary arguments, before addressing the contempt allegations directly. First, the landowners allege that the motion for contempt is an improper SLAPP suit ("strategic lawsuit against public participation"), designed to silence the critics of the MVP project. They contend that the Reillys, in particular, have been extremely vocal critics of the pipeline and that the motion is designed to impose significant legal fees on them in an attempt to intimidate and silence them. The court finds no merit in this contention.

The Reillys, as is their right, have in fact opposed the pipeline on many legal fronts, and the court sees nothing in MVP's motion for enforcement that suggests that it is an attempt to silence the Reillys. Instead, the court believes that the motion is a good faith attempt by MVP to obtain full access to, and use of, the Easements over which it has possession by targeting landowners who are either assisting, or at the very least not preventing, persons from using their property to access MVP's easements and obstruct its construction activities through tree-sitting. Notably, there are other landowners who have engaged in lawful oppositional activity, or fought the pipeline on many lawful fronts, and who continue to do so. But MVP has not asked this court to hold any of those landowners in contempt, other than persons who have tree-sitters located on MVP's easements on their property. So the court rejects the Reillys' first contention.

Second, the Reillys claim that the motion is not yet ripe because MVP has not yet tried to cut trees within the Easements on their property. They allege that MVP "has never once entered the Easement[s] with a tree cutting crew only to be hindered by alleged tree sitters." (Opp'n 4, Dkt. No. 840.) They contend that MVP should be required to show up with a tree-cutting crew and be thwarted in their attempts before there is a live controversy here.[4]

The court disagrees. First of all, the landowners have not cited to any authority that construes the jurisdictional ripeness doctrine so narrowly. More fundamentally, the argument is

---

[4] Relatedly, the landowners argue that the motion is not yet ripe because the pipeline and its planned route are still subject to various challenges, legal and otherwise. Indeed, in a declaration by Ian Reilly filed late on May 14, 2018 (Dkt. No. 862-1), he avers that another legal action, including a motion for stay of construction of the pipeline, was filed on May 11, 2018, in the Fourth Circuit Court of Appeals (Case No. 18-1533), and, as of noon on May 15, 2018, the docket in that case reflects that the motion to stay remains pending. But the existence of pending legal challenges (absent a stay), does not void this court's prior orders. The landowners also make arguments similar to those made by the Terrys—a landowner and two tree-sitters on different parcels—in briefing a contempt motion against them, *i.e.*, that MVP either is not permitted, or should not be permitted, to clear trees after March 31, 2018, based on prior statements by its witnesses. For the same reasons the court set forth in the memorandum opinion explaining why MVP should not be held in contempt (*see* Mem. Op. on Cross-Motions for Contempt 8–10 & nn.8–9, Dkt. No. 845), the court finds these arguments to be without merit. Moreover, it is undisputed that FERC has given MVP authority to conduct tree-felling on the Tract, and although the Reillys dispute that such authority was properly given by the appropriate official (Dkt. No. 862-1), the Reillys have not pointed to any restriction imposed *by FERC* that the tree-felling there could not occur after March 31 and until November.

based on an improperly narrow reading of the court's prior injunction. The court's order does not prohibit only interference with tree-cutting; it also prohibits "delaying, obstructing, or interfering with access to or use of the Easements." (Dkt. No. 658 at 2.) Notably, MVP has shown that it wants to begin tree-clearing (even if it has not yet mobilized a tree-clearing crew and brought them to the property) and that it cannot do so safely if there are people up in the trees. MVP has further shown that it has informed the Reillys—through a letter to counsel— that the Tree-sitters are interfering with its access to and use of its Easements.

Furthermore, on May 14, 2018, MVP filed a supplemental declaration from Steve McGary, who is a security supervisor assigned to the MVP project. (Dkt. No. 860.) He avers that two of the three tree stands have now been removed, but that one remains. On May 11, 2018, Mr. McGary saw a tree-sitter pulling himself up into the remaining tree stand. He further avers that "[b]ecause the [tree stand] was occupied, MVP was not able to complete tree-clearing on the property as planned that day." That additional information not only likely moots the Reillys' ripeness argument, but also fully supports the conclusion that the controversy is ripe.

Accordingly, the court concludes that the Tree-sitters are already sufficiently interfering with MVP's access to and use of its Easements so as to render the controversy ripe.

## B. Standards for Civil Contempt[5]

In order to find a person in civil contempt, the person moving for a contempt finding must prove each of the following elements by clear and convincing evidence:

> (1) the existence of a valid decree of which the alleged contemnor had actual or constructive knowledge;

> (2) that the decree was in the movant's "favor";

---

[5] As the court noted in its order to show cause, the contempt proceedings and the sanctions the court imposes are designed to compensate MVP and/or obtain compliance with the court's prior order, not to punish. Because their purpose is not punishment, they are civil in nature. (Dkt. No. 812 at 2–3.)

> (3) that the alleged contemnor by its conduct violated the terms of the decree, and had knowledge (at least constructive knowledge) of such violations; and
>
> (4) that [the] movant suffered harm as a result.

*Ashcraft v. Conoco, Inc.*, 218 F.3d 288, 301 (4th Cir. 2000) (citation omitted).

The Fourth Circuit has also held that "the plain language of [Federal Rule of Civil Procedure 65] establishes the principle that a court, in the exercise of its equitable powers, may hold in contempt those who act in concert with named parties to frustrate an injunctive decree or to avoid compliance with it. The principle is confirmed by precedent." *E.E.O.C v. Int'l Longshoremen's Assoc.*, 541 F.2d 1062, 1064 n.1 (4th Cir. 1976) (citing *Regal Knitwear Co. v. N.L.R.B.*, 324 U.S. 9 (1945), *Thaxton v. Vaughan*, 321 F.2d 474 (4th Cir. 1963), *Day Companies v. Patat*, 440 F.2d 1343 (5th Cir. 1971), and *Alemite Mfg. Corp. v. Staff*, 42 F.2d 832, 833 (2d Cir. 1930)). Thus, the mere fact that the Tree-sitters are not parties to the underlying suit or injunction does not protect them from being held in contempt. And the fact that the Reillys are not the people in the trees does not protect them from a contempt finding, if they are working in active concert with those violating the court's order. *See, e.g.*, *Regal Knitwear*, 324 U.S. at 14 ("[D]efendants may not nullify a decree by carrying out prohibited acts through aiders and abettors . . . .").

## C. Alleged Contempt of the Reillys

Turning to the contempt elements with regard to the Reillys, the parties agree, and the court so finds, that the court's March 8 order is a valid decree and that the Reillys had notice of it. So, the first element is established.

As to the second element, the Reillys argue that it is questionable whether the order is in MVP's favor because it also includes a provision noting that the Reillys retain their right to enjoy

their property so long as they do not interfere with or obstruct the broad grant to MVP. The court disagrees. Although the order reserves to the landowners the right to use their land without interfering, this reservation of rights does not mean that the order is not in MVP's favor. Notably, the Reillys and many other landowner defendants, through counsel, expended tremendous effort and time in opposing the result in that order and the court's January 31, 2018 memorandum opinion and order. In combination, those decrees granted to MVP immediate possession and the right to begin clearing trees and to begin construction on the pipeline, consistent with FERC requirements. Furthermore, the reservation of rights provision was not entered or included over MVP's objection; indeed, MVP never asked the court to deprive landowners of these rights. Thus, the court concludes that its March 8, 2018 order is in MVP's favor.

Turning to the third element, MVP has shown, by clear and convincing evidence, that the Reillys are in violation of the court's order. Despite being parties to the underlying action and bound by the court's order, both Reillys engaged in behavior that, in concert and coupled with the actions of the Tree-sitters, has delayed, obstructed, or interfered with MVP's use of the Easements.

As already noted, the Reillys readily admit that they have taken no steps to remove the Tree-sitters. And if that failure to act, or passive conduct, were all that the contempt motion were based on, then it likely would be insufficient to establish contempt. But the Reillys have engaged in active conduct that has aided and abetted the Tree-sitters in violating the court's order. Thus, the Reillys can be seen to be in "active concert or participation" with the Tree-sitters, effectively allowing the Tree-sitters to violate the order by proxy, with the assistance and complete consent of the Reillys. Specifically, the below list of actions or statements are

established by clear and convincing evidence, and most have been admitted by one or both

Reillys. All of them show the type of "active participation," support, and encouragement of the

Tree-sitters' interference with MVP's Easements sufficient to establish contempt.[6] They are:

- The Reillys have provided the Tree-sitters (and possibly other people supporting them) with tents and a camper to stay in on the Tract, although outside the boundaries of the Easements. This obviously has facilitated the Tree-sitters' ability to prolong their stay in the Easements and given them an ability both to re-supply easily when they descend from the tree stands and to quickly return to the tree stands when desired.

- Chicken wire that came from the Reillys' farm is under burlap sacks wrapped around the trunks of trees where the tree stands are located, and is designed to prevent or interfere with tree-cutting.

- When a member of MVP's security team went to the Tract to give notice to the Tree-sitters to vacate the Easements and explained his purpose to Mr. Reilly, Mr. Reilly said something to the effect of, "We're here to stay." That itself indicates that Mr. Reilly does not simply cheer the Tree-sitters from the sidelines, but identifies with them (by use of the term "we") and implies that he continues to assist them in staying in the Easements.

- Mrs. Reilly approved the use of statements from both herself and Mr. Reilly on a Facebook page "[l]aunched," according to Mr. Reilly, as an "act of protection for [their] family's home, land and water." That page is designed, at least in part, to support and encourage the Tree-sitters and to raise money for them and for the Reillys. "Launch[ing]" a Facebook page with the clear intent of encouraging and obtaining broader financial and/or emotional support for the Tree-sitters is also assistance given directly to the persons who, by their continued presence after MVP has asked that they leave—a fact fully known to the Reillys—are interfering with MVP's use of the Easements.

- The statements approved by Mrs. Reilly also include the following quotation attributed to Mr. Reilly: "This is about choosing for ourselves when the fight is over. MVP thought we would just resign when pipeline tree clearing began. But the fight has just begun and we still believe we can stop this destructive project. We will win." Given the context of the statement on the page and its reference to the tree clearing, the "fight" clearly includes the occupancy of the tree stands. Once again, moreover, he is not only showing and encouraging support for the Tree-sitters, but identifying with them.

It is also worth noting that Mrs. Reilly was the administrator of the Facebook page, at

least "for a day or two." That page contains numerous statements allegedly from one or more of

---

[6] The court notes that the Reillys are free to make statements opposing the pipeline, but the First Amendment does not bar the court from considering the statements as evidence of concerted action.

the Tree-sitters, and a video that clearly is from one of them. The page promotes the tree-sitting

that, at least since MVP gave notice to the Reillys that it wanted the Tree-sitters removed and full

access to its Easements, has resulted in violations of the court's prior order.

There are some facts that are in the Reillys' favor. For example, there is no evidence that

they helped design or build the tree stands or provided any materials for them. Instead, Mrs.

Reilly claims (although the court finds this difficult to believe)[7] that she did not have any idea

that the tree-sits would appear on her property until she noticed them at some point in February.

Another fact suggesting that the tree stands might not have been, at least at first, intended to

interfere with MVP's access, but just to make a statement, is Mrs. Reilly's testimony that the tree

stands were in place before the court entered its order granting immediate possession and

enjoining the Reillys from interfering. But the facts before the court also show that the Tree-

sitters have ascended and descended the tree stands repeatedly, including after the court's order.

And during that time, they have been provided shelter and access by the Reillys. Thus, even

subsequent to the entry of that order, the Reillys have continued to assist in the ways already

identified.

For all of these reasons, the court concludes that the Reillys have offered both material

assistance and encouragement to people who are interfering with MVP's ability to conduct its

construction activities in the Easements located on the Tract. As other courts have recognized,

similar conduct by persons subject to an injunction, which resulted in a clear violation by non-

parties, warranted contempt sanctions. *See, e.g.*, *Roe v. Operation Rescue*, 54 F.3d 133, 138–39

---

[7] In part, this is difficult to believe based on Mrs. Reilly's lack of credibility and her evasiveness at the hearing. Additionally, she said that some of the people staying in the tents and RV, some of whom were the Tree-sitters, are people she had met previously, had cell phone numbers for them, and who had previously asked permission to stay in the tents and RV. It is wholly implausible to the court that the same people would have asked to stay in tents and campers, but did not seek permission to erect structures on the Reillys' property or, at the very least notify or state their intent to the Reillys.

(3d Cir. 1995) (reversing district court where it failed to enter a contempt order against a party who, although he was not present and did not participate directly in a blockade that violated the injunction, gave a speech encouraging others to attend and helped to organize, publicize, and raise money to support the blockade); *see also Regal Knitwear*, 324 U.S. at 14 (explaining that defendants violate an order where they do so through non-party "aiders and abettors"). The third element is thus established.

As to the fourth element of its civil contempt claim, MVP presented clear evidence of harm from the violations. It offered a number of examples. MVP testified as to $450 it paid to have its security personnel deal with the presence of the Tree-sitters, including the travel time and time spent providing notice of MVP's motion. It also has incurred attorneys' fees in bringing and prosecuting the motion. There was also testimony that MVP incurred costs to survey the location of the tree stands to confirm that they were within the Easements (in the amount of $6,300). MVP would have to pay approximately $12,000 to remove the tree stands prior to the mechanical tree-clearing equipment, even assuming the Tree-sitters were out of the trees. If they were not out of the trees, it would cost at least $25,000 for one crew to skip around that property. Thus, the final element is established, too.

## D. Alleged Contempt of the John and Jane Doe Tree-sitters

With regard to the Tree-sitters themselves, the court cannot hold them in contempt at this time. One or more of the Tree-sitters *could* be bound as a non-party due to his or their active concert and participation with the Reillys. *See* Fed. R. Civ. P. 65(d) (stating that an injunction binds non-parties "who are in active concert or participation with parties); *see also, e.g.*, *Gucci Am., Inc. v. Weixing Li*, 768 F.3d 122, 137 (2d Cir. 2014) (recognizing that other circuits have permitted the exercise of jurisdiction over "nonparties who, with knowledge of an injunction,

15

intentionally aided in its violation"); *ClearOne Commc'ns, Inc., v. Bowers*, 651 F.3d 1200, 1215–16 (10th Cir. 2011) ("[A] district court may properly exercise personal jurisdiction over a nonparty for purposes of entering contempt orders, when the nonparty, with actual notice of an injunctive order issued by the district court, and in active concert or participation with a party, violates that order."); *S.E.C. v. Homa*, 514 F.3d 661, 673–75 (7th Cir. 2008); *Waffenschmidt v. MacKay*, 763 F.2d 711, 718–19 (5th Cir. 1985) ("We agree with the Second Circuit and hold that a court may assert jurisdiction over persons who, with knowledge of the court's orders, actively aid and abet an enjoined party.")

But there is insufficient evidence before the court as to who those Tree-sitters are and whether any one that is currently in a tree stand is the same individual who has received actual or constructive notice of both the court's prior order and the show cause order. Without evidence that any specific unidentified party currently in a tree stand has received adequate notice and had an opportunity to be heard, the court cannot hold that party in contempt. Accordingly, the court will deny MVP's motion without prejudice insofar as it seeks to hold John or Jane Doe in contempt.[8]

## E. Appropriate Remedy for the Reillys' Contempt

Having found the Reillys in contempt, the court has broad discretion to fashion an appropriate remedy to coerce compliance with the terms of its injunction. *Int'l Union, United Mine Workers of Am. v. Bagwell*, 512 U.S. 821, 828 (1994); *United States v. Darwin Constr. Co.*, 873 F.2d 750, 756 (4th Cir. 1989). If the court elects to impose a fine, the purpose of the fine can be compensatory and/or coercive. *United States v. United Mine Workers*, 330 U.S. 258, 303–04 (1947). Additionally, the court's order may include a period of time in which the

---

[8] Nothing in this order precludes MVP from pursuing other avenues available to it to achieve the removal of any Tree-sitter or Tree-sitters who remain in the Easement, such as state civil or criminal proceedings.

contemnor may purge herself of the contempt and avoid any penalties, before beginning to assess a daily fine. *See, e.g.*, *S.E.C. v. Dunlap*, 253 F.3d 768, 771 (4th Cir. 2001).

The ultimate remedy that MVP seeks is the ability to use and work in the Easements unimpeded, which will require the Tree-sitters to come down from (or be removed from) the tree stands. But that result is not entirely within the Reillys' control. Even if they stopped providing shelter and stopped encouraging, supporting, or contributing to the Facebook page to raise funds, a Tree-sitter might insist that he or she intends to remain in the tree stand and refuse to come down. Thus, the court cannot fairly impose a sanction designed to coerce that result. Instead, any sanction imposed must be compensatory and payable to MVP to offset a small portion of its losses. Accordingly, each of the Reillys is assessed a $1,000 fine, payable to MVP, for their contempt.

## III. CONCLUSION

As their counsel has described it, the Reillys are "unabashed about their opposition to MVP," and they have expressed their belief that the MVP project is ill-advised and a threat to their land, water, business, and way of life. That expression—whether through signs on their property, statements to the press, participation in all of the administrative processes before FERC and other state boards, or their participation in this lawsuit and others—is not challenged in this proceeding. Like many landowners, the Reillys have engaged in lawful attempts to prevent or stop the construction of the pipeline. But this court enjoined them from interfering or obstructing with MVP's access to or use of the Easements, and they were told that the Tree-sitters' presence was causing such interference. Afterward, the Reillys' continued actions in providing shelter and access from their property to those persons who are interfering with MVP's access to and use of its Easements, in conjunction with the chicken wire designed to interfere with tree-cutting,

crossed the line from legal oppositional conduct to a violation of the court's order.  As the court explained with regard to its prior opinion concerning the Terry family (a landowner and two tree-sitters on a different property who the court also found in contempt), the court understands that the Reillys and others are disappointed and frustrated with the situation and the results of their opposition thus far.  But they have resorted to actions that clearly violate this court's order and MVP's rights under it and that conduct constitutes contempt.

Even if their conduct is viewed as a form of civil disobedience intended to focus the public's attention or to express their opposition to the project, those who disobey valid orders of a court should be prepared to face the consequences of doing so.  *Maness*, 419 U.S. at 458–59 (1975) ("If a person to whom a court directs an order believes that order is incorrect the remedy is to appeal, but, absent a stay, he must comply promptly with the order pending appeal.  Persons who make private determinations of the law and refuse to obey an order generally risk . . . contempt even if the order is ultimately ruled incorrect.").  As Supreme Court Justice Felix Frankfurter ably expressed, "If one [person] can be allowed to determine for himself [or herself] what is law, every [person] can. That means first chaos, then tyranny."  *United States v. United Mine Workers of Am.*, 330 U.S. 258, 312 (1947) (Frankfurter, J., concurring).   Thus, the court will impose the sanctions described above on the Reillys.

MVP indicated a desire to recover attorneys' fees.  The court will entertain a separate motion for attorneys' fees, with supporting documentation, if filed not later than June 14, 2018.

An appropriate order will be entered.

Entered: May 15, 2018.

*/s/ Elizabeth K. Dillon*
Elizabeth K. Dillon
United States District Judge

18